David J. Smith                                                    June 16th, 2020
Clerk of Court
11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

If the court has already ruled against me then please consider this a Motion for Reconsideration.

I am trying to save my country by giving them information.

Godspeed

Sincerely,



20-11692-cc

David Andrew Christenson
Box 9063
Miramar Beach, Florida 32550
504-715-3086
davidandrewchristenson@gmail.com;
dchristenson6@hotmail.com;

U.S. COURT OF APPEALS
RECEIVED
CLERK
JUN 17 2020
ATLANTA, GA

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

David Andrew Christenson – Appellant (Movant)

United States
Plaintiff – Appellee

v.

Reality Winner
Defendant - Appellant

No. 20-11692 ⁓ C C
(Case: 1:17-oo034-JRH-BKE)

Motion for Leave to File Multiple Amicus Briefs which are attached

This case is critical to Mankind's survival. I have to find a way to show you that this one criminal case is actually a cataclysmic event. Please make the effort to help Reality Winner and myself save Mankind. This case is directly connected to me.

Censorship by the United States is why we are having the Pandemic and the associated calamities. The censorship is why mankind will cease to exist.

Our Government is Tyrannical. (President Lincoln was right; we will fall from within.)

The tyranny/cancer is systemic throughout our Government and all associated parties and that includes the attorneys.

Attachment 1: Email for FBI Special Agent Steven Rayes to me. This email was sent to me five months before Rayes had me arrested for cyberstalking him. The email is dated 10/18/10 and my arrest was 03/15/11. Why would the Violent Crime Task Force be involved with a Federal Whistleblower? Why was Rayes and the FBI trying to help me? Rayes was going to commit me if I did not stop my research. 1 page. See Attachment

Attachment 2: Sixteenth Amicus – Simplified version, which I could not invent, of how the Federal Government murdered Federal Whistleblower Coast Guard Commander William Goetzee – 10 pages Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 44 Entered on FLSD Docket 06/11/2020 Page 1 of 5
Case 1:20-cv-21108-UU Document 44-1 Entered on FLSD Docket 06/11/2020 Page 1 of 5

Attachment 3: We paid the Baker Donelson $5,000.00. The DOJ asked them to withdraw and they did. Reality Winner did not receive zealous representation. Two cause of action, VII and VIII. 3 letters to the judge and the complaint. 8 pages.

Attachment 4: Fifteenth Amicus – Documentation about how they murder Federal Whistleblowers, those of us that are trying to save Mankind. 100 pages.
Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 45 Entered on FLSD Docket 06/11/2020 Page 1 of 4
Case 1:20-cv-21108-UU Document 45-1 Entered on FLSD Docket 06/11/2020 Page 1 of 96

Attachment 5: Eighteenth Amicus – Perfect example of my being censored with the conclusion being the Genocide of Mankind. 15 pages.
Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 47 Entered on FLSD Docket 06/12/2020 Page 1 of 15

Attachment 6: Nineteenth Amicus – I am asking you, as a Federal Judge and an American, to review my arrest for cyberstalking an FBI Agent and tell our country if it was Constitutional. I was never charged with a crime. 32 pages.
Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 46 Entered on FLSD Docket 06/12/2020 Page 1 of 32

Attachment 7: Twentieth Amicus – U.S. Air Force Airman Reality Winner is a hero and should not be in prison. 4 of 15 pages.
Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 48 Entered on FLSD Docket 06/12/2020 Page 1 of 15

Attachment 8: Twenty-First Amicus – If I was wrong why would the Department of Justice go to such drastic lengths to CENSOR me? 16 pages.
Docketed in: Alters v. People's Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Mancusi Ungaro
Case 1:20-cv-21108-UU Document 49 Entered on FLSD Docket 06/16/2020 Page 1 of 16

Godspeed

Sincerely

David Andrew Christenson
Box 9063
Miramar Beach, Florida 32550
504-715-3086
davidandrewchristenson@gmail.com;
dchristenson6@hotmail.com;

CERTIFICATE OF SERVICE

I hereby certify that on June 16th, 2020, filed the foregoing with the Clerk of Court and served the pleading on all counsel of record by e-mail and first-class mail.

David Andrew Christenson

# Attachment 1

# RE: Madere

From: **Rayes, Steven P.** (Steven.Rayes@ic.fbi.gov)
**Sent: Mon 10/18/10 1:00 PM**
To: *'David* Christenson' (dchristenson6@hotmail.com); 16Steven Rayes (srayes@leo.gov); Martin,
Walter (USMS) (Walter.Martin2@usdoj.gov)

Mr. Christenson-

You really need to stop being paranoid. There is no plot and it's not some big conspiracy. *__However,__* __if__
__you keep up with this paranoia you're going to get yourself committed for evaluation.__ I'm trying to help
you the best I can, but you must give it sometime.

*Steve*

**Steven Rayes**
**Special Agent**
__New Orleans Violent Crime Task Force__
**Federal Bureau of Investigation**
*(504)* **8J6-33J9** *(w)*
*(504)* **329-9553** (c)

# Attachment 2

Alters v. Peoples Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Ungaro
Federal Court - 400 North Miami Avenue - Room 12-4 - Miami, Florida 33128
Movant David Andrew Christenson
June 9th, 2020

FILED BY _____ D.C.

JUN 1 1 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Sixteenth Amicus – Simplified version, which I could not invent, of how the Federal Government murdered Federal Whistleblower Coast Guard Commander William Goetzee

He was trying to save us by exposing the truth but instead he was censored via death.

How could the Supreme Court endorse this type of behavior knowing that the conclusion is the Genocide of Mankind?

The attached package was created on January 21st, 2017. The Goetzee family complaint for wrongful death was filed on July 23rd, 2012.

Filed in the following cases:

1. United States v. Boucher (1:18-cr-00004) District Court, W.D. Kentucky Judge Marianne O. Battani Federal Court - 231 W. Lafayette Blvd., Room 252 - Detroit, MI 48226
2. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Judge E. Sullivan Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001
3. United States v. Stone (1:19-cr-00018) District Court, District of Columbia Judge A. Jackson Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001
4. Greco v. Peoples Republic of China (5:20-cv-02235) District Court, E.D. Pennsylvania Judge Anita Blumstein Brody Federal Court - 601 Market Street - Philadelphia, PA 19106
5. Patella v. Peoples Republic of China (1:20-cv-00433-TDS-JEP) District Court, M.D. North Carolina Judge Thomas D. Schroeder Federal Court - 251 N. Main Street - Winston-Salem, NC 27101
6. Benitez-White v. Peoples Republic of China (4:20-cv-01562) District Court, S.D. Texas Judge Ewing Werlein Jr. Federal Court - 515 Rusk Street - Houston, TX 77002
7. State of Mississippi v. People's Republic of China (1:20-cv-00168-LG-RHW) District Court, S.D. Mississippi Judge Louis Guirola Jr. Federal Court - 2012 15th Street - Suite 814 - Gulfport, MS 39501
8. Azelea Woods of Ouachita v. Peoples Republic of China (3:20-cv-00457-TAD-KLH) District Court, W.D. Louisiana Judge Terry Alvin Doughty Federal Court - 201 Jackson Street - Suite 215 - Monroe, Louisiana 71201
9. Edwards v. Peoples Republic of China (2:20-cv-01393) District Court, E.D. Louisiana Hon N. V. Jolivette Brown Federal Court - 500 Poydras Street - New Orleans, LA 70130
10. State of Missouri v. Peoples Republic of China (1:20-cv-00099) District Court, E.D. Missouri Judge Stephen Limbaugh - Federal Court - 555 Independence Street - Cape Girardeau, MO 63703
11. Alters v. Peoples Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Ungaro Federal Court - 400 North Miami Avenue - Room 12-4 - Miami, Florida 33128
12. Bella Vista LLC v. The Peoples Republic of China (2:20-cv-00574) District Court, D. Nevada Judge James C. Mahan - Federal Court - 333 S. Las Vegas Blvd - Las Vegas, NV 89101

13. Buzz Photo v. Peoples Republic of China (3:20-cv-00656) District Court, N.D. Texas Judge Ed Kinkeade Federal Court - 1100 Commerce St. - Room 1625 - Dallas, Texas 75242

14. Cardiff Prestige Property, Inc. v. Peoples Republic of China (8:20-cv-00683) District Court, C.D. California Judge David O. Carter - Federal Court - 411 West Fourth St. - Courtroom 9D - Santa Ana, CA, 92701

15. Bourque CPA s & Advisors v. The Peoples Republic of China (8:20-cv-00597) District Court, C.D. California Judge R. Gary Klausner - Federal Court - 255 East Temple Street - Los Angeles, CA 90012

16. Aharon v. Chinese Communist Party (9:20-cv-80604) District Court, S.D. Florida Judge Roy K. Altman Federal Court - 299 East Broward Blvd. - Fort Lauderdale, Fl. 33301

17. Smith v. Chinese Communist Party (2:20-cv-01958) District Court, E.D. Pennsylvania Judge Anita B. Brody Federal Court - 601 Market Street - Philadelphia, PA 19106

18. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Judge John Gleeson Debevoise & Plimpton LLP - 919 Third Avenue - New York, New York 10022

19. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Attorney Beth Wilkinson - 2001 M Street N.W. - 10th Floor - Washington, D.C. 20036

20. United States v. Manning (1:19-dm-00012) District Court, E.D. Virginia Judge Anthony John Trenga Federal Court - 401 Courthouse Square - Alexandria, VA 22314

21. United States v. Snowden (1:19-cv-01197) District Court, E.D. Virginia Judge Liam O'Grady Federal Court - 401 Courthouse Square - Alexandria, VA 22314

22. United States v. Snowden (1:13-cr-265)) District Court, E.D. Virginia Senior Judge Claude M. Hilton Federal Court - 401 Courthouse Square - Alexandria, VA 22314

23. United States v. Winner (1:17-cr-00034) District Court, S.D. Georgia Judge James Randal Hall Federal Court - 600 James Brown Blvd. - Augusta, GA 30901

24. United States v. Assange (1:18-cr-00111) District Court, E.D. Virginia Senior Judge Claude M. Hilton Federal Court - 401 Courthouse Square - Alexandria, VA 22314

25. In re: Michael Flynn (20-5143) Court of Appeals for the D.C. Circuit Clerk Mark Langer U. S. Appeals Court D.C. - 333 Constitution Ave. N.W. - Washington D.C. 20001

26. In re: Reality Winner (20-11692) Court of Appeals for the 11th Circuit Clerk David Smith Appeals Court 11th Circuit - 56 Forsyth St., N.W. - Atlanta, Georgia 30303

27. Center for Democracy & Technology v. Trump (1:20-cv-01456) District Court, District of Columbia Judge Trevor Neil McFadden - Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001

28. McCarthy v. Pelosi (1:20-cv-01395-RC) District Court, District of Columbia Judge Rudolph Contreras - Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001

Godspeed

Sincerely,

David Andrew Christenson
Box 9063
Miramar Beach, Florida 32550
504-715-3086

davidandrewchristenson@gmail.com;
dchristenson6@hotmail.com;

### CERTIFICATE OF SERVICE

I hereby certify that on June 9th, 2020 I filed the foregoing with the Clerk of Court and served the pleading on all counsel of record by e-mail and first-class mail.

_____

David Andrew Christenson

I was never charged with a crime. Read the names and email address for the 74 people on the non-domestic stay away order. Two US Senators and the Director of the FBI.

I was arrested with a Louisiana Warrant but never charged with the misdemeanor of cyberstalking an FBI Agent that I was under orders to send emails to. 66 of the 74 people I never met, all I did was send emails to. I set a record for bond when they asked for $500,000.00 and got $300,000.00. After 11 days in isolation being medicated against my will I was granted release and ordered to seek treatment for an unknown illness in Florida. Read item 9 of the order. This was illegal and not a condition of bond. It allowed them to keep me on bond for a year without ever charging me with a crime. I was kept on bond for 21 days longer than the law allowed.

The DOJ murdered Federal Whistleblower Coast Guard Commander William Goetzee. They had him strapped to a wheel chair in Federal Court and where tasing him when he spoke.

Attached is the Goetzee family lawsuit. Start with page 18 paragraph 31 and then go and read the whole petition. What they did was reminiscent of what the Nazis did to the Jews.

1. I was there at the court house the day he was arrested. The DOJ, just like with me, lied to the press. He was exposing the truth about the BP Oil Spill.
2. The family did not sue anyone from the Federal Government. Why?
3. I was in the cell four months earlier and there was no toilet and no toilet paper.
4. The low-level US Marshals initially released him but when they realized he was handing out information about the spill, corexit and the Katrina Virus they had to silence him.
5. His office was in the Federal Court house and he was working with the EPA. His commanding Admiral would not even help him and his office was in the court house as well.
6. He had health insurance and the ability to hire an attorney.
7. The civil attorney and his Federal Public defender both represented me. They are puppets for the DOJ.
8. When they arrested, me they appointed US Attorney Billy Gibbens to represent me.
9. They succeeded where they failed with me.

This is the end of Mankind. When the Gulf of Mexico dies so do we.

Godspeed.
David Andrew Christenson
504-715-3086



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 JUL 23  PM 1: 03

LORETTA G. WHYTE
CLERK

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARGARET GOETZEE NAGLE and JOHN ERIC GOETZEE | * | CIVIL ACTION |
| | * | NUMBER: |
| VERSUS | * | SECTION: **12-1910** |
| SHERIFF MARLIN GUSMAN, DR. SAMUEL GORE, | * | JUDGE: **SECT. R MAG.2** |
| DR. CHARLES "MIKE" HIGGINS, DR. JOSE HAM, | * | MAGISTRATE: |
| MARY ANNE BENITEZ, DARRYL JACKSON, LPN WALLACE, S. PEMBO, S. BATISTE, DAVID SCHAIBLE, E. BARGKY, | * | CIVIL RIGHTS |
| C. JOHNSON, FNP, WARDEN CARLOS LOUQUE, HOD WATCH COMMANDERS JOHN DOES I and II, SGT. NICOLE HARRIS, SGT EVERETT MARSHALL, | * | |
| DEPUTY WILLIAM THOMPSON, DEPUTY MICHAEL WILLIAMS and | * | JURY TRIAL DEMANDED |
| DEPUTY SHELIA CRADER | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT

### I. INTRODUCTION

1.     This case involves the tragic death on August 7, 2011 of U.S. Coast

Guard Commander William ("Bill") Goetzee, a 48-year-old federal career civilian

1

Fee 350
Process
Dkid
CtRmDep
Doc. No.

employee of the U.S. Coast Guard and active member and Commander of the U.S. Coast Guard Reserves, who, while working in highly responsible and high-stress positions with the Coast Guard, including duties related to the BP oil spill, experienced a profound mental health crisis and breakdown. This breakdown manifested in a desperate attempt by Commander Goetzee to commit suicide on August 2, 2011 by attempting to grab the gun of a federal protective officer in order to kill himself. As a result of this dire crisis, Commander Goetzee was arrested, transported and placed in the custody of the defendants, all of whom had responsibility for his care and safety in his time of need.

2.     Instead of providing adequate, appropriate and necessary care and treatment to Commander Goetzee, the defendants failed in their professional duties and their legal obligations. Commander Goetzee was treated by the defendants in a callous, harsh and indifferent manner, resulting in his death by suicide in a barren cell on the tenth floor "mental health" unit of the House of Detention (HOD), an outmoded, dangerous and completely inadequate facility which, at all relevant times, was a critical part of the Orleans Parish Prison (OPP) complex and which was not a reasonable accommodation for a person suffering from Mr. Goetzee's illness and disability and in his condition. The OPP complex was operated and supervised by the Orleans Parish Sheriff's Office (OPSO), under the leadership of Sheriff Marlin Gusman, at all relevant times.

3.     Commander Goetzee was not properly diagnosed, treated or cared for

2

properly screen, evaluate or refer Mr. Goetzee for psychiatric evaluation, diagnosis or treatment. Defendant LPN Wallace failed to properly or adequately address Mr. Goetzee's report of recent suicidal thoughts, his need for medication, or his obvious physical injury.  Defendant LPN Wallace was aware, must have been aware, or should have been aware, that Mr. Goetzee was psychologically fragile, required psychiatric evaluation, intervention and review of his medication status, yet failed to take appropriate steps to insure that would occur.

30.     Despite Mr. Goetzee's condition, defendant LPN Wallace referred Mr. Goetzee for housing in "general population".  Defendant LPN Wallace knew, must have known or should have known, at Mr. Goetzee was at high risk of serious harm due to his disability and his medical condition and that the jail lacked adequate and appropriately trained staff and facilities to properly tend to Mr. Goetzee's medical needs or to provide reasonable accommodations for his disabilities. Yet she failed to take necessary and appropriate steps to insure that he was either referred to a hospital for treatment or for medical clearance as to the appropriateness of housing him at the jail, or, if to be admitted to the jail, that he was adequately and reasonably examined, housed and treated and afforded reasonable accommodation for his disability and his condition.

31.     Mr. Goetzee was booked into OPP and taken to Templeman V, the "federal tier". The following morning he appeared in federal court for a first appearance hearing. His medical and psychiatric condition had deteriorated overnight and he was

18

delusional, combative, disoriented and non-responsive. He had to be physically

restrained in a wheelchair. At some point he was tased. He had spent the night in the

jail with no medical treatment, no medication and no appropriate intervention or

accommodation for his condition, thereby aggravating and worsening his condition.

On information and belief, various deputies and other employees of the defendant

Sheriff, acting in the course and scope of their employment,  knew, must have known or

should have known that Mr. Goetzee was in serious need of medical attention, yet failed

to report or seek appropriate care for him during this time.

      32.    Mr. Goetzee was removed from federal court and returned to the jail,

where he received a "Psychiatric Nursing/MA Assessment" for the first time while in

custody, due to "suicidal ideation", and referred to University Hospital by defendant Dr.

Higgins, through a verbal order to defendant E. Bargky, LPN,  to "Rule Out Delirium".

By that time, he had blood pressure of 181/122, a pulse rate of 128, respiration rate of

20 and a temperature of 100.1. His allergy to prednisone was noted at this time, as was

the fact that he was without any medication.  His skin was warm and moist to touch. He

was described as oriented OX1, oriented as to name only, a marked deterioration of the

AAOX3 orientation described at Intake by defendant LPN Wallace. The Nurse Notes

completed by defendant Bargky identified his name as "William Wesley", despite the

booking information which gave his name as "Goetzee, William W." This error

regarding his name persisted through his hospitalization at University and when he

returned to the jail, causing confusion and inconsistencies in his medical treatment. He

and a "code" was called, and resuscitation efforts were initiated. During resuscitation efforts it was discovered that Mr. Goetzee had toilet tissue stuffed down his throat, blocking his airway. On information and belief, Mr. Goetzee had been given access to toilet paper, which was not otherwise provided in his cell, by OPP staff, including defendant nurses and deputies, which allowed him to collect a sufficient quantity of the paper so as to kill himself.

64.     Placing a prisoner on "Direct observation" under "Suicide watch" at HOD-10 required that the patient would be under continuous, direct supervision at all times. On August 7, 2011, defendant former deputy William Thompson was assigned to perform "direct observation" of William Goetzee. Deputy Thompson was to sit in a chair, outside Mr. Goetzee's cell, and watch him. He was to fill out, every fifteen minutes, an observation sheet of Mr. Goetzee's behavior and activities.

65.     The OPSO suicide watch procedures, using a checklist filled out by deputies, is a poorly designed, inadequately monitored procedure which fails to ensure adequate observation of suicidal prisoners and which facilitates the entry of false and/or misleading information. The defendants knew, must have known, or should have known that the practice of deputies failing to maintain direct, continuous observation of suicidal prisoners was widespread, as was falsification of these checklists. Yet the defendants failed to take appropriate or necessary steps to intervene or to ensure that direct, continuous observation by qualified, medically trained staff, with accurate and meaningful documentation of suicidal prisoners took place. In addition, medical

35

# Attachment 3

Honorable Robin M. Giarrusso                                    October 9th, 2007
Judge, Division "G"
Civil District Court for the Parish of Orleans
421 Loyola Avenue
Room 411
New Orleans, La. 70112
504-592-9345 Fax

     Re:   Renee Christenson and David Christenson v. Lee Madere, Jerrelyn Jessop
Madere and Les Carillons Condominium Association, Inc. Civil District Court for the
Parish of Orleans No. 2007-9243; Division "G-11".

Dear Judge Giarrusso,

Please allow us to file our "objection" to the "motion to withdraw" in the above
referenced matter as well as a request for a hearing. The following items should be noted
by the court in the interest of justice:

The law firm of Baker Donelson (BD) should have included with their motion the fact
that their clients would "object" to their "motion to with withdraw" and that a hearing
was requested. BD knew that their motion was opposed and should have disclosed that to
the court. M. David Kurtz acknowledged this fact in his letter addressed to you and
delivered by fax on October 8th, 2007.

There has not been appropriate service of the motion by BD. Service should be by first
class U.S. mail. M. David Kurtz certified that he served a copy to us on October 5th, 2007
via e-mail. This did not happen. M. David Kurtz has acknowledged this fact.

Our lawsuit was filed on August 24th, 2007. 24 days later BD informed us that they
would withdraw. We had retained BD in October, 2006 (one year).

We hope and pray that the court will allow us to be heard so that we may present
substantial evidence as to why BD should not be allowed to withdraw.

<u>Allowing BD to withdraw will cause us irreparable harm and will possible place us in a
life threatening situation.</u>

                                              Sincerely,

                                              David Christenson
                                              842 Camp Street
                                              Unit 4
                                              New Orleans, La. 70130
                                              504-715-3086

Honorable Robin M. Giarrusso                                    October 17th, 2007
Judge, Division "G"
Civil District Court for the Parish of Orleans
421 Loyola Avenue
Room 411
New Orleans, La. 70112
504-592-9345 Fax

    Re:    Renee Christenson and David Christenson v. Lee Madere, Jerrelyn Jessop
Madere and Les Carillons Condominium Association, Inc. Civil District Court for the
Parish of Orleans No. 2007-9243; Division "G-11".

Dear Judge Giarrusso,

Please place this letter and the proceedings under seal.

This is a very complex and bizarre civil case. The following are just a few points that
need to be elaborated on within the confines of a hearing.

In October, 2006 we provided full disclosure to the Baker Donelson (BD) law firm
concerning our financial condition and the bizarre nature of the case. BD accepted us as
clients and agreed to zealously represent us. We do not have the financial ability to retain
new counsel. Our living situation is very dangerous. The loss of counsel will increase the
volatility and the harassment that we suffer at the hands of the defendants.

We purchased a condo from the defendants on February 27th, 2006. That was 20 months
ago and our condo and the condo complex are still not complete. The market value of our
condo has decreased $50,000.00 (purchased for $275,000.00).

We provided punch lists, letters and hired BD to protect our interests against the
developer. I wrote over 10 letters, over four months, to the New Orleans Police
department complaining of threats by the defendant and called 911. The defendant Lee
Madere is an attorney who knows how to manipulate the system and he had me arrested
for simple battery. He knew that by doing so that it would harm my civil case. I have
been declared indigent and appointed a team of public defenders.

This is only the tip of the iceberg. Allowing BD to withdraw now will irreparably harm
my wife and me.

                                            Sincerely,

                                            David Christenson
                                            842 Camp Street
                                            Unit 4
                                            New Orleans, La. 70130
                                            504-715-3086

Honorable Robin M. Giarrusso                                          November 8, 2007
Judge, Division "G"
Civil District Court for the Parish of Orleans
421 Loyola Avenue
Room 411
New Orleans, La. 70112
504-592-9345 Fax

    Re:    Renee Christenson and David Christenson v. Lee Madere, Jerrelyn Jessop
Madere and Les Carillons Condominium Association, Inc. Civil District Court for the
Parish of Orleans No. 2007-9243; Division "G-11".

# Please place this letter "under seal"

Dear Judge Giarrusso,

The Baker Donelson firm has ceased to represent us in all matters without your approval.
It is hard for me to believe that they can ethical or legally do this. We are suffering
irreparable harm because of their inactions.

Before Baker Donelson filed their motion to withdraw but after they filed the lawsuit they
were sent the attached letter that shows that a lien was filed against us for $7,700.00 for
49 days of fines. Pictures are provided. This lien was and is a result of our wanting our
condo and the condo complex completed. It is a part of the bizarre harassment that we
receive on a daily basis. Please note the fine for window sheers. We have curtains and
shutters already installed. Baker Donelson has assured us that the fines and the lien are
illegally and unenforceable but yet they have not taken the necessary steps to protect us.
Lee Madere, the developer, has a voyeurism problem. He has continued to harass us and
photograph us in our condo using both his cell phone and a digital camera. As a side note
he is being sued by the Catholic Church for video voyeurism. I have attached an e-mail
that I sent to Baker Donelson asking them to serve the lawsuit on September 12th, 2007
and to add a third part that protects us from the liens. I have repeatedly asked them to
serve the lawsuit and they have not. The motion to withdraw was filed on October 8th,
2007. It can be proven that Christopher Utley the attorney that wrote the Lien Affidavit
lied in the Affidavit.

Over the last year Baker Donelson was to prepare and file a lawsuit that covered "breach
of contract, fraud, and other issues/actions" but has chosen not to. I have attached a copy
of the "Louisiana Residential Property Disclosure". Item 35 asks: Is there any pending
litigation regarding the property? This disclosure item is our strongest legal position. It
can be proven without a doubt that Lee Madere, the developer and owner, has breached
his contract with us. We paid $275,000.00 for our condo. Lee Madere is asking 1.8
million dollars for the last condo. This condo represents most of his wealth.

Our filing a $10,000,000.00 lawsuit is not to win the money but to get our condo and the
condo complex completed and to allow us to live in peace. All of my communications

with Baker Donelson have expressed this. A reasonable lawsuit with substantial damages is the victory. Lee Madere would have to disclose such a lawsuit and the liability that a potential buyer would assume. His condo represents half of the association. Would any potential buyer assume a 5 million dollar risk? This legal tactic is to get him to honor his contract and to leave us to live in peace.

Sincerely,

David Christenson
842 Camp Street
Unit 4
New Orleans, La. 70130
504-715-3086

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO.                                                                                    DIVISION "    "

**RENEE CHRISTENSON AND DAVID CHRISTENSON**

**VERSUS**

**LEE MADERE, JERRELYN JESSOP MADERE**
**AND LES CARILLONS CONDOMINIUM ASSOCIATION, INC.**

FILED: _____                    _____

                                                            **DEPUTY CLERK**

**PETITION**

NOW INTO COURT, through undersigned counsel, come plaintiffs, Renee Christenson and David Christenson (the "Christensons"), and, in support of their petition, respectfully aver as follows:

I.

Made defendants herein are Lee Madere and Jerrelyn Jessop Madere (the "Maderes"), persons of the age of majority who reside in the Parish of Orleans.

II.

Made defendant herein is Les Carillons Condominium Association, Inc. (the "Association"), a non-profit corporation with its principal place of business and domicile in New Orleans, Louisiana.

III.

By an Act of Cash Sale dated February 27, 2006, the Christensons purchased from Lee Madere and Jerrelyn Madere a certain condominium unit known as Unit 4 of the Les Carillons Condominium, which is located at 842 Camp Street, New Orleans, Louisiana 70130, together with its appurtenant interest in the common areas (the "Property").

1

IV.

As owners of the Property, the Christensons are members of the Association.

V.

As declarants, the Maderes currently control the Association. The Association, in turn, administers and operates the Les Carillons Condominium.

VI.

The common areas of the Les Carillons Condominium include a pool room. As owners of the Property and members of the Association, the Christensons have the right to access and store materials in the pool room.

VII.

The Maderes, acting individually and/or on behalf of the Association, have denied the Christensons access to the pool room by changing the locks. Despite repeated requests, the Maderes have refused to allow the Christensons back into the pool room. Moreover, by denying the Christensons access to the pool room, the Maderes have prevented the Christensons from accessing and enjoying certain personal property stored therein.

VIII.

As members of the Association, the Christensons are entitled by law to review all financial and other records of the Association. Despite repeated requests, including by letters dated March 13, May 21 and June 8, 2007, the Association and/or the Maderes have refused to produce any financial records other than a few summary pages. By so refusing, the Association violated its obligations under applicable law, and the Maderes breached their obligations as declarants exercising the authority of the Board of the Association.

WHEREFORE, Renee and David Christenson respectfully pray:

2

1)    That this Petition be deemed good and sufficient, that Lee Madere, Jerrelyn Madere and Les Carillons Condominium Association be duly served with a copy of this Petition in accordance with law and that they be duly cited to appear and answer same;

2)    That the Court enter a judgment herein in favor of the Christensons, and against Lee Madere, Jerrelyn Madere and Les Carillons Condominium Association, enjoining them from interfering with the Christensons' access to common areas of the Les Carillons Condominium Association, and further enjoining them from interfering with the Christensons' right to access personal property stored in such common areas;

3)    That the Court issue a writ of mandamus requiring the Les Carillons Condominium Association to immediately produce to the Christenson all financial records relating to the Association; and

4)    For all other legal and/or equitable relief that this Court deems appropriate.

NO MDK 152814 v1
2905103-000001

Attachment 4

Alters v. Peoples Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Ungaro
Federal Court - 400 North Miami Avenue - Room 12-4 - Miami, Florida 33128
Movant David Andrew Christenson
June 9th, 2020

Fifteenth Amicus – Documentation about how they murder Federal Whistleblowers, those of us that are
trying to save Mankind.

➢ The Plaintiffs have to disprove me and the fact that it was the United States that created and is
responsible for the Pandemic. The Complaint is frivolous and the Chinese know that. Governments are gambling with our lives in some stupid high stakes game of poker.

➢ Censorship is allowing them to murder us.

FILED BY _____ D.C.

JUN 1 1 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**Read the Goetzee family complaint and you will think that it was written by a Jew in a Nazi Concentration Camp.**

How could the Supreme Court deny my Extraordinary Writ of Mandamus and Prohibition?

No Government or Civilization has survived and neither will ours. Censorship will destroy us.

I pray you make the effort to read the documentation. Mankind deserves a fighting chance.

Filed in the following cases:

1. United States v. Boucher (1:18-cr-00004) District Court, W.D. Kentucky Judge Marianne O.
   Battani Federal Court - 231 W. Lafayette Blvd., Room 252 - Detroit, MI 48226
2. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Judge E. Sullivan
   Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001
3. United States v. Stone (1:19-cr-00018) District Court, District of Columbia Judge A. Jackson
   Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001
4. Greco v. Peoples Republic of China (5:20-cv-02235) District Court, E.D. Pennsylvania Judge Anita
   Blumstein Brody Federal Court - 601 Market Street - Philadelphia, PA 19106
5. Patella v. Peoples Republic of China (1:20-cv-00433-TDS-JEP) District Court, M.D. North Carolina
   Judge Thomas D. Schroeder Federal Court - 251 N. Main Street - Winston-Salem, NC 27101
6. Benitez-White v. Peoples Republic of China (4:20-cv-01562) District Court, S.D. Texas Judge
   Ewing Werlein Jr. Federal Court - 515 Rusk Street - Houston, TX 77002
7. State of Mississippi v. People's Republic of China (1:20-cv-00168-LG-RHW) District Court, S.D.
   Mississippi Judge Louis Guirola Jr. Federal Court - 2012 15th Street - Suite 814 - Gulfport, MS
   39501
8. Azelea Woods of Ouachita v. Peoples Republic of China (3:20-cv-00457-TAD-KLH) District Court,
   W.D. Louisiana Judge Terry Alvin Doughty Federal Court - 201 Jackson Street - Suite 215 -
   Monroe, Louisiana 71201

9. Edwards v. Peoples Republic of China (2:20-cv-01393) District Court, E.D. Louisiana Hon N. V. Jolivette Brown Federal Court - 500 Poydras Street - New Orleans, LA 70130

10. State of Missouri v. Peoples Republic of China (1:20-cv-00099) District Court, E.D. Missouri Judge Stephen Limbaugh - Federal Court - 555 Independence Street - Cape Girardeau, MO 63703

11. Alters v. Peoples Republic of China (1:20-cv-21108) District Court, S.D. Florida Judge Ursula Ungaro Federal Court - 400 North Miami Avenue - Room 12-4 - Miami, Florida 33128

12. Bella Vista LLC v. The Peoples Republic of China (2:20-cv-00574) District Court, D. Nevada Judge James C. Mahan - Federal Court - 333 S. Las Vegas Blvd - Las Vegas, NV 89101

13. Buzz Photo v. Peoples Republic of China (3:20-cv-00656) District Court, N.D. Texas Judge Ed Kinkeade Federal Court - 1100 Commerce St. - Room 1625 - Dallas, Texas 75242

14. Cardiff Prestige Property, Inc. v. Peoples Republic of China (8:20-cv-00683) District Court, C.D. California Judge David O. Carter - Federal Court - 411 West Fourth St. - Courtroom 9D - Santa Ana, CA, 92701

15. Bourque CPA s & Advisors v. The Peoples Republic of China (8:20-cv-00597) District Court, C.D. California Judge R. Gary Klausner - Federal Court - 255 East Temple Street - Los Angeles, CA 90012

16. Aharon v. Chinese Communist Party (9:20-cv-80604) District Court, S.D. Florida Judge Roy K. Altman Federal Court - 299 East Broward Blvd. - Fort Lauderdale, Fl. 33301

17. Smith v. Chinese Communist Party (2:20-cv-01958) District Court, E.D. Pennsylvania Judge Anita B. Brody Federal Court - 601 Market Street - Philadelphia, PA 19106

18. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Judge John Gleeson Debevoise & Plimpton LLP - 919 Third Avenue - New York, New York 10022

19. United States v. Flynn (1:17-cr-00232) District Court, District of Columbia Attorney Beth Wilkinson - 2001 M Street N.W. - 10th Floor - Washington, D.C. 20036

20. United States v. Manning (1:19-dm-00012) District Court, E.D. Virginia Judge Anthony John Trenga Federal Court - 401 Courthouse Square - Alexandria, VA 22314

21. United States v. Snowden (1:19-cv-01197) District Court, E.D. Virginia Judge Liam O'Grady Federal Court - 401 Courthouse Square - Alexandria, VA 22314

22. United States v. Snowden (1:13-cr-265)) District Court, E.D. Virginia Senior Judge Claude M. Hilton Federal Court - 401 Courthouse Square - Alexandria, VA 22314

23. United States v. Winner (1:17-cr-00034) District Court, S.D. Georgia Judge James Randal Hall Federal Court - 600 James Brown Blvd. - Augusta, GA 30901

24. United States v. Assange (1:18-cr-00111) District Court, E.D. Virginia Senior Judge Claude M. Hilton Federal Court - 401 Courthouse Square - Alexandria, VA 22314

25. In re: Michael Flynn (20-5143) Court of Appeals for the D.C. Circuit Clerk Mark Langer U. S. Appeals Court D.C. - 333 Constitution Ave. N.W. - Washington D.C. 20001

26. In re: Reality Winner (20-11692) Court of Appeals for the 11th Circuit Clerk David Smith Appeals Court 11th Circuit - 56 Forsyth St., N.W. - Atlanta, Georgia 30303

27. Center for Democracy & Technology v. Trump (1:20-cv-01456) District Court, District of Columbia Judge Trevor Neil McFadden - Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001

28. McCarthy v. Pelosi (1:20-cv-01395-RC) District Court, District of Columbia Judge Rudolph Contreras - Federal Court - 333 Constitution Ave. N.W. - Washington D.C. 20001

Godspeed

Sincerely,

David Andrew Christenson
Box 9063
Miramar Beach, Florida 32550
504-715-3086
davidandrewchristenson@gmail.com;
dchristenson6@hotmail.com;

CERTIFICATE OF SERVICE

I hereby certify that on June 9th, 2020 I filed the foregoing with the Clerk of Court and served the pleading on all counsel of record by e-mail and first-class mail.

David Andrew Christenson



Money Back Guarantee to U.S., select APO/FPO/DPO, and select International destinations. See DMM and IMM at pe.usps.com over complete details.
Money Back Guarantee for U.S. destinations only.   × For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.

No. 14-10077
Title:                In Re David Andrew Christenson, Petitioner
                      v.

Docketed:             June 4, 2015

~~~Date~~~ ~~~~~~~Proceedings and Orders~~~~~~~~~~~~~~~~~~~~~

Jun 1 2015    Petition for a writ of mandamus and/or prohibition and motion for leave to proceed in forma pauperis filed.
              (Response due July 6, 2015)

Jun 30 2015   Supplemental brief of petitioner filed.

Jul 2 2015    Waiver of right of respondent United States to respond filed.

Jul 6 2015    Second supplemental brief of petitioner filed. (Distributed)

Jul 9 2015    DISTRIBUTED for Conference of September 28, 2015.

Jul 13 2015   Third supplemental brief of petitioner filed. (Distributed)

Jul 30 2015   Fourth Supplemental brief of petitioner filed. (Distributed)

Aug 3 2015    Fifth supplemental brief of petitioner filed. (Distributed)

Aug 8 2015    Sixth supplemental brief of petitioner filed. (Distributed)

Aug 19 2015   Seventh supplemental brief of petitioner filed. (Distributed)

Aug 21 2015   Eighth supplemental brief of petitioner filed. (Distributed)

Aug 28 2015   Ninth supplemental brief of petitioner filed. (Distributed)

Aug 31 2015   Tenth supplemental brief of petitioner filed. (Distributed)

Sep 1 2015    Eleventh supplemental brief of petitioner filed. (Distributed)

Sep 2 2015    Twentieth supplemental brief of petitioner filed. (Distributed)

Sep 3 2015    Thirteenth supplemental brief of petitioner filed. (Distributed)

Sep 5 2015    Fourteenth supplemental brief of petitioner filed. (Distributed)

Sep 8 2015    Fifteenth supplemental brief of petitioner filed. (Distributed)

Sep 9 2015    Sixteenth supplemental brief of petitioner filed. (Distributed)

Oct 5 2015    Petition DENIED.

Oct 5 2015    Petition for Rehearing filed.

Oct 14 2015   DISTRIBUTED for Conference of October 30, 2015.

Nov 2 2015    Rehearing DENIED.

| ~~Name~~~~~~~~~~~~~~~~~~~~~ | ~~~~~~~Address~~~~~~~~~~~~~~~~~~ | ~~Phone~~~ |
|---|---|---|
| **Attorneys for Petitioner:** | | |
| David Andrew Christenson | P.O. Box 9063 | (504) 715-3086 |
| | Miramar Beach, FL 32550 | |
| Party name: | | |
| **Attorneys for Respondent:** | | |
| Donald B. Verrilli Jr. | Solicitor General | (202) 514-2217 |
| | United States Department of Justice | |

950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
SupremeCtBriefs@USDOJ.gov

Party name: United States

14-10077
August 19th, 2015
Supplemental Eight
Coast Guard Commander William Goetzee was Murdered by the Department of Justice
Extraordinary Writ with Writ of Prohibition and Writ of Mandamus
Filed May 22nd, 2015

Coast Guard Commander William Goetzee was Murdered by the Department of Justice. The same process was used on me four months prior. When you read the complaint you will think you are in Nazi Germany.

Notice that the Goetzee family did not sue the Federal Government. Why? He was arrested on a Federal Warrant and held in Federal custody. The complaint was filed in Federal Court.

Everything the Department of Justice put in the public domain was a lie.

I was never charged with a crime. I was arrested on a Louisiana Warrant and not Federal. Why? 11 days in isolation being medicated against my will. Having a 9mm put to my forehead by an FBI Agent who threatened to kill me if I did not stop. He bragged about how he would get away with it and I knew that he was right. Stupid me for believing in the oath that I took.

Attachments

A1 Page 18 and 19, item 31, of the Goetzee family complaint. The Coast Guard Commander was strapped to a wheelchair in Federal Court and tased. The entire complaint is A5.

A2 Letter drafted (2011) by me about "The Murder of Coast Guard Commander William Goetzee" and the background between us. The entire package is A4.

A3 Letter drafted by me on 08/09/2011 to Chief Justice John Roberts. This letter is part of A4.

A4 16 pages. "The Murder of Coast Guard Commander William Goetzee"

A5 66 pages. The Goetzee family Federal Complaint.

The Supreme Court of the United States of America has granted authority to the Department of Justice to execute and assassinate Americans who are exercising their Constitutional Rights, especially Federal Whistleblowers such as me.

All Americans deserve the protection of the Supreme Court.

Is this really the world that the Supreme Court wants?

Sincerely filed,
In Proper Person and Pro Se,


David Andrew Christenson
Box 9063
Miramar Beach, Fl. 32550
504-715-3086, davidandrewchristenson@hotmail.com

CERTIFICATE OF SERVICE

I hereby certify that on August 19th, 2015 I filed the foregoing with the Clerk of Court and
served the pleading on all counsel of record by e-mail including:

Solicitor General Donald B. Verrilli Jr.

Counsel of Record United States Department of Justice

950 Pennsylvania Avenue, N.W.

Washington, DC 20530-0001

SupremeCtBriefs@USDOJ.gov, (202) 514-2217

_____

David Andrew Christenson

properly screen, evaluate or refer Mr. Goetzee for psychiatric evaluation, diagnosis or treatment. Defendant LPN Wallace failed to properly or adequately address Mr. Goetzee's report of recent suicidal thoughts, his need for medication, or his obvious physical injury.  Defendant LPN Wallace was aware, must have been aware, or should have been aware, that Mr. Goetzee was psychologically fragile, required psychiatric evaluation, intervention and review of his medication status, yet failed to take appropriate steps to insure that would occur.

30.     Despite Mr. Goetzee's condition, defendant LPN Wallace referred Mr. Goetzee for housing in "general population".  Defendant LPN Wallace knew, must have known or should have known, at Mr. Goetzee was at high risk of serious harm due to his disability and his medical condition and that the jail lacked adequate and appropriately trained staff and facilities to properly tend to Mr. Goetzee's medical needs or to provide reasonable accommodations for his disabilities. Yet she failed to take necessary and appropriate steps to insure that he was either referred to a hospital for treatment or for medical clearance as to the appropriateness of housing him at the jail, or, if to be admitted to the jail, that he was adequately and reasonably examined, housed and treated and afforded reasonable accommodation for his disability and his condition.

31.     Mr. Goetzee was booked into OPP and taken to Templeman V, the "federal tier".  The following morning he appeared in federal court for a first appearance hearing. His medical and psychiatric condition had deteriorated overnight and he was

18

delusional, combative, disoriented and non-responsive. He had to be physically restrained in a wheelchair. At some point he was tased. He had spent the night in the jail with no medical treatment, no medication and no appropriate intervention or accommodation for his condition, thereby aggravating and worsening his condition. On information and belief, various deputies and other employees of the defendant Sheriff, acting in the course and scope of their employment, knew, must have known or should have known that Mr. Goetzee was in serious need of medical attention, yet failed to report or seek appropriate care for him during this time.

32.     Mr. Goetzee was removed from federal court and returned to the jail, where he received a "Psychiatric Nursing/MA Assessment" for the first time while in custody, due to "suicidal ideation", and referred to University Hospital by defendant Dr. Higgins, through a verbal order to defendant E. Bargky, LPN, to "Rule Out Delirium". By that time, he had blood pressure of 181/122, a pulse rate of 128, respiration rate of 20 and a temperature of 100.1. His allergy to prednisone was noted at this time, as was the fact that he was without any medication. His skin was warm and moist to touch. He was described as oriented OX1, oriented as to name only, a marked deterioration of the AAOX3 orientation described at Intake by defendant LPN Wallace. The Nurse Notes completed by defendant Bargky identified his name as "William Wesley", despite the booking information which gave his name as "Goetzee, William W." This error regarding his name persisted through his hospitalization at University and when he returned to the jail, causing confusion and inconsistencies in his medical treatment. He

The Murder of Coast Guard Commander William Goetzee

My background

I was held on the 10th floor of the House of Detention in the Orleans Parish Jail. This is the psychiatric floor. Suicidal prisoners are held here. In my case (not suicidal) I was placed in isolation and medicated against my will and knowledge. This was torture. The Federal Government was hoping that I would kill myself. The conditions are deplorable. The lights are on 24 hours a day. The noise from the fans and televisions is deafening. If you are not crazy when you go in, you are when you come out. I stopped eating and drinking. The only thing I consumed was water. The drugs they give you can actually trigger a psychosis, depression, etc. The "suicide watch" cell has nothing in it but a bench. There is no toilet. There is no toilet paper. When you are on suicide watch you wear a kevlar type vest that goes from your shoulders to your knees and nothing else. There was a young black kid in the "suicide watch" cell while I was there. He continually defecated on himself and the stench was unbelievable. Nobody helped him. I worried about him and I wonder what happened to him.

The Federal Government did everything possible to paint me as crazy and to discredit me. They have done the same to Commander Goetzee. I believe the story about Goetzee and his arrest was a fraud, a fabrication. The Federal Government wanted to isolate and silence Commander Goetzee. He was murdered. I was lucky.

Attachment 1: Coast Guard Commander William Wesley Goetzee's Obituary.

Commander Goetzee had quite a background. He was not indigent. I would assume he had health insurance as he was an employee of the Federal Government. He worked in the same building as the Federal Courthouse, US Attorney, US Marshal's office, etc. There was extremely heavy security at the building that day because of the Danziger Bridge Trial.

Attachment 2: Article.

Commander Goetzee "reported episodes of suicidal ideation...". The man needed help. What medication was he being forced to take? I could not invent this. The Federal Government, US Marshal Service, places Federal suicidal prisoners in a jail that was condemned in 2009 by the Justice Department. "The Justice Department criticized the mental health care provided by the institution, including its suicide-prevention practices." Why was Commander Goetzee appointed a Federal Public Defender? He was a person of means. The Department of Justice wanted to control him just like they did me when they appointed US Attorney Billy Gibbens to represent me.

Attachment 3: Article.

Could you invent this? "Investigators say Goetzee had been swallowing toilet tissue throughout the day". Are you kidding me?

Attachment 4: Article.

See the last page, 3. "Margaret Nagel, his sister, said that after his arrest, she was unable to get any information about his condition or even where he was being held." It is important to note that the Coast Guard provided official notification of Commander Goetzee's death. This notification was improper unless he died during active duty. This was very odd and suspicious. By law The US Marshal Service should have provided notification since he was in their custody. Note that he was working on the BP oil spill.

Attachment 5.

Court document: detention hearing. Why was Commander Goetzee not at his detention hearing? Why did he not have private counsel. He had been charged and had not entered a plea. The Federal Government wanted him isolated. The man needed help and had the resources. Commander Goetzee was entitled to bond and should have been released within 72 hours. His family and fiancée could have helped him. Why did his peers in the Coast Guard not help him? They worked with him for 10 years. (Truth about the BP oil spill?)

Attachment 6.

Again could you invent the truth? Review the second page. He did not want to cause harm to anyone but himself. Goetzee exclaimed "I want to kill myself, give me your gun." Was he crying out for help or was this an attempt to discredit him? Do you know how hard it is to take a gun from a man sitting down in a car?

Attachment 7.

An email from me to multiple Federal Courts in the Eastern District of Louisiana.

Attachment 8.

Letter/Fax to the United States Supreme Court. I have only included one of the many letters that I wrote to the Supreme Court.

Sincerely,
David Christenson
"The Reluctant Patriot"

Chief Judge John Roberts
Judge Steven Breyer
Marshal Pamela Talkin
United States Supreme Court
1 First Street NE
Washington, DC. 20543
202-479-3000

08/09/2011
Arrested 03/15/2011

FAX
202-479-2971
6 pages.

This further incriminates the Supreme Court.

The Department of Justice and the Federal Courts killed/murdered William Goetzee. **The man needed help**. Read the attached newspaper article. Mr. Goetzee was not present at his own detention hearing on August 5th, 2011. Why? See attachment. Why did Public Defender Sam Scillitani not get his client help? What help could he have possible received in the Orleans Parish Jail? He was on suicide watch.

Why was the minute entry not posted until 08/09/2011?

Here is a perfect example of how bizarre my life is. Virginia Schlueter is the chief public defender for the Eastern District of Louisiana. She was Mr. Goetzee's attorney. Ms. Schlueter represented me a few years back on a civil contempt charge. The Supreme Court was connected and had full knowledge. Ms. Schlueter is a despicable person and a puppet for the Department of Justice. I have firsthand knowledge of this fact. I wrote numerous complaints but got nowhere. Based on what I have read in the court record, newspapers and my own experiences I believe Mr. Goetzee would be alive today if it were not for the criminal actions of Ms. Schlueter.

Sincerely,

David Christenson
842 Camp Street
Unit 4
New Orleans, La. 70130
504-715-3086
504-529-3455 Fax

MINUTE ENTRY
KNOWLES, M.J.
AUGUST 5, 2011

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                       NO. 11-93

WILLIAM GOETZEE                              SECTION: MAG

A detention hearing was set this date before Magistrate Judge Daniel E. Knowles, III.

PRESENT:     Frederick Veters, Asst. U.S. Attorney
             Sam Scillitani, Counsel for the defendant

Mr. Scillitani requested that this matter be continued for reasons stated on the record.

There was no objection by the Government.

Good cause shown, **IT IS ORDERED** that the detention hearing is **CONTINUED to be**

reset on motion of defendant..

DANIEL E. KNOWLES, III, U.S. MAGISTRATE

JUDGE

CLERK TO NOTIFY:
U.S. ATTORNEY, PRE-TRIAL SERVICES,
U.S. MARSHAL, ATTORNEY FOR DEFENDANT,
DEFENDANT

MJSATR:  00:02

SINGLE

## U. S. District Court
## Eastern District of Louisiana (New Orleans)
## CRIMINAL DOCKET FOR CASE #: 2:11-mj-00093-DM-1

Case title: USA v. Goetzee                          Date Filed: 08/02/2011

Assigned to: Magistrate Duty
Magistrate

**Defendant (1)**

**William Goetzee**                    represented by **Virginia Laughlin Schlueter**
                                                      Federal Public Defender (New Orleans)

                                                      Hale Boggs Federal Building
                                                      500 Poydras St.
                                                      Room 318
                                                      New Orleans, LA 70130
                                                      504-589-7930
                                                      Email: Virginia_Schlueter@fd.org
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Public Defender
                                                      Appointment*

**Pending Counts**                     **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                  **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                         **Disposition**

18:111 & 18:1114 ASSAULT ON A
FEDERAL OFFICER

**Plaintiff**

**USA**                                represented by **Frederick William Veters , Jr.**
                                                      U. S. Attorney's Office (New Orleans)
                                                      650 Poydras St.
                                                      Suite 1600
                                                      New Orleans, LA 70130
                                                      504-680-3073
                                                      Email: frederick.veters@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2011 | 1 | COMPLAINT signed by Magistrate Judge Daniel E. Knowles, III as to William Goetzee (1). (Attachments: # 1 Crim Mag Sheet) (gbw, ) (Entered: 08/04/2011) |

| 08/02/2011 | 2 | Arrest Warrant Issued by Magistrate Judge Daniel E. Knowles, III as to William Goetzee. (gbw, ) (Entered: 08/04/2011) |
|---|---|---|
| 08/02/2011 | 4 | Warrant Executed with Arrest of William Goetzee executed on 8/2/2011. (gbw, ) (Entered: 08/05/2011) |
| 08/03/2011 | 3 | Minute Entry for proceedings held before Magistrate Judge Daniel E. Knowles, III: Initial Appearance as to William Goetzee held on 8/3/2011. FPD appointed. Defendant remanded. Detention Hearing set for 8/5/2011 10:00 AM before Magistrate Duty Magistrate. Preliminary Hearing set for 8/17/2011 02:00 PM before Magistrate Duty Magistrate. (gbw, ) (Entered: 08/04/2011) |
| 08/03/2011 | 5 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to William Goetzee.. Signed by Magistrate Judge Daniel E. Knowles, III on 8/3/2011. (gbw, ) (Entered: 08/05/2011) |
| 08/05/2011 | 6 | Minute Entry for proceedings held before Magistrate Judge Daniel E. Knowles, III:Detention Hearing was set this date. ORDERED that the detention hearing is CONTINUED to be reset on motion of defendant.(Court Reporter Magistrate Clerical.) (plh, ) (Entered: 08/09/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/09/2011 09:08:29 | | |
| **PACER Login:** rc1902 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** 2:11-mj-00093-DM |
| **Billable Pages:** 2 | **Cost:** | 0.16 |



# Inmate on suicide watch dies

### Guard accused of leaving post at jail

**By Laura Maggi**
Staff writer

A federal inmate who expressed his desire to kill himself just moments before his arrest committed suicide at the Orleans Parish jail Sunday night,

according to a news release from Sheriff Marlin Gusman issued late Monday.

William Goetzee, 48, was arrested Aug. 2 outside federal court after he tried to match a gun from a federal security officer. During the attempt to get the gun, he told the officer he wanted to kill himself.

Gusman's news release states that Goetzee was initially evaluated at the Interim LSU Public Hospital before being placed on the sheriff's office psychiatric

tier and put on suicide watch. That tier is on the 10th floor of the jail's House of Detention.

Marc Ehrhardt, a spokesman for Gusman, said that when somebody is placed on suicide watch at the jail, they are supposed to be under constant supervision. This means under supervision "24 hours a day," he said.

The jail suspended a deputy who was charged with observing Goetzee, according to a news release. The deputy, whom the

release did not name, left his post for an undisclosed period of time, the release said.

The jail's preliminary investigation found Goetzee "surreptitiously swallowed toilet tissue" on Sunday. While an autopsy is still pending from the Orleans Parish coroner's office, the jail concluded that Goetzee was able to asphyxiate himself with the tissue paper.

Goetzee was found by the deputy at 6:30 p.m., who told medical staff the inmate was

unresponsive. EMS arrived to help with resuscitation efforts, but Goetzee was pronounced dead at 7:17 p.m.

In the news release, Gusman's office noted that Goetzee "reported episodes of suicidal ideation during his incarceration, but denied having suicidal thoughts during Sunday's sick call clinic." He was also responsive and talkative during the afternoon "medication call" with medical staff.

*See **JAIL**, B-8*

# Gusman's office: Inmate on suicide watch killed himself

**JAIL,** *from B-1*

The jail suspended the deputy assigned to watch Goetzee without pay pending an investigation. The sheriff's office, along with the U.S. Marshals Service, will investigate his death, according to the release.

A 2009 examination of the Orleans Parish jail by the U.S. Department of Justice found unconstitutional conditions at the facilities. In particular, the Justice Department criticized the mental health care provided by the institution, including its suicide-prevention practices.

Goetzee was arrested last Tuesday near the federal courthouse on Poydras Street, according to a criminal complaint filed in court.

Goetzee allegedly approached the passenger side of a marked Federal Protective Services vehicle shortly before 11 a.m., opened the door and sat inside, according to the filing. Federal Officer William Watson, who was sitting in the driver's seat, questioned Goetzee.

Goetzee "took a couple of deep breaths," lunged toward Watson and tried to remove Watson's weapon from its holster, the complaint states. Amid the scuffle, Goetzee allegedly said, "I want to kill myself, give me your gun."

Watson, with the assistance of federal agents who ran to help, eventually subdued and handcuffed Goetzee.

Goetzee appeared in federal magistrate court the next day and was assigned a public defender. He was remanded to the custody of the U.S. Marshal's Service and ordered to return to court in two weeks.

• • • • • • • •

*Staff writer Brendan McCarthy contributed to this report.*

*Laura Maggi can be reached at lmaggi@ timespicayune.com or 504.826.3316.*

## The Murder of Coast Guard Commander William Goetzee

### My background

I was held on the 10<sup>th</sup> floor of the House of Detention in the Orleans Parish Jail. This is the psychiatric floor. Suicidal prisoners are held here. In my case (not suicidal) I was placed in isolation and medicated against my will and knowledge. This was torture. The Federal Government was hoping that I would kill myself. The conditions are deplorable. The lights are on 24 hours a day. The noise from the fans and televisions is deafening. If you are not crazy when you go in, you are when you come out. I stopped eating and drinking. The only thing I consumed was water. The drugs they give you can actually trigger a psychosis, depression, etc. The "suicide watch" cell has nothing in it but a bench. There is no toilet. There is no toilet paper. When you are on suicide watch you wear a kevlar type vest that goes from your shoulders to your knees and nothing else. There was a young black kid in the "suicide watch" cell while I was there. He continually defecated on himself and the stench was unbelievable. Nobody helped him. I worried about him and I wonder what happened to him.

The Federal Government did everything possible to paint me as crazy and to discredit me. They have done the same to Commander Goetzee. I believe the story about Goetzee and his arrest was a fraud, a fabrication. The Federal Government wanted to isolate and silence Commander Goetzee. He was murdered. I was lucky.

Attachment 1: Coast Guard Commander William Wesley Goetzee's Obituary.

Commander Goetzee had quite a background. He was not indigent. I would assume he had health insurance as he was an employee of the Federal Government. He worked in the same building as the Federal Courthouse, US Attorney, US Marshal's office, etc. There was extremely heavy security at the building that day because of the Danziger Bridge Trial.

Attachment 2: Article.

Commander Goetzee "reported episodes of suicidal ideation...". The man needed help. What medication was he being forced to take? I could not invent this. The Federal Government, US Marshal Service, places Federal suicidal prisoners in a jail that was condemned in 2009 by the Justice Department. "The Justice Department criticized the mental health care provided by the institution, including its suicide-prevention practices." Why was Commander Goetzee appointed a Federal Public Defender? He was a person of means. The Department of Justice wanted to control him just like they did me when they appointed US Attorney Billy Gibbens to represent me.

Attachment 3: Article.

Could you invent this? "Investigators say Goetzee had been swallowing toilet tissue throughout the day". Are you kidding me?

**Attachment 4: Article.**

See the last page, 3. "Margaret Nagel, his sister, said that after his arrest, she was unable to get any information about his condition or even where he was being held." It is important to note that the Coast Guard provided official notification of Commander Goetzee's death. This notification was improper unless he died during active duty. This was very odd and suspicious. By law The US Marshal Service should have provided notification since he was in their custody. Note that he was working on the BP oil spill.

**Attachment 5.**

Court document: detention hearing. Why was Commander Goetzee not at his detention hearing? Why did he not have private counsel. He had been charged and had not entered a plea. The Federal Government wanted him isolated. The man needed help and had the resources. Commander Goetzee was entitled to bond and should have been released within 72 hours. His family and fiancée could have helped him. Why did his peers in the Coast Guard not help him? They worked with him for 10 years. (Truth about the BP oil spill?)

**Attachment 6.**

Again could you invent the truth? Review the second page. He did not want to cause harm to anyone but himself. Goetzee exclaimed "I want to kill myself, give me your gun." Was he crying out for help or was this an attempt to discredit him? Do you know how hard it is to take a gun from a man sitting down in a car?

**Attachment 7.**

An email from me to multiple Federal Courts in the Eastern District of Louisiana.

**Attachment 8.**

Letter/Fax to the United States Supreme Court. I have only included one of the many letters that I wrote to the Supreme Court.

Sincerely,
David Christenson
"The Reluctant Patriot"

Case 2:20-cv-21108-JU 16 Document 45-1 Entered on FLSD Docket 06/11/2020 Page 17 of 96

William Goetzee Obituary: William Goetzee's Obituary by the The Times-Picayune.    Page 1 of 1

**William Wesley Goetzee**



GOETZEE CDR William Wesley Goetzee died Sunday August 7, 2011. Born on November 14, 1962 in Plainfield, NJ to the late Helen Seman Goetzee and John Goetzee. Beloved brother to Margaret Nagle and John Eric Goetzee and loving fiancée to Donna Gauthier. Bill grew up in Scotch Plains, NJ. He received an Associate Degree in Applied Science, and began his professional career as a chemist with a Pharmaceutical Co. He also worked as an Emergency Medical Technician for the Scotch Plains Rescue Squad. He continued his education receiving a Bachelor of Science in Engineering Technology. Bill's love of flying began early in his life. He earned a private pilot license, then, following his Father's footsteps, he enlisted into the US Navy Reserve as an Ensign Student Pilot Aviator where he successfully completed and received a Certification of Solo Flight. After an honorable discharge from the Navy, he returned to New Jersey and was rehired by his previous Pharmaceutical Co. with a promotion to Quality Assurance chemist. He continued with his education and earned a Master's Degree of Science in Occupational Health and Safety Engineering. Bill received a Direct Commission into the US Coast Guard in 1998, and was stationed in New Orleans. In 2007 he was hired as an Environmental Protection Specialist by the Department of Homeland Security at the US Coast Guard 8th District where he was recognized as an expert in oil spill response technology. He remained in the Coast Guard Reserve and achieved his current rank of Commander in 2009. He received numerous citations, chief among them were the Coast Guard Achievement Medal for outstanding service during Hurricane Katrina, and the Commendation Medal for his work during the Deepwater Horizon incident. Relatives and friends are invited to attend visitation on Saturday, August 27, 2011 at LAKE LAWN METAIRIE FUNERAL HOME, 5100 Pontchartrain Blvd., from 10:00am to 1:00pm followed by funeral Service at 1:00pm in the Chapel. Contributions to the Coast Guard Mutual Assistance, USCG Stop 7180, 4200 Wilson Blvd, Suite 610, Arlington, VA 20598-7180, preferred, in lieu of flowers. To view and sign the guest book, visit www.lakelawnmetairie.com.

Published in The Times-Picayune on August 25, 2011

Case 2:20-cv-01080-UU Document 45-1 Entered on FLSD Docket 06/10/2020 Page 48 of 96
Inmate on suicide watch kills himself, Orleans sheriff says
Page 1 of 2



**Everything New Orleans**

## Inmate on suicide watch kills himself, Orleans sheriff says

Published: Monday, August 08, 2011, 9:29 PM   Updated: Monday, August 08, 2011, 9:32 PM

 **Laura Maggi, The Times-Picayune**
By

A federal inmate who **expressed his desire to kill himself** just moments before his arrest committed suicide at the Orleans Parish jail Sunday night, according to a news release from Sheriff Marlin Gusman issued late Monday.



Times-Picayune archive
An Orleans Parish Prison inmate committed suicide Sunday night despite being on a 24-hour suicide watch, Sheriff Marlin Gusman said Monday.

William Goetzee, 48, was arrested Aug. 2 outside federal court after he tried to snatch a gun from a federal security officer. During the attempt to get the gun, he told the officer he wanted to kill himself.

Gusman's news release states that Goetzee was initially evaluated at the Interim LSU Public Hospital before being placed on the Sheriff's Office psychiatric tier and put on suicide watch. That tier is on the 10th floor of the jail's House of Detention.

Marc Ehrhardt, a spokesman for Gusman, said that when someone is placed on suicide watch at the jail, they are supposed to be under constant supervision. This means under supervision "24 hours a day," he said.

The jail suspended a deputy who was charged with observing Goetzee, according to a news release. The deputy, whom the release did not name, left his post for an undisclosed period of time, the release said.

The jail's preliminary investigation found Goetzee "surreptitiously swallowed toilet tissue" on Sunday. While an autopsy is still pending from the Orleans Parish coroner's office, the jail concluded that Goetzee was able to asphyxiate himself with the tissue paper.

Goetzee was found by the deputy at 6:30 p.m., who told medical staff the inmate was unresponsive. EMS arrived to help with resuscitation efforts, but Goetzee was pronounced dead at 7:17 p.m.

In the news release, Gusman's office noted that Goetzee "reported episodes of suicidal ideation during his incarceration, but denied having suicidal thoughts during Sunday's sick call clinic." He was responsive and talkative during the afternoon "medication pass" with medical staff.

The jail suspended the deputy assigned to watch Goetzee without pay pending an investigation. The Sheriff's Office, along with the U.S. Marshals Service, will investigate the death, according to the release.

A 2009 examination of the Orleans Parish jail by the U.S. Department of Justice found unconstitutional conditions at the facilities. In particular, the Justice Department criticized the mental health care provided by the institution, including its suicide-prevention practices.

Case 2:14-cv-02150-JVM Document 45-1 Entered on FLSD Docket 06/10/2020 Page 199 of 96
Inmate on suicide watch kills himself, Orleans sheriff says
Page 2 of 2

Goetzee was arrested last Tuesday near the federal courthouse on Poydras Street, according to a criminal complaint filed in court.

Goetzee allegedly approached the passenger side of a marked Federal Protective Services vehicle shortly before 11 a.m., opened the door and sat inside, according to the filing. Federal Officer William Watson, who was sitting in the driver's seat, questioned Goetzee.

Goetzee "took a couple of deep breaths," lunged toward Watson and tried to remove Watson's weapon from its holster, the complaint states. Amid the scuffle, Goetzee allegedly said, "I want to kill myself, give me your gun."

Watson, with the assistance of federal agents who ran to help, eventually subdued and handcuffed Goetzee.

Goetzee appeared in federal magistrate court the next day and was assigned a public defender. He was remanded to the custody of the U.S. Marshals Service and ordered to return to court in two weeks.

•••••••

*Staff writer Brendan McCarthy contributed to this report. Laura Maggi can be reached at lmaggi@timespicayune.com or 504.826.3316.*

© 2011 NOLA.com. All rights reserved.



## Deputy suspended after inmate suicide at OPP

wwltv.com

Posted on August 8, 2011 at 10:24 PM

Recommend

**WWLTV.com**

NEW ORLEANS -- The man who allegedly assaulted a federal officer Friday in an attempt to commit suicide has died.

The deputy assigned to watch him has been suspended without pay.

The Orleans Parish Sheriff's Office said 48-year-old William Goetzee suffocated himself with toilet tissue in his cell Sunday night. Investigators say Goetzee had been swallowing toilet tissue throughout the day.

They say he was found unresponsive at 6:30 p.m.   ↖ why would he have it?

The deputy will remain suspended without pay, pending the outcome of the investigation.

**Add another comment**



**Everything New Orleans**

# Inmate suicide in New Orleans jail raises calls for federal oversight

Published: Friday, August 12, 2011, 7:15 PM

 By **Laura Maggi, The Times-Picayune**

Two years ago, **the U.S. Department of Justice issued a highly critical report** on the **Orleans Parish jail** that specifically found that staffers there weren't doing enough to prevent suicides.



**View full size**                    Michael DeMocker, The Times-Picayune
archive

A prisoner is shown to a holding cell in the intake section of Orleans Parish Prison.

Nonetheless, federal deputy marshals last week placed at the jail a Coast Guard employee who was avowedly suicidal after he tried to wrest a gun from a security officer outside the federal courthouse in New Orleans. The inmate, 48-year-old William Goetzee, successfully killed himself on the jail's psychiatric tier six days later, on Sunday, by swallowing enough toilet paper that it cut off his air supply.

Sheriff Marlin Gusman blamed the suicide on a lax deputy who left a post watching Goetzee for an unspecified period of time. That deputy, a 10-year veteran of the agency whom Gusman has not named, has been suspended.

In an interview on Friday, Gusman said as jail officials conduct an investigation into Goetzee's death, they have been consulting with the Orleans Parish district attorney's office about possible charges.

Critics of the jail said the death underscores the urgency of wrapping up a federal investigation that began in 2008 and -- at least publicly -- appears to have stalled.

Norris Henderson, a community activist and a member of the Orleans Parish Prison Reform Coalition, said advocates recently expressed their frustration about the languid pace to officials with the Justice Department's special litigation section, which conducted the review of the jail released in September 2009.

"The biggest thing we want is federal oversight," Henderson said. "It is not getting better; it is getting worse."

### 'Inconsistent' practices found

The 2009 report found unconstitutional conditions at the jail ranging from violence against inmates by guards and other inmates to substandard mental health care. The report noted that Gusman requires that suicidal inmates be put under constant direct observation, but the investigation found that staff practices were "inconsistent" with that policy, as well as "generally accepted standards."

Both Gusman and a spokeswoman for the Justice Department said the two sides are working on resolving the problems identified in 2009, although they framed the end result differently.

"We are aware of the ongoing problems at the jail and hope to negotiate a consent decree in the near future," said Xochitl Hinojosa, a Justice Department spokeswoman, in a statement.

Gusman, however, said they aren't working on a consent decree, which is a legal agreement that is ultimately overseen by a federal judge and an appointed monitor. Instead, he said, the Justice Department and the Sheriff's Office are negotiating a "memorandum of understanding," which would be an agreement directly between the jail and the federal agency.

Such an agreement, he said, would have "teeth."

"It will spell out what they expect us to do," he said.

Gusman also emphasized that he believed many of the problems outlined by the Justice Department's report had already been addressed, saying the initial findings even when released in 2009 were outdated.

Jail critics won't be satisfied just with an agreement between the jail and the Justice Department, said Henderson. He said federal court oversight is key to building faith that broad changes will be made.

If negotiations fail, the Justice Department can sue the Sheriff's Office, an option they noted in the 2009 report.

### Consent decree

Dana Kaplan, executive director of the Juvenile Justice Project of Louisiana and a member of the prison reform coalition, said a consent decree is something city officials and Gusman should embrace. She noted that Gusman has long complained he doesn't get enough money from the city, and a consent decree could help fix that problem, among others.

Gusman said he thinks a memorandum of understanding might accomplish that as well.

While emphasizing the jail is investigating Goetzee's death, Gusman defended the mental health care provided at the jail, noting that his agency last year was reaccredited by National Commission on Correctional Health Care.

The Marshals Service declined to answer questions about whether the agency will re-evaluate placement of suicidal inmates at the Orleans Parish jail.

"The U.S. Marshals Service is always concerned about the treatment of its detainees, and is working with local authorities throughout the investigation into the death of inmate William Goetzee," Deputy Chief Steve Blando of the service's public affairs office said in a written statement.

For Goetzee's family, there are still unanswered questions about his death. Margaret Nagle, his sister, said that after his arrest, she was unable to get any information about his condition or even where he was being held.

"I have received no information from any authority from the time my brother was taken into custody until I was notified by the Coast Guard about the death," Nagle said.

Goetzee had worked as a civilian employee with the Coast Guard for more than 10 years, while also serving in the Coast Guard reserves, said Lt. Sue Kerver, a spokeswoman. He worked at the Coast Guard's offices on Poydras Street as a coordinator with regional response teams, including the BP oil spill.

*Laura Maggi can be reached at lmaggi@timespicayune.com or 504.826.3316.*

© 2011 NOLA.com. All rights reserved.

MINUTE ENTRY
KNOWLES, M.J.
AUGUST 5, 2011

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                       NO. 11-93

WILLIAM GOETZEE                              SECTION: MAG

A detention hearing was set this date before Magistrate Judge Daniel E. Knowles, III.

PRESENT:   Frederick Veters, Asst. U.S. Attorney
           Sam Scillitani, Counsel for the defendant

where was Goetzec

Mr. Scillitani requested that this matter be continued for reasons stated on the record.

There was no objection by the Government.

Good cause shown, **IT IS ORDERED** that the detention hearing is **CONTINUED to be**

reset on motion of defendant..

Daniel E. Knowles III

DANIEL E. KNOWLES, III, U.S. MAGISTRATE

JUDGE

CLERK TO NOTIFY:
U.S. ATTORNEY, PRE-TRIAL SERVICES,
U.S. MARSHAL, ATTORNEY FOR DEFENDANT,
DEFENDANT

MJSATR:  00:02

Case 2:20-cv-02108-UU  Document 45-1  Entered on FLSD Docket 06/01/2020  Page 55 of 96
Case 2:11-cv-02108-UU  Document 45-1  Entered on FLSD Docket 06/01/2020  Page 25 of 96
LAED CM/ECF - Live
Page 1 of 2

SINGLE

## U. S. District Court
### Eastern District of Louisiana (New Orleans)
### CRIMINAL DOCKET FOR CASE #: 2:11-mj-00093-DM-1

Case title: USA v. Goetzee                        Date Filed: 08/02/2011

Assigned to: Magistrate Duty
Magistrate

**Defendant (1)**

**William Goetzee**                        represented by **Virginia Laughlin Schlueter**
Federal Public Defender (New Orleans)

Hale Boggs Federal Building
500 Poydras St.
Room 318
New Orleans, LA 70130
504-589-7930
Email: Virginia_Schlueter@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender*
*Appointment*

**Pending Counts**                        **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                        **Disposition**

18:111 & 18:1114 ASSAULT ON A
FEDERAL OFFICER

**Plaintiff**

**USA**                        represented by **Frederick William Veters , Jr.**
U. S. Attorney's Office (New Orleans)
650 Poydras St.
Suite 1600
New Orleans, LA 70130
504-680-3073
Email: frederick.veters@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2011 | 1 | COMPLAINT signed by Magistrate Judge Daniel E. Knowles, III as to William Goetzee (1). (Attachments: # 1 Crim Mag Sheet) (gbw, ) (Entered: 08/04/2011) |

| 08/02/2011 | 2 | Arrest Warrant Issued by Magistrate Judge Daniel E. Knowles, III as to William Goetzee. (gbw, ) (Entered: 08/04/2011) |
|---|---|---|
| 08/02/2011 | 4 | Warrant Executed with Arrest of William Goetzee executed on 8/2/2011. (gbw, ) (Entered: 08/05/2011) |
| 08/03/2011 | 3 | Minute Entry for proceedings held before Magistrate Judge Daniel E. Knowles, III: Initial Appearance as to William Goetzee held on 8/3/2011. FPD appointed. Defendant remanded. Detention Hearing set for 8/5/2011 10:00 AM before Magistrate Duty Magistrate. Preliminary Hearing set for 8/17/2011 02:00 PM before Magistrate Duty Magistrate. (gbw, ) (Entered: 08/04/2011) |
| 08/03/2011 | 5 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to William Goetzee.. Signed by Magistrate Judge Daniel E. Knowles, III on 8/3/2011. (gbw, ) (Entered: 08/05/2011) |
| 08/05/2011 | 6 | Minute Entry for proceedings held before Magistrate Judge Daniel E. Knowles, III:Detention Hearing was set this date. ORDERED that the detention hearing is CONTINUED to be reset on motion of defendant.(Court Reporter Magistrate Clerical.) (plh, ) (Entered: 08/09/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/09/2011 09:08:29 | | |
| PACER Login: rc1902 | Client Code: | |
| Description: Docket Report | Search Criteria: | 2:11-mj-00093-DM |
| Billable Pages: 2 | Cost: | 0.16 |



AFFIDAVIT IN SWORN OF COMPLAINT AND ARREST WARRANT

I, PATRICK STRAWN, being duly sworn, do hereby depose and state:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been employed in that capacity for 9 years. I am currently assigned to the New Orleans Violent Crimes Task Force. My duties include but are not limited to the investigation of bank robberies, kidnapping matters, fugitives, crimes aboard aircraft, and assaults against federal agents.

2. The information contained in this affidavit is based upon an investigation conducted by the FBI, and other federal and local law enforcement officials in connection with the assault on Federal Protective Service Officer William Watson in New Orleans, LA on August 2, 2011. Since this affidavit is submitted only for the limited purpose of securing a criminal complaint, I have not set forth each and every fact known to me concerning this investigation. I have included what I believe are the facts sufficient to establish probable cause for the complaint sought.

3. On August 2, 2011, at approximately 10:55 a.m., a single white male, identified as William Goetzee, date of birth November 14, 1962, approached the passenger side of a Federal Protective Services fully marked patrol vehicle. Officer Watson, wearing full police uniform and sitting in the drivers side of the vehicle, believed the subject was approaching to ask him a question, and rolled down the front passenger window.

4. After approaching the marked patrol vehicle, Goetzee opened the front passenger side door, entered the vehicle, and sat down in the front passenger seat. Watson inquired why Goetzee thought he could just sit down in his patrol vehicle.

5. Upon being questioned by Watson, Goetzee took a couple of deep breaths, lunged towards Watson, grabbed Watson's service weapon, and attempted to remove the weapon from

it's holster. During the course of the struggle, which included physical contact on Watson by Goetzee, Goetzee exclaimed, "I want to kill myself, give me your gun."

6. Watson struggled to maintain control of his weapon, and during the struggle the weapon's magazine became dislodged. While struggling with Goetzee, Watson called out to a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) who was standing nearby requesting help.

7. The ATF Special Agent grabbed Goetzee through the front passenger window, in an attempt to restrain him, at which time Watson was able to exit the vehicle and run around to the passenger's side. Around that same time, another Federal Protective Service Officer came to provide assistance with apprehending Goetzee. Goetzee was forcibly removed from the vehicle and placed in handcuffs.

8. Based on the above facts, your Affiant has reason to believe that on August 2, 2011, William Goetzee committed an act in violation of Title 18 United States Code 111, Assault on a Federal Officer.

PATRICK B. STRAWN
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me this ____ day of August, 2011

HONORABLE DANIEL E. KNOWLES, III
United States Magistrate Judge

2

## FW: Goetzee/FYI/Please tell me if you want to be removed.

From: **David Christenson** (dchristenson6@hotmail.com)

Sent: Thu 8/04/11 7:17 AM

To: 26Pam Radosta (pam_radosta@laed.uscourts.gov); 26Susan Adams (susan_adams@laed.uscourts.gov)

Cc: 26Jennifer Rogers (jennifer_rogers@laed.uscourts.gov); 26EAmanda Ballay (amanda_ballay@laed.uscourts.gov)

    1 attachment

    Goetzee1.pdf (677.0 KB)

FYI.

Please read attachment about Goetzee. This is very odd.

It appears that he works at the Hale Boggs Building with the Coast Guard (Federal Court House). Extra security is in place because of the Danziger Trial.

He has been charged and made an appearance but yet there is no official record. Why? The charge and the court appearance would require that there be a record. Who are his attorneys? Is it the Federal Public Defenders or a private law firm? Billy Gibbens or his firm?

Why would the violent crime task force be involved? Were Marshal Walter Martin and FBI Agent Steven Rayes involved?

Do you have any idea how hard it would be to wrestle a holstered gun away from a sitting man?

The man was crying out for help or there is more to the story.

David Christenson
504-715-3086

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 JUL 23   PM 1: 03

LORETTA G. WHYTE.
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARGARET GOETZEE NAGLE and JOHN ERIC GOETZEE | *     CIVIL ACTION |
| | *     NUMBER: |
| VERSUS | *     SECTION: **12-1910** |
| SHERIFF MARLIN GUSMAN, DR. SAMUEL GORE, DR. CHARLES "MIKE" HIGGINS, DR. JOSE HAM, MARY ANNE BENITEZ, DARRYL JACKSON, LPN WALLACE, S. PEMBO, S. BATISTE, DAVID SCHAIBLE, E. BARGKY, C. JOHNSON, FNP, WARDEN CARLOS LOUQUE, HOD WATCH COMMANDERS JOHN DOES I and II, SGT. NICOLE HARRIS, SGT EVERETT MARSHALL, DEPUTY WILLIAM THOMPSON, DEPUTY MICHAEL WILLIAMS and DEPUTY SHELIA CRADER | *     JUDGE: **SECT. R MAG.2** |
| | *     MAGISTRATE: |
| | *     CIVIL RIGHTS |
| | * |
| | *     JURY TRIAL DEMANDED |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### COMPLAINT

### I. INTRODUCTION

1.     This case involves the tragic death on August 7, 2011 of U.S. Coast

Guard Commander William ("Bill") Goetzee, a 48-year-old federal career civilian

1

Fee 350
Process
Dktd.
CtRmDep.
Doc. No.

employee of the U.S. Coast Guard and active member and Commander of the U.S. Coast Guard Reserves, who, while working in highly responsible and high-stress positions with the Coast Guard, including duties related to the BP oil spill, experienced a profound mental health crisis and breakdown. This breakdown manifested in a desperate attempt by Commander Goetzee to commit suicide on August 2, 2011 by attempting to grab the gun of a federal protective officer in order to kill himself. As a result of this dire crisis, Commander Goetzee was arrested, transported and placed in the custody of the defendants, all of whom had responsibility for his care and safety in his time of need.

2.      Instead of providing adequate, appropriate and necessary care and treatment to Commander Goetzee, the defendants failed in their professional duties and their legal obligations. Commander Goetzee was treated by the defendants in a callous, harsh and indifferent manner, resulting in his death by suicide in a barren cell on the tenth floor "mental health" unit of the House of Detention (HOD), an outmoded, dangerous and completely inadequate facility which, at all relevant times, was a critical part of the Orleans Parish Prison (OPP) complex and which was not a reasonable accommodation for a person suffering from Mr. Goetzee's illness and disability and in his condition. The OPP complex was operated and supervised by the Orleans Parish Sheriff's Office (OPSO), under the leadership of Sheriff Marlin Gusman, at all relevant times.

3.      Commander Goetzee was not properly diagnosed, treated or cared for

2

while in the custody of the defendants. He was denied appropriate and necessary medical, psychiatric, nursing and therapeutic care, treatment and supervision. Instead, he was confined in a hostile, barren and isolated environment that exacerbated and aggravated his condition, which was fragile and precarious to begin with. Defendants and their staff provided Commander Goetzee with access to materials to harm himself while in an acute state of emotional and psychological crisis. The mistreatment of Commander Goetzee by the defendants and their staff in this facility was in contravention of the community standard of care and violated applicable federal and state constitutional and statutory standards.

4.     The defendants' actions and omissions, manifested in inadequate medical screening and intake, inadequate staffing, inadequate training and supervision of staff, inadequate facilities, inadequate policies and procedures relating to diagnosis and treatment of mentally ill and suicidal persons in custody, as well as inadequate care, treatment, and monitoring of Commander Goetzee, were directly and causally related to Commander Goetzee's death.

5.     For too many years there have been numerous other similar, avoidable, unnecessary and unconscionable injuries, sufferings and deaths of prisoners in the custody of the Orleans Parish Sheriff's Office related to the denial of adequate medical care, inadequate supervision and training of staff, and lack of reasonable accommodations for individuals with disabilities, mental illness in particular. The instant case represents yet another instance of a shocking degree of callous and inexcusable

3

disregard for the serious medical needs of a prisoner at OPP, in this instance, Commander Goetzee, by those very persons who were responsible for his care.

## II. JURISDICTION

6.    This action is brought pursuant to 42 U.S.C. 1983, pursuant to the First, Fourth, and Fourteenth Amendments to the United States Constitution, Section 504 of the Rehabilitation Act of 1973 which authorizes actions to redress discrimination based on disability and handicap, Title II of the Americans with Disabilities Act of 1990, 42 USC 12131, 42 USC 1988 and 42 USC 12205, et seq.   Jurisdiction is founded on 28 U.S.C. Sections 1331 and 1343 and the aforementioned statutory and constitutional provisions. Plaintiff further invokes the pendant jurisdiction of this Court to consider claims arising under state law pursuant to 28 USC Section 1367.   A jury trial is requested.

## III. PARTY PLAINTIFF

7.    Margaret Goetzee Nagle is the sister and John Eric Goetzee is the brother of William "Bill" Goetzee,  who died while under the custody and care of the defendants as further described herein. Margaret Nagle is a person of the full age of majority, who resides in Scotch Plains, New Jersey. John Eric Goetzee is a person of the full age of majority, who resides in Winfield Park, New Jersey. At the time of his death, William "Bill" Goetzee was unmarried, had no children and was pre-deceased by both of his parents. He was a resident of LaPlace, Louisiana.

4

## IV. PARTY DEFENDANTS

8.    Defendant Sheriff Marlin Gusman was Sheriff of Orleans Parish at all times described herein, and, as such, is responsible for the hiring, training, supervision, discipline and control of the employees of the OPSO, including medical and correctional staff. He is also responsible for the supervision, administration, policies, practices, customs and operations of the OPSO and its correctional facilities. He is a final policymaker. He is liable both directly and vicariously for the actions complained of herein. He is sued in his individual and in his official capacity for those acts and omissions, which occurred while he was Sheriff. As Sheriff of Orleans Parish, defendant Sheriff Gusman accepts federal funds and is charged with providing custodial care to prisoners in custody of the Orleans Parish jail and directed all medical providers in the care of William Goetzee, deceased.  He is a person of the full age of majority and, on information and belief, a resident of the Eastern District of Louisiana.

9.    Defendant Dr. Samuel Gore is the Medical Director of the Orleans Parish Sheriff's Office and is an employee of the OPSO. At all pertinent times herein, he was responsible for the provision of medical care and health care services for persons incarcerated in OPSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified health care professionals and staff, insuring adequate staffing for the medical needs of prisoners, for the supervision, training, discipline and oversight of personnel and provision of medical services at OPSO correctional facilities and was responsible to insure access and provision of reasonable

5

and adequate health care for persons in custody at the jail. He is responsible for supervising the development and revision of policies, procedures, and protocols concerning the delivery of medical and mental health services at the jail. He is also responsible for monitoring compliance with all health services policies, procedures and protocols. He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPSO. All matters of medical and mental health judgment are the sole province of the Medical Director. He is a final policymaker with regard to the provision of medical and psychiatric services to persons in the custody of the OPSO. He was responsible for the direction, supervision and discipline of the medical/psychiatric defendants named herein as well as medical/security co-ordination and training and supervision of correctional employees in health-related matters. He is sued in his individual and official capacity. He is a person of full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

10. Defendant Dr. Michael Higgins is the Mental Health Director for OPP and is an employee of the OPSO. At all pertinent times herein, he was responsible for the provision of psychiatric services for persons incarcerated in OPSO facilities, both directly and as a supervisor. He was responsible for recommending and hiring qualified mental health care professionals and staff, insuring adequate staffing for the medical needs of prisoners, for the supervision, training, discipline and oversight of personnel and provision of mental health services at OPSO correctional facilities, and was

6

responsible to insure access and provision of reasonable and adequate health care for persons in custody at the jail. He is responsible for supervising the development and revision of policies, procedures, and protocols concerning the delivery of mental health services at the jail. He is also responsible for monitoring compliance with all health services policies, procedures and protocols. He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPSO. All matters of mental health judgment are within his duties as Mental Health Director. He is a final policymaker with regard to the provision of medical and psychiatric services to persons in the custody of the OPSO. He was responsible for the direction, supervision and discipline of the medical/psychiatric defendants named herein as well as medical/security co-ordination and training and supervision of correctional employees in health-related matters. He is sued in his individual and official capacity. He is a person of full age and majority and, on information and belief, is a resident of the Eastern District of Louisiana.

    11.    Defendant Mary Anne Benitez performed duties relating to health services administration for the OPSO, at all pertinent times herein, and was responsible for assisting with supervising daily administrative operations within the department including quality control, review of medical records, establishing and maintaining functional information systems within the medical department and between medical and security personnel. She was also responsible for oversight, training and supervision of medical employees and health care training for correctional officers, as well as

7

coordination between medical and security personnel. She was responsible for insuring

the provision and adequacy of care and safety of William Goetzee at the time of Mr.

Goetzee's incarceration and death. She was responsible for insuring that appropriate

and adequate medical, psychiatric and nursing care was given to persons at risk for

suicide in the custody of the OPSO. She is sued in her individual and official capacity.

She is a person of the full age of majority and, on information and belief, is a resident of

the Eastern District of Louisiana.

    12.    Defendant Dwayne Johnson was the Director of Nursing (DON) for the

OPSO at all pertinent times herein and as such was responsible for hiring, training,

supervision, discipline and co-ordination of nursing services, including co-ordinating

physician/nursing sick call and follow-up care, staffing and implementation of

appropriate nursing standards and procedures. He was responsible for insuring that

appropriate and adequate nursing care was given to persons at risk for suicide at OPP

including intake procedures and those being held on HOD-10 at OPP.

    13.    Defendant Dr. Jose Ham  is a medical doctor employed by OPSO, who

was the Health Services Administrator at all pertinent times herein, and was responsible

for assisting with supervising daily administrative operations within the department

including quality control, review of medical records, establishing and maintaining

functional information systems within the medical department and between medical and

security personnel. He was also responsible for oversight, training and supervision of

medical employees and health care training for correctional officers, as well as

8

coordination between medical and security personnel. On information and belief, he was responsible for co-ordinating the medical care for Mr. Goetzee and assisted in the care and treatment of Mr. Goetzee. He was responsible for insuring that appropriate and adequate medical, psychiatric and nursing care was given to persons at risk for suicide in the custody of the OPSO. At all pertinent times herein he was responsible for providing appropriate and adequate medical care to persons in custody of the OPSO, including William Goetzee. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He also was responsible for reviewing charts and doing quality control regarding the standards and practices of the Medical Department at OPP. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

14.     Defendant Dr. Marcus Dileo is a medical doctor employed by OPSO, who provided medical services to William Goetzee. At all pertinent times herein he was responsible for providing appropriate and adequate medical care to persons in custody of the OPSO, including William Goetzee. He was responsible for medical care and treatment of William Goetzee as described herein. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He is sued in his individual and official capacity. He is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

9

15.     Defendant LPN Wallace was an employee of the OPSO in the position of Licensed Practical Nurse (LPN) and at all pertinent times herein, was responsible for providing reasonable and adequate medical care to persons held in the custody of the OPSO and in particular, in medical screening, evaluation and care of individuals as they were booked into the jail. She was directly involved in the screening, evaluation and care of William Goetzee as described herein. She is sued in her individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

16.     Defendant C. Johnson, FNP was an employee of the OPSO in the position of Nurse Practitioner (FNP) and at all pertinent times herein, was responsible for providing appropriate and adequate medical care to persons held in the custody of the OPSO. She had direct involvement in the evaluation and care of William Goetzee as described herein. She had supervisory responsibilities regarding other medical personnel employed by the OPSO, including Licensed Practical Nurses (LPN) and Medical Assistants (MA). She is sued in his individual and official capacity. She is a person of the full age of majority and, on information and belief, is a resident of the Eastern District of Louisiana.

17.     Defendants S. Pembo, S. Batiste, David Schaible, and E Bargky were each employees of the OPSO, licensed and employed as LPNs, at all pertinent times herein, and were responsible for providing appropriate and adequate nursing care, including documentation and paperwork necessary for continuity of care of persons in

10

the custody of the OPSO, including assessing and monitoring the medical and psychiatric condition, health and safety of William Goetzee and providing appropriate and adequate nursing care and assessments for him, with proper documentation of same. Defendants Pembo, Batiste, Schaible and Bargky had the authority and responsibility to monitor and make regular and periodic checks relative to William Goetzee's physical and mental status, including the duty to insure that he was in a safe, appropriate environment and that he was not held in conditions that would exacerbate or worsen his medical and mental conditions. These defendants are sued in their individual and official capacities. These defendants are persons of the full age of majority, and on information and belief, are residents of the Eastern District of Louisiana.

18.     Defendant Carlos Louque was employed by the OPSO as Warden of HOD where William Goetzee was held, and at all pertinent times was responsible for training, supervising, monitoring and disciplining OPSO deputies at HOD, including those named as defendants herein and overseeing the security and well-being of persons held on HOD-10. He was also responsible for co-ordination between security officers and medical personnel regarding prisoners in need of medical care, including William Goetzee.   He is sued in his individual and official capacity.  He is a person of the full age of majority and, on information and belief, he is a resident of the Eastern District of Louisiana.

11

19.    Defendants HOD Watch Commanders on Duty August 5-7, 2011 John Does I and II were employed by the OPSO as Watch Commanders of HOD where William Goetzee was held, and at all pertinent times were responsible for training, supervising, monitoring and disciplining of OPSO deputies, including those named as defendants herein and overseeing the security and well-being of persons held on HOD-10. These Watch Commanders were also responsible for co-ordination between security officers and medical personnel regarding prisoners in need of medical care, including William Goetzee.   They are each sued in their individual and official capacity. They are each persons of the full age of majority and, on information and belief, are each residents of the Eastern District of Louisiana.

20.    Defendants Sgt. Everett Marshall and Sgt. Nicole Harris were each employed by the OPSO as correctional officers and were each supervisors, assigned to the House of Detention (HOD) of the Orleans Parish jail. At all pertinent times herein each defendant supervisor was responsible for observing and communicating reported or obvious medical needs of prisoners, including William Goetzee, to medical staff and for properly supervising, monitoring, training and overseeing the proper job performance of OPSO employees under their supervision, including the defendant deputies in this matter. Each was responsible for monitoring, checking on, and supervising the condition of William Goetzee, and those employees responsible for his care and safety, while Mr. Goetzee was held at HOD, and for insuring that Mr. Goetzee was in a safe environment and was being properly monitored. They were each responsible for

12

insuring that proper documentation was done for the observation of Mr. Goetzee on "suicide watch", as well as being responsible for the supervision and training of defendant deputies, both named and unnamed, who had responsibilities relative to the care and custody of William Goetzee. They are each persons of the full age of majority and, on information and belief, are each residents of the Eastern District of Louisiana. They are each sued in their official and individual capacities.

21.    Defendants OPSO Deputies William Thompson, Michael Williams and Shelia Crader were all employed by the OPSO as correctional officers. At all pertinent times herein they were each responsible for insuring that there was appropriate and constant monitoring of William Goetzee while he was on "suicide watch" and of communicating reported or obvious medical needs of prisoners, including William Goetzee to appropriate persons. They were responsible for monitoring, checking on, and supervising the condition of William Goetzee as described herein. They each also had the duty to report and to intervene if and when they became aware that other deputies or employees of the OPSO were not properly performing their duties relative to William Goetzee. They are each sued in their official and individual capacities. They are each of full age of majority and, on information and belief, they are each residents of the Eastern District of Louisiana.

## V. **STATEMENT OF FACTS**

22.    . On Tuesday, August 2, 2011, William ("Bill") Goetzee, a 48- year- old civilian employee and Commander, U.S. Coast Guard Reserves, experienced a severe

13

mental breakdown during which time he attempted to commit suicide by trying to grab a gun from a federal protective officer in order to kill himself. Commander Goetzee had been on extended sick leave as a result of an automobile accident in June, 2011, where he was injured. He had been suffering from symptoms from extreme exhaustion, chronic insomnia, stress, and mental illness, which had seriously impacted his ability to function properly. He was treated in an emergency room with prednisone for injuries from the accident, which resulted in an episode of "prednisone induced psychosis" which required in-patient treatment in a local mental health facility. He was under physician's care and was being treated for depression, chronic insomnia and other manifestations of mental illness. He was still under treatment and in a state of physical and mental exhaustion and illness, when he returned to work on August 2, 2011 and tried to kill himself outside the federal courthouse.

23.     After he was subdued by federal agents, Mr. Goetzee was taken by ambulance to Tulane Medical Center (TMC), where he was treated for physical injuries, including contusions to his forehead, related to his scuffle with the federal officers. It was clear that Mr. Goetzee was attempting to harm himself, not the federal officer.  At TMC Mr. Goetzee was treated for his physical injuries but he was not evaluated by a psychiatrist nor did he receive appropriate mental health care. Instead, he was released by TMC. Preparations were being made by his fiancée to transport him to East Jefferson hospital, which has an in-patient psychiatric unit, for appropriate medical and psychiatric care. However, en route to East Jefferson, Mr. Goetzee was stopped and

14

arrested by federal agents who took him to the Orleans Parish Prison, operated by

defendant Sheriff Marlin Gusman and the Orleans Parish Sheriff's Office. This facility

housed federal prisoners in the custody of the U.S. Marshall's Office, which was Mr.

Goetzee's status when he arrived at the jail.

24.     Upon arrival at the Intake and Processing Center (IPC) of the Orleans

Parish Prison, Mr. Goetzee was seriously mentally ill, suicidal, and in need of medical

and psychiatric care in an appropriate setting, which the OPP could not provide. Instead

of referring Mr. Goetzee for appropriate medical care, Mr. Goetzee was booked into the

jail. As part of that process, defendant LPN Wallace conducted the OPSO Medical

Intake Screening, which is used to determine the medical status and appropriate

housing for arrestees.

25.     Defendant LPN Wallace failed to adequately assess, evaluate or

document Mr. Goetzee's serious medical condition, failed to provide adequate medical

care or treatment for him, failed to adequately or properly record or report his condition,

or to properly alert other medical and correctional personnel so as to insure that Mr.

Goetzee would receive adequate medical care for his serious medical needs.

26.     The medical intake screening questionnaire has two sections, one for

visual observations by medical intake screening personnel and the other involving

"questions for all inmates". The intake form specifically requires the intake screener to

note any obvious injury, including wounds, on the arrested subject. Defendant LPN

Wallace failed to note that Mr. Goetzee had contusions on his forehead which had been

15

documented at Tulane Medical Center earlier that afternoon, injuries resulting from his efforts to kill himself that morning.

27.    In response to the question, "Does the inmate "appear despondent or depressed or voice suicidal ideation?" defendant LPN Wallace marked "N" for "No". Yet in the sections where the arrestee is asked to respond to questions, in response to the questions "Are you currently taking any medications including medications for mental illness or bad nerves?" defendant Wallace noted "states takes and (sic) anti-anxiety name unk". In response to the question "How are you feeling right now" defendant LPN Wallace noted : "OK",  yet in response to the following question "Do you have any mental health problems or have you been under the care of a psychiatrist within the last year?" the following is noted: "Yes. River Oaks 6/11 states have racing thoughts, mind reading manic thoughts."  River Oaks is a well-known mental health clinic and in-patient treatment facility. When asked "have you recently thought about hurting or killing yourself?" the response was recorded as "Yes. This AM last suicide thought". When asked if he had "ever tried" to commit suicide, the response is recorded as "No". When asked "do you feel like you might hurt someone else now" the response is recorded as "No." Mr. Goetzee is not asked whether he felt like he might want to hurt himself now, a logical question in light of his admission that he had suicidal thoughts that morning, as well as "racing thoughts, mind reading, manic thoughts." Defendant LPN Wallace reported that Mr. Goetzee "denies any S.I. or H.I." which is obviously contradicted by his own admission to suicidal thoughts that same morning. Defendant LPN Wallace cleared

16

Mr. Goetzee for "general population" while also recommending "contact psychiatrist for disposition". There is no record that defendant LPN Wallace followed up or that any psychiatrist was ever contacted or saw Mr. Goetzee to assess his condition or the appropriateness of his admission to the jail or the adequacy of the jail's facilities and staff to provide appropriate care and reasonable accommodation for his condition. On information and belief, defendant LPN Wallace had the authority to request an immediate physical and mental examination of Mr. Wallace by appropriately trained medical personnel, which she failed to do.

28.     In addition, there is no indication that vital signs were taken or that any physician or other appropriately trained medical personnel conducted a physical examination of Mr. Goetzee at any time during the booking process or while he was being admitted to the jail, to determine whether he was in adequate physical or mental condition for admission to the jail. On information and belief, no assessment was made to determine whether his condition required hospitalization or whether he should be assigned to any infirmary or specialized medical or mental health unit within the jail for treatment and/or observation. Defendant LPN Wallace didn't even refer him for the next psychiatric or medical sick call. No steps were taken to obtain further information regarding his medications or to contact River Oaks.

29.     The Medical Intake Screening form itself was inadequate and failed to provide for pertinent questions regarding mental and physical health of arrestees or suicidality. Defendant LPN Wallace failed to take appropriate or necessary steps to

17

properly screen, evaluate or refer Mr. Goetzee for psychiatric evaluation, diagnosis or treatment. Defendant LPN Wallace failed to properly or adequately address Mr. Goetzee's report of recent suicidal thoughts, his need for medication, or his obvious physical injury.  Defendant LPN Wallace was aware, must have been aware, or should have been aware, that Mr. Goetzee was psychologically fragile, required psychiatric evaluation, intervention and review of his medication status, yet failed to take appropriate steps to insure that would occur.

30.    Despite Mr. Goetzee's condition, defendant LPN Wallace referred Mr. Goetzee for housing in "general population".   Defendant LPN Wallace knew, must have known or should have known, at Mr. Goetzee was at high risk of serious harm due to his disability and his medical condition and that the jail lacked adequate and appropriately trained staff and facilities to properly tend to Mr. Goetzee's medical needs or to provide reasonable accommodations for his disabilities. Yet she failed to take necessary and appropriate steps to insure that he was either referred to a hospital for treatment or for medical clearance as to the appropriateness of housing him at the jail, or, if to be admitted to the jail, that he was adequately and reasonably examined, housed and treated and afforded reasonable accommodation for his disability and his condition.

31.    Mr. Goetzee was booked into OPP and taken to Templeman V, the "federal tier". The following morning he appeared in federal court for a first appearance hearing. His medical and psychiatric condition had deteriorated overnight and he was

delusional, combative, disoriented and non-responsive. He had to be physically restrained in a wheelchair. At some point he was tased. He had spent the night in the jail with no medical treatment, no medication and no appropriate intervention or accommodation for his condition, thereby aggravating and worsening his condition. On information and belief, various deputies and other employees of the defendant Sheriff, acting in the course and scope of their employment, knew, must have known or should have known that Mr. Goetzee was in serious need of medical attention, yet failed to report or seek appropriate care for him during this time.

     32.     Mr. Goetzee was removed from federal court and returned to the jail, where he received a "Psychiatric Nursing/MA Assessment" for the first time while in custody, due to "suicidal ideation", and referred to University Hospital by defendant Dr. Higgins, through a verbal order to defendant E. Bargky, LPN, to "Rule Out Delirium". By that time, he had blood pressure of 181/122, a pulse rate of 128, respiration rate of 20 and a temperature of 100.1. His allergy to prednisone was noted at this time, as was the fact that he was without any medication. His skin was warm and moist to touch. He was described as oriented OX1, oriented as to name only, a marked deterioration of the AAOX3 orientation described at Intake by defendant LPN Wallace. The Nurse Notes completed by defendant Bargky identified his name as "William Wesley", despite the booking information which gave his name as "Goetzee, William W." This error regarding his name persisted through his hospitalization at University and when he returned to the jail, causing confusion and inconsistencies in his medical treatment. He

19

was described as semi-alert, with bizarre behavior, a loud speech pattern and unclear thought processes and judgment/insight. He is also described as verbalizing "inappropriately".

33.    Upon admission to University hospital, he was diagnosed as suffering from acute psychosis, rhabdomyolysis, hypertension, chest pain and hypokalemia. He was found to have suicidal ideation and auditory and visual hallucinations. It was noted that his behavior and speech were bizarre. He was given an i.v. of Ativan, which sedated him. He was transferred to a medical floor to address his medical condition. He was also the subject of an emergency commitment, a 72 hour PEC (Physician's Emergency Commitment) due to his obvious psychotic and suicidal state.

34.    On August 4, 2011, a psychiatric consultation was performed at University hospital. At that time Mr. Goetzee told the University psychiatrist that, on August 2, 2011, he had grabbed the gun of the federal officer at the courthouse, with the intention to commit suicide so that "China will stop reading his thoughts." He stated that "he feels China has the technology to read his thoughts and that suicide was the only way to make them stop." He was positive for suicidal ideation but denied having a plan. It was noted that he "laughs inappropriately". He reported that his work was stressful, that he was suffering from chronic insomnia and that he believed that sleep deprivation had put him into a "manic and psychotic state." He is described as being "acutely psychotic with anxiety stemming from paranoia". He was reported as having a GAF (Global Assessment of Functioning) score of 20. He was medicated with

20

Risperdal, Vistaril for anxiety and Lisinipril for blood pressure.

    35.    On August 4, 2011, University hospital personnel requested an examination by a representative of the Coroner's office to determine whether Mr. Goetzee should be committed by the Coroner for an additional 14 days. He was discharged from University Hospital on August 5, 2011, before the Coroner's office had the opportunity to examine him.

    36.    Shortly after midnight, on August 5, 2011. Mr. Goetzee became agitated and pulled out the catheter and grabbed at a nurse. He was found, upon examination, to be disoriented and trying to get out of bed, despite being handcuffed to the bed. He was placed in 4 point restraints and given Ativan as a sedative. The restraints were discontinued at 6:50 A.M. as he was "sleeping peacefully". When he was interviewed by a psychiatrist later that morning, he stated that he "didn't want to be tortured when he died" and was not able to answer questions logically. It was noted that he remained on the Risperdal and Visteril but still had "intermittent agitation" . At 1335 (1:35 pm) it was noted that he "remains delusional" . It was also noted that he was showing "gradual improvement" on his current medication.

    37.    On August 5, 2011, University discharged him to the care of defendant Dr. Higgins, with recommended prescribed medications of Risperdal, Visteril and Lisinipril, all medications which he been receiving at University.

    38.    Mr. Goetzee was still very ill and delusional when transferred, on Friday afternoon, August 5, 2011,  to the jail from University hospital. His diagnosis upon

<p style="text-align:center">21</p>

transfer to the jail was: (1) Psychosis NOS (2) Rhabdomyolysis-mild (3) HTN (hypertension) (4) Chest Pain (5) Hypokalemia and (6) Macrocylic Anemia. The discharge papers from University hospital stated "Needs Psych Follow Up ASAP". Recommended treatment was Risperdal, Lisinopril and Vistaril. These recommendations were duly noted in the OPP Medical Department records. However, immediately upon arriving back at the jail, these recommendations were disregarded. The prescription for Vistaril, the anti-anxiety medication, was discontinued with no explanation. The last time Mr. Goetzee received it was at 2:00 pm on August 5, 2011, at University, shortly before being transferred back to the jail. It had been prescribed at University for three times a day and as needed. Instead, the defendants withheld this medication from Mr. Goetzee, despite his diagnosis, condition and the obvious need for continuity of care. No anti-anxiety medication was prescribed by the defendants or given to Mr. Goetzee from the time he arrived at the jail until he died. Meanwhile, Mr. Goetzee remained in a state of acute psychosis, delusion, paranoia and suicidal ideation, without adequate or appropriate care or medication.

39.    On information and belief, the defendants, and especially defendant Higgins, have a policy and practice of withholding and not prescribing anti-anxiety medications for persons in custody, even when the need for the medication is clearly evident, is medically indicated and when it has been prescribed by the inmate's treating physician. On information and belief, defendants knew, must have known or should have known that it would cause detrimental effects upon an individual in Mr. Goetzee's

22

condition, to deprive him of medication which would help to calm him and provide some relief from his acute anxiety, particularly given the conditions in which he was confined. On information and belief, the defendants were involved with and/or aware of the general policies and practices in this regard as well as the decision to deprive Mr. Goetzee of the recommended anti-anxiety medication or any other similar, anti-anxiety medication or treatment. The defendants knew, must have known, or should have known that withholding anti-anxiety medication could cause undue suffering, trauma and serious harm to a patient in Mr. Goetzee's situation.

40.     Defendants as well as other staff and employees of the OPSO not named herein but acting in the course and scope of their employment, also knew, must have known, or should have known that the facilities, staff and operations at HOD were grossly inadequate and incapable of adequately, properly or humanely providing reasonable accommodations, adequate treatment, monitoring or care for Mr. Goetzee, especially on a weekend when staffing and supervision were minimal, and that there was a serious risk of harm or self-harm to accept him back into the jail in his condition. The defendants knew, must have known or should have known that he would be placed in a barren cell and hostile environment on HOD-10, which was not a therapeutic or appropriate placement for an acutely psychotic, suicidal individual in Mr. Goetzee's situation. The defendants knew, must have known or should have known that he would more likely than not be required to sit and sleep on the floor, without any of the basic comforts provided in a hospital, such as a bed, covers, appropriate clothing, and

23

appropriate medical attention. The defendants knew, must have known, or should have known, that the HOD-10 lacked the capacity to provide appropriate medications, such as Ativan or any other similar sedatives via i.v., treatment which he had received in the hospital when he became disoriented and needed sedation.

41.     The defendants also knew, must have known or should have known that there was a problem with the air conditioning on the $10^{th}$ floor, in August, and that the physical conditions would be challenging, uncomfortable and difficult, particularly for an individual who was actively delusional, psychotic and suicidal.

42.     The defendants also knew, must have known, or should have known, that, while confined on HOD-10, Mr. Goetzee would not have access to a telephone or to visits from attorneys or others, particularly over the weekend, and that he would basically be held in isolation and incommunicado from friends, family, loved ones and professional, legal and spiritual advisors. They also knew, must have known or should have known that, more likely than not, Mr. Goetzee would be stripped of his clothing and made to wear a "suicide smock" or "turtle suit" as it was sometimes called, as a suicide prevention method, an ordeal that Mr. Goetzee would not be subject to had he remained in the hospital for his care. Nevertheless, the defendants re-admitted Mr. Goetzee to the jail, and sent him to HOD-10, stripped also of anti-anxiety medication to help him through this ordeal.

43.     Defendant nurses also knew, must have known or should have known, that the conditions under which a suicidal and psychotic patient like Mr. Goetzee would

24

be held on HOD-10, were not conducive to appropriate or adequate medical or nursing care or treatment for a person in his condition and were not a reasonable accommodation for his disability. Defendant nurses knew, must have known or should have known that the anti-anxiety medication prescribed at University Hospital had been discontinued by the doctors at the jail. They knew, must have known, or should have known that HOD-10 was not adequately staffed or supervised. They also knew, must have known or should have known that the conditions under which Mr. Goetzee were being held were not therapeutic and would in fact exacerbate and worsen his condition, and contribute to the severe feelings of isolation and despair that he was experiencing. Defendant nurses knew, must have known , or should have known that, unlike at the hospital, suicide monitoring was not conducted by licensed health care professionals but by security guards. The nurses knew, must have known, or should have known that compliance by deputies with orders for direct, continuous monitoring and observation by correctional staff of suicidal patients on the 10th floor of HOD, was inconsistent and was frequently completely lacking or absent. Defendant nurses violated their ethical and professional duties and standards of care by failing to report, intervene or take appropriate or necessary measures to insure that Mr. Goetzee's treatment would be adequate, humane and appropriate for his condition and his situation.

44.    Nevertheless, when Mr. Goetzee was brought back to the jail, he was accepted and admitted to the jail, as per instructions from defendant Dr. Dileo and defendant S. Pembo, despite the fact that Dr. Dileo and Nurse Pembo knew that he

25

remained positive for suicidal ideation and was not responsive to questions.  On
information and belief, Dr. Dileo and Nurse Pembo failed to take necessary and
appropriate steps to obtain more information about Mr. Goetzee's condition or the
circumstances of his hospitalization at University Hospital. They failed to request or
review  the mental health assessments which were performed at University hospital or
related records.  There is also no indication that the August 2, 2011 jail medical intake
records were reviewed or the computer checked for medications. Documentation
regarding the appropriateness of Mr. Goetzee's re-admission to the jail from the
hospital, as handled by defendants and other staff at the jail, was sparse, inadequate
and lackadaisical, reflecting a lack of care and professional responsibility regarding the
seriousness of Mr. Goetzee's condition. This same attitude persisted throughout Mr.
Goetzee's tragic confinement at the jail, reflected even in the persistent disregard for his
correct name and his allergy to prednisone.

45.        Defendant S. Batiste, an LPN, performed the first "Medical
Assessment: Suicide Watch" by trained medical personnel of Mr. Goetzee on August 5,
2011 at 2000 (8:00 pm), hours after his re-admission to the jail. Mr. Goetzee was
reported to be "lying on the floor in uniform". He is described as positive for suicidal
ideation though no description or other information is provided. Nevertheless, she
described his comfort level as "fair". No vital signs were taken, despite the fact that he
was recently discharged from the hospital with hypertension and rhabdomyolysis. There
is no documentation of any comfort care or any effort to provide him with

26

encouragement or therapeutic support. There is no indication that defendant Batiste
took any steps to intervene or to inform any appropriate authorities that the conditions
under which Mr. Goetzee was being held were unacceptable and medically contra-
indicated for a person in Mr. Goetzee's condition and mental state. Nor did she attempt
any intervention during the entire period of time for which she was responsible for his
care.  Her conduct in this regard was mirrored by the actions of the other LPN's
involved in Mr. Goetzee's "care" at the jail.

46.     Precisely two hours later, at 2200, (10 pm) Defendant S. Batiste reported
that Mr. Goetzee was "lying on floor eyes open to verbal stimuli". He was positive for
suicidal ideation. He was "alert, orient and awake". His "comfort level" was described as
"fair". There was no documentation of any therapeutic interventions. No vital signs were
taken.

47.     Precisely four hours later, at 0200, ( 2 a.m.) defendant S. Batiste reported
again on Mr. Goetzee. At this time she failed to give any description of Mr. Goetzee's
appearance. She reported that he still had suicidal ideation, was oriented and that his
comfort level was  "fair." There was no indication of any therapeutic intervention. No
vital signs were taken

48.     Precisely three hours later, at 0500, ( 5 a.m.) defendant S. Batiste
described Mr. Goetzee's appearance as "lying on the floor awake talking to himself". He
had suicidal ideation. He was alert. His comfort level was "WNL" (within normal limits)..
For the first time there was an "additional comment": "I/M (inmate) moaning stating he

27

wants to die". Again, there was no indication of any therapeutic intervention by defendant nurse S. Batiste. No vital signs were taken.

49.      There was no indication in any of defendant Batiste's notes or indeed of any of the nurse defendants who later performed similar functions, of the presence of any correctional officers who were supposed to be monitoring Mr. Goetzee, or that any of the nurses reviewed any of the observation records which were supposedly being filled out by the deputies on a continuous basis, every 15 minutes, regarding Mr. Goetzee's condition.

50.      On August 6 at 0602 am, defendant Dr. Higgins conducted an "Initial Psychiatric Evaluation" of Mr. Goetzee at which time Dr. Higgins noted that Mr. Goetzee was suicidal, that he had come to the jail from University, where he had been treated for "delirium vs psychosis". He was aware that Mr. Goetzee had previously been on anti-anxiety and anti-insomnia medication. Despite this information, he did not prescribe any medication to Mr. Goetzee to treat either his anxiety or insomnia and discontinued the anti-anxiety medication, Vistaril, which Mr. Goetzee had been prescribed at the hospital. Dr. Higgin's "Psychiatric Treatment Plan" was to continue Mr. Goetzee on Risperdal and to place him on the "Mental health tier", under "watch" with "direct observation" and a "suicide smock" and to follow up the next day.

51.      Dr. Higgins knew, must have known or should have known that Mr. Goetzee was at serious risk of suicide. He knew, must have known, or should have known that the monitoring and assessments that Mr. Goetzee would receive on HOD-

28

10, particularly on a weekend, would be of poor quality, with superficial and incomplete

accounts, erratic documentation and no therapy or comfort care. He knew, must have

known or should have known that the staffing, facilities, housing conditions, and the

type and quality of care which Mr. Goetzee would receive at the jail would be

inadequate for his needs and significantly deficient compared to treatment he would

receive in a hospital. He knew, must have known or should have known that the jail was

not an appropriate place for Mr. Goetzee, given his condition and his disability.   Dr.

Higgins knew, must have known or should have known of a number of other deaths by

suicide of mentally ill patients at the jail, and at HOD-10, which were related to

inadequate care, treatment and monitoring. In a number of instances, those prisoners

who committed suicide or who died on HOD-10 were under Dr. Higgins care.   Yet he

made no effort to return Mr. Goetzee to the hospital for appropriate care. He gave no

orders to increase the frequency or improve the quality of Mr. Goetzee's medical

assessments  or to insure that medical and correctional staff would be vigilant in

observing and monitoring Mr. Goetzee. He gave no orders to monitor Mr. Goetzee's

vital signs though he knew, must have known or should have known that he had

recently been released from the hospital with hypertension and rhabdomyolosis and that

untreated anxiety can trigger panic attacks which can be manifested in increases in

blood pressure, heart rate and pulse rate.  He made no effort to obtain the psychiatric

consults and records from University hospital, which would have provided important

information as to Mr. Goetzee's condition.  He knew the jail could not provide necessary

and appropriate care for Mr. Goetzee and that the standard of care at the jail for mentally ill, suicidal patients was not consistent with the standard of care in the community yet he failed to take any appropriate measures to address this problem.

52.     On August 6, 2011, at 0715 am, defendant E. Bargky, who had been involved with the transfer of Mr. Goetzee to University hospital on August 3, 2011 to "rule out delirium", reportedly conducted a "Medical Assessment: Suicide Watch" assessment of Mr. Goetzee while Mr. Goetzee remained in a cell on HOD-10. Mr. Goetzee was reported to be "awake, sitting on the floor". He is described as positive for suicidal ideation though no description or other information is provided. Nevertheless, his comfort level is "fair". As with all of defendant Bargky's "assessments" of Mr. Goetzee, no vital signs were taken. There is no documentation of any comfort care or any effort to provide him with encouragement or therapeutic support. There is no indication that defendant Bargky took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. Nor did she attempt any intervention during the weekend when she was responsible for his care.

53.     According to OPSO records, Defendant Bargky conducted an assessment at 1615 (4:15 pm) where Mr. Goetzee was "awake, standing at the gate". She failed to document whether or not he was continuing to experience suicidal ideation. He was reported, however, to be oriented, with no complaints voiced.

Defendant Bargky reportedly did another assessment at some undocumented time on August 6, 2011, where Mr. Goetzee was reported to be "awake, standing at the gate". At that unknown time, according to defendant Bargky, Mr. Goetzee did not have suicidal ideation, although there is no description of his behavior or further information given to substantiate that assessment. There was no assessment of his "LOC" (Level of Consciousness) while his comfort level was reported as "fair" with no complaints "voiced". Again, no vitals were taken.

54.     Defendant David Schaible, the nurse who was on duty at HOD-10 on "night shift" on August 6-7, 2011, apparently prepared his "suicide watch assessments" on a computer, as they are neatly typed and printed out, covering four entries beginning on 8/6/11 at 21:00 (9:00 pm) and continuing on 8/7/11 at 00:01 am, 3:00 am and 6:00 am. All four reports are identical, with no comments, no descriptions, no information except that apparently Mr. Goetzee was in the cell, his appearance was "NADN" (No apparent distress noted), he was suicidal, he was oriented X 3, he voiced "no complaints" and his comfort level was "okay". There is no documentation of what Mr. Goetzee was saying or doing. Vital signs were not recorded.

55.     Every defendant nurse who checked on Mr. Goetzee from August 5-7, 2011, over a 48-hour period, reported that he was awake everytime he was checked. However, there is no inquiry made by any of them as to whether he was suffering from insomnia, which he had reported to Dr. Higgins as a chronic problem, and no treatment or intervention was provided to enable him to get some sleep. The defendant nurses

31

and Dr. Higgins knew, must have known, or should have known that Mr. Goetzee had a history of insomnia, and had previously taken anti-insomnia medication, which was not currently being prescribed or given to him at the jail. The defendant nurses and Dr. Higgins knew, must have known or should have known that chronic lack of sleep can have a serious impact on an individual's judgment, thought processes and mental status, yet nothing was done for Mr. Goetzee to provide relief or treatment for this serious condition.

56.      There is no documentation of any efforts by any of the nurse defendants to seek additional medical intervention or medications for Mr. Goetzee during this entire time. There is no documentation that he was offered any comfort care or that there were any efforts to provide him with encouragement or therapeutic support. There is no indication that any of the nurse defendants or any other staff at the jail took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state.   The nurses also failed to provide adequate documentation regarding Mr. Goetzee's condition and behavior.

57.      There is no indication on any of defendant nurses' reports that any supervisor ever checked their reports or participated in or reviewed the monitoring of Mr. Goetzee during the time he was confined at the jail.   Defendant Daryl Jackson, the Director of Nursing, was responsible to insure adequate training and supervision of nursing staff and failed to do so.  Defendants Jose Ham and Mary Ann Benitez were

32

responsible to do quality control and to review medical charts and to see that nurses were properly performing their duties consistent with professional standards and the standard of care in this community. They failed to do so.

58.     Defendants Dr. Gore and Dr. Higgins, as the medical and psychiatric directors at the jail, respectively, each had responsibility for training, supervising and overseeing the services provided by medical staff including nurses, as well as correctional officers assigned to HOD-10. All of the defendants who were in supervisory positions with oversight responsibilities failed to properly carry out their responsibilities.

59.     On information and belief, none of the OPSO nursing or medical staff, including the defendants, were disciplined for their acts or omissions regarding the events described herein.

60.     On Sunday, August 7, 2011, defendant Nurse Bargky resumed "suicide watch" for Mr. Goetzee. At 0800 (8 am) and over six hours later at 1410 (2:10 pm) defendant Bargky reported that Mr. Goetzee was "awake, sitting on the floor". At 0800 he is reported as having suicidal ideation, with no further information as to how that condition manifested itself, while at 1410 (2:10 pm) he had no suicidal ideation, again with no explanation reported. There is also no explanation for the six-hour delay between assessments.

61.     At 2:20 pm, 10 minutes after defendant Bargky reported that Mr. Goetzee no longer had suicidal ideation, he was evaluated by defendant C. Johnson, FNP, who, as a nurse practitioner, had more training, a higher level of professional

33

licensing and more responsibility than the LPNs. For the first time in over 24 hours, there is a minimal narrative account of what Mr. Goetzee is saying: "states he 'has things he hears in his head that may convince him to harm himself'. The "Impression/Assessment & Plan" is "suicide assessment" which, on information and belief, is to continue what had been going on already. For "medications" defendant Johnson ordered "continue suicidal direct observation with smock." She failed to prescribe or recommend any anti-anxiety, anti-insomnia, or other medication. There is no documentation that Mr. Goetzee was offered any comfort care or that there were any efforts to provide him with encouragement or therapeutic support. There is no indication that defendant Johnson took any steps to intervene or to inform any appropriate authorities that the conditions under which Mr. Goetzee were being held were unacceptable and medically contra-indicated for a person in Mr. Goetzee's condition and mental state. Instead, she merely ordered that he be followed up the next day by Dr. Higgins, for him to conduct another "eval suicidal assessment."

62.     At 1615 (4:15 pm) defendant Bargky documented that Mr. Goetzee was "awake standing at the cell gate" and once again he was reported by defendant nurse Bargky as having "no" suicidal ideation. There is no documentation of any therapeutic intervention, care, or treatment for Mr. Goetzee.

63.     Approximately 2 hours and 15 minutes later, at about 1836 (6:36 pm), deputies were informed, on information and belief by another inmate, that Mr. Goetzee was on the floor of his cell, unresponsive. Deputies informed defendant nurse Bargky,

34

and a "code" was called, and resuscitation efforts were initiated. During resuscitation

efforts it was discovered that Mr. Goetzee had toilet tissue stuffed down his throat,

blocking his airway. On information and belief, Mr. Goetzee had been given access to

toilet paper, which was not otherwise provided in his cell, by OPP staff, including

defendant nurses and deputies, which allowed him to collect a sufficient quantity of the

paper so as to kill himself.

   64.  Placing a prisoner on "Direct observation" under "Suicide watch" at

HOD-10 required that the patient would be under continuous, direct supervision at all

times. On August 7, 2011, defendant former deputy William Thompson was assigned to

perform "direct observation" of William Goetzee. Deputy Thompson was to sit in a chair,

outside Mr. Goetzee's cell, and watch him. He was to fill out, every fifteen minutes, an

observation sheet of Mr. Goetzee's behavior and activities.

   65.  The OPSO suicide watch procedures, using a checklist filled out by

deputies, is a poorly designed, inadequately monitored procedure which fails to ensure

adequate observation of suicidal prisoners and which facilitates the entry of false and/or

misleading information. The defendants knew, must have known, or should have

known that the practice of deputies failing to maintain direct, continuous observation of

suicidal prisoners was widespread, as was falsification of these checklists. Yet the

defendants failed to take appropriate or necessary steps to intervene or to ensure that

direct, continuous observation by qualified, medically trained staff, with accurate and

meaningful documentation of suicidal prisoners took place. In addition, medical

35

personnel were not required to review these documents, they were not routinely made a part of the prisoners' medical records and as a result, there was no effective monitoring program to ensure accurate and truthful documentation relevant to the diagnosis and treatment of prisoners on "direct observation suicide watch".

66.      Defendants knew, must have known or should have known that the monitoring of Mr. Goetzee for August 5-7, 2011, was not being properly performed, documented or reviewed, yet failed to report or intervene. Defendant former deputy William Thompson was assigned on August 7, 2011, to provide continuous, direct monitoring of Mr. Goetzee.  Defendant deputies Williams and Crader were also assigned to HOD-10 on August 7, 2011.  Deputy Thompson showed up late for his assignment and left his post on at least three different occasions. On one occasion he was with defendant deputy Williams, assisting with "feed-up". Defendant deputies Williams and Crader knew, must have known or should have known that defendant Thompson had abandoned his post to directly and continuously observe Mr. Goetzee, yet they failed to take any action to report that abandonment or to take appropriate steps to ensure that Mr. Goetzee was being observed at all times.  In addition, defendant Thompson left his post to go to the restroom, without having anyone fill his place, a practice that was common and known to be common among OPSO staff who worked at HOD, including deputies, nurses, doctors, supervisors, watch commanders and the warden.

67.      Defendant Thompson also left his required duties to provide direct,

36