No. 20-11692

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

United States of America,

Plaintiff-Appellee,

v.

Reality Leigh Winner

Defendant-Appellant.

## APPEAL

From the United States District Court for the Southern District of Georgia
(Case 1:17-CR-00034-JRH-BKE)
Hon. J. Randal Hall,
UNITED STATES DISTRICT JUDGE

## APPENDIX TO THE BRIEF OF APPELLANT
## VOLUME II

JOE D. WHITLEY
BRETT A. SWITZER
**BAKER, DONELSON, BEARMAN,**
 **CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Road
Monarch Plaza, Suite 1500
Atlanta, Georgia 30326
Tel. (404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

LAURA E. COLLINS
**BAKER, DONELSON, BEARMAN,**
 **CALDWELL & BERKOWITZ, P.C.**
100 Light Street
Baltimore, Maryland 21202
Tel. (410) 685-1120
LCollins@bakerdonelson.com

*Counsel for Appellant Reality Leigh Winner*

# INDEX OF APPENDIX

**VOLUME TWO**                                          **Docket/Tab No.**

Exhibit 4 - Attorney General William Barr's March 26, 2020
Memorandum ................................................................................ 341-5

Exhibit 5 - Attorney General William Barr's April 6, 2020 Memorandum ...... 341-6

Exhibit 6 – Court Orders re Granting Motions for Compassionate
Release: .................................................................................... 341-7

> *United States v. Hernandez*, No. 1:18-cr-00834-PAE
> *United States v. Rodriguez*, No. 2:03-cr-00271-AB
> *United States v. Wilson Perez*, No. 1:17-cr-513-AT
> *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15

Exhibit 7 – Confidential Medical Records (Filed Under Seal) ......................... 341-8

Exhibit 8 – Letter of Support from Indira Garcia ............................................ 341-9

Exhibit 9 – Letter of Support from Shana Messerschmidt ............................. 341-10

Reality Winner's Motion for Expedited Briefing and Immediate Hearing ........... 343

Order .......................................................................................................... 344

USA's Response re Motion for Compassionate Release ...................................... 345

Reality Winner's Reply re Motion for Compassionate Release ........................... 347

Exhibit 1 - April 1, 2020 Letter from David Patton, et al., Co-Chairs of the
Federal Public & Community Defenders Legislative Committee to
Honorable William P. Barr, Attorney General .................................................. 347-1

Exhibit 2 - Declaration of Alison Johnston Grinter, Esq. ................................. 347-2

Exhibit 3 – Brennan Center for Justice at NYU School of Law Center for
American Progress, *Expanding BOP's Response to the Novel Coronavirus,
and Helping States Safely Reduce Their Prison Populations* (April 16, 2020) 347-3

Exhibit 4 - Legal Information Services Associates, LLC, Newsletter to Federal Prisoners (April 20, 2020) .................................................................... 347-4

Order ............................................................................................................. 349

Notice of Appeal ............................................................................................. 350

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served upon the following counsel of record by first class mail and/or by electronically filing the foregoing with the Court on this the 22nd day of June, 2020.

Bobby L. Christine
Jennifer G. Solari
Justin G. Davids
Nancy Greenwood
U.S. Attorney's Office
P.O. Box 8970
Savannah, Georgia 31412

/s/ Joe D. Whitley
Joe D. Whitley
Georgia Bar No. 756150

*Counsel for Appellant*
*Reality Leigh Winner*

# 341-5

# Exhibit 4 – Attorney General William Barr's March 26, 2020 Memorandum

# EXHIBIT 4



# Office of the Attorney General
## Washington, D. C. 20530

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:            THE ATTORNEY GENERAL

SUBJECT:      <u>Prioritization of Home Confinement As Appropriate in Response to
COVID-19 Pandemic</u>

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.      TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Memorandum from the Attorney General                                    Page 2
Subject: Department of Justice COVID-19 Hoarding and Price Gouging Task Force

- The security level  of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

# 341-6

# Exhibit 5 – Attorney General William Barr's April 6, 2020 Memorandum

# EXHIBIT 5



**Office of the Attorney General**
Washington, D. C. 20530

April 6, 2020

MEMORANDUM FOR ALL HEADS OF DEPARTMENT COMPONENTS AND
ALL UNITED STATES ATTORNEYS

FROM:            THE ATTORNEY GENERAL

SUBJECT:     Litigating Pre-Trial Detention Issues During the COVID-19
Pandemic

  The mission of the Department of Justice is to enforce our nation's laws and to ensure the safe and fair administration of justice. We have an obligation to maintain public safety and to protect victims and witnesses from threats and retaliation, and we must also safeguard the health and safety of those remanded to our custody. As always, controlling weight should be given to public safety, and under no circumstance should those who present a risk to any person or the community be released. But the current COVID-19 pandemic requires that we also ensure we are giving appropriate weight to the potential risks facing certain individuals from being remanded to federal custody. Each case must be evaluated on its own and, where appropriate, the risks the pandemic presents should be part of your analysis, as elaborated further below.

  First, the Bail Reform Act ("BRA") remains the governing statute for pretrial detention issues and you are to continue enforcing that provision according to its terms. As you know, the BRA provides that a defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

  For certain crimes, it is presumed that "no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3). We should continue applying the BRA's factors and that presumption according to their terms. We simply cannot agree to anything that will put the public at risk. COVID-19 presents real risks, but so does allowing violent gang members and child predators to roam free. When you believe a defendant poses a risk to the safety of any person or the community at large, you should continue to seek remand as zealously today as you would have before the pandemic began, in accordance with the BRA's plain terms. Protecting the public from criminals is our paramount obligation.

Memorandum from the Attorney General                                           Page 2
Subject: Litigating Pre-Trial Detention Issues During the COVID-19 Pandemic

Second, in applying the familiar BRA analysis, which already includes some consideration of the defendant's "physical and mental condition," *id.*, you should now consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic. Even with the extensive precautions we are currently taking, each time a new person is added to a jail, it presents at least some risk to the personnel who operate that facility and to the people incarcerated therein. It also presents risk to the individual being remanded into custody—risk that is particularly acute for individuals who are vulnerable to a serious infection under the Centers for Disease Control and Prevention ("CDC") Guidelines.

We have an obligation to minimize these risks to the extent possible while remaining faithful to the BRA's text and discharging our overriding obligation to protect the public. That means you should consider not seeking detention to the same degree we would under normal circumstances—specifically, for those defendants who have not committed serious crimes and who present little risk of flight (but no threat to the public) and who are clearly vulnerable to COVID-19 under CDC Guidelines. In this analysis, the risk of flight and seriousness of the offense must be weighed against the defendant's vulnerability to COVID-19. Accordingly, we should continue to seek detention for defendants who are charged with serious crimes and who pose a substantial risk of flight, or for defendants who would normally warrant detention under the BRA and who are not vulnerable to COVID-19 under CDC Guidelines.

Third, these same considerations should govern your litigation of motions filed by detained defendants seeking release in light of the pandemic. In these cases, the Court has already made a finding based on the evidence presented that a defendant posed a risk of flight or a danger to the community and should therefore be remanded pending trial. In assessing whether it is appropriate to revisit that determination, you should also consider the potential risk that the defendant will spread COVID-19 in his or her community upon release. At the same time that the defendant's risk from COVID-19 should be a significant factor in your analysis, you should also consider any risk that releasing the defendant would pose to the public. This consideration will depend on the facts and circumstances of each defendant and the facility where he or she is being held, and you should factor this consideration into your analysis as appropriate. Our duty to protect the public extends to protecting it from contagion spread by someone released from our custody.

*     *     *

The factors and considerations discussed herein should guide your analysis of pretrial detention issues while the pandemic is ongoing, but what position to take in each particular case is ultimately your decision. We must adapt to the current difficult circumstances, while also ensuring that we never deviate from our duty to keep the public safe from dangerous criminals. Please exercise your discretion appropriately.

# 341-7

# Exhibit 6 – Court Orders re Granting Motions for Compassionate Release:

*United States v. Hernandez*, No. 1:18-cr-00834-PAE
*United States v. Rodriguez*, No. 2:03-cr-00271-AB
*United States v. Wilson Perez*, No. 1:17-cr-513-AT
*United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

DANIEL HERNANDEZ,

Defendant.

18 Cr. 834-04 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

WHEREAS on December 18, 2019, the Court imposed sentence on the defendant as set

forth in a Judgment, dated December 20, 2019 (ECF No. 398);

WHEREAS on March 22, 2020, the defendant moved this Court for compassionate

release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 437);

WHEREAS on March 25, 2020, the Court denied the defendant's motion for failure to

exhaust the administrative remedies set forth in 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 440);

WHEREAS on March 31, 2020, now having exhausted his administrative remedies, the

defendant renewed his motion for compassionate release pursuant to 18 U.S.C. §

3582(c)(1)(A)(i) (ECF No. 445);

NOW THEREFORE IT IS HEREBY ORDERED that, for the reasons set forth in an

accompanying Opinion and Order, the Court grants the defendant's motion for compassionate

release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i);

IT IS FURTHER ORDERED that pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the Court

hereby reduces the defendant's term of incarceration such that he is released from the custody of

the Bureau of Prisons effective immediately;

IT IS FURTHER ORDERED that the defendant is hereby placed on supervised release and the Court re-imposes the terms and conditions of supervised release as set forth in the December 20, 2019 Judgment (ECF No. 398) with the following amendments:

1. The defendant shall serve the first four months of supervised release on home incarceration, to be enforced by GPS monitoring, at an address approved by the defendant's probation officer;

2. In light of the COVID-19 pandemic, the defendant must remain at his residence except to seek any necessary medical treatment or to visit his attorney, in each instance with prior notice and approval by the Probation Department; and

3. In the event the Probation Department is unable to implement GPS monitoring upon the defendant's release, the defendant is ordered to have daily contact with the defendant's probation officer through videoconferencing technology until GPS monitoring is implemented.

IT IS FURTHER ORDERED that the Court grants the Government's request that the docketing of this Order be delayed, such that this Order and the Court's accompanying Opinion and Order are not to be docketed until 4 p.m. on April 2, 2020.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 1, 2020
      New York, New York

2

Case 2:03-cr-00271-AB  Document 135  Filed 04/01/20  Page 1 of 21
Case 1:12-cr-00034-JRH-BKE  Document 341  Filed 04/10/20  Page 4 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 17 of 170

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES

v.

JEREMY RODRIGUEZ

Criminal Action
No. 2:03-cr-00271-AB-1

## MEMORANDUM

We are in the midst of an unprecedented pandemic.  COVID-19 has paralyzed the entire world.  The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it.  It may kill 200,000 Americans and infect millions more.[1]  At this point, there is no approved cure, treatment, or vaccine to prevent it.[2]  People with pre-existing medical conditions—like petitioner Jeremy Rodriguez—face a particularly high risk of dying or suffering severe health effects should they contract the disease.

Mr. Rodriguez is an inmate at the federal detention center in Elkton, Ohio.  He is in year seventeen of a twenty-year, mandatory-minimum sentence for drug distribution and unlawful firearm possession, and is one year away from becoming eligible for home confinement.  Mr. Rodriguez has diabetes, high blood pressure, and liver abnormalities. He has shown significant rehabilitation in prison, earning his GED and bettering himself with numerous classes. He moves for a reduction of his prison sentence and immediate release under the "compassionate release"

---

[1] Bobby Allyn, *Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

[2] *See* Pien Huang, *How the Novel Coronavirus and the Flu Are Alike . . . And Different*, National Public Radio (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

statute, 18 U.S.C. § 3582(c)(1)(A).  He argues that "extraordinary and compelling reasons

warrant such a reduction."  18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Rodriguez, nothing could be more extraordinary and compelling than this

pandemic. Early research shows that diabetes patients, like Mr. Rodriguez, have mortality rates

that are more than twice as high as overall mortality rates.[3]  One recent report revealed: "Among

784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That

compares with 2.2% of those with no underlying conditions needing ICU treatment."[4]

These statistics—which focus on the non-prison population—become even more

concerning when considered in the prison context.  Prisons are tinderboxes for infectious disease.

The question whether the government can protect inmates from COVID-19 is being answered

every day, as outbreaks appear in new facilities.  Two inmates have already tested positive for

COVID-19 in the federal detention center in Elkton—the place of Rodriguez's

incarceration.[5]  After examining the law, holding oral argument, and evaluating all the evidence

that has been presented, I reach the inescapable conclusion that Mr. Rodriguez must be granted

"compassionate release."

## I.    DISCUSSION

18 U.S.C. § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court

finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction

---

[3] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[4] Tom Avril, *How much diabetes, smoking, and other risk factors worsen your coronavirus odds*, Phialdelphia Inquirer (Mar. 31, 2020), https://www.inquirer.com/health/coronavirus/coronavirus-underlying-conditions-heart-lung-kidney-cdc-20200331.html.

[5] *COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 31, 2020), https://www.bop.gov/coronavirus/index.jsp.

Case 2:03-cr-00271-ABKE Document 135-1 Filed 04/01/20 Page 2 of 24
Case 1:17-cr-00034-JRH-BKE Document 341 Filed 06/22/20 Page 6 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 19 of 170

would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.[6] Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," none of which apply to Mr. Rodriguez. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). It also provides a fourth "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Id.* § 1B1.13, cmt. n.1(D). Mr. Rodriguez argues that, in light of the First Step Act, the Court is no longer bound by the policy statement. Therefore, he argues, the Court can and should exercise its discretion to determine that "extraordinary and compelling reasons" exist for his release. The government argues that Rodriguez does not meet any of the enumerated criteria in the policy statement, and that the Court cannot independently assess whether other extraordinary and compelling reasons exist that warrant a sentence reduction.

I conclude that (1) the Court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic—in combination with Mr. Rodriguez's underlying health conditions, proximity to his release date, and rehabilitation—constitute "extraordinary and compelling reasons" that warrant a reduction; (3) Mr. Rodriguez is not a danger to his community; and (4) the factors under § 3553(a) favor reducing Mr. Rodriguez's sentence. Therefore, I will grant the motion.

---

[6] The government agrees that Rodriguez's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility.").

### A.  The Court may decide whether "extraordinary and compelling reasons" exist

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c).  Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission."  Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions."  *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

The BOP rarely did so.  The BOP was first authorized to file compassionate-release motions in 1984.  From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions.  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates  . . . not being considered for release, and terminally ill inmates dying before their requests were decided."  *Id.*  The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release."  *Id.*

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration."  *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First*

Case 2:03-cr-00372-RH-BKE Document 135 Filed 04/01/20 Page 5 of 84
Case 1:17-cr-00034-JRH-BKE Document 341 Filed 04/10/20 Page 8 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 21 of 170

*Step Act of 2018: An Overview* 1 (2019)).  In an effort to improve and increase the use of the

compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to

directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper"

role.[7]  Congress made this change in § 603(b) of the First Step Act.  Section 603(b)'s purpose is

enshrined in its title: "Increasing the Use and Transparency of Compassionate Release."  Section

603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate

release process of the Bureau of Prisons.'"  *Brown*, 411 F. Supp. 3d at 451 (quoting Granting

Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018)).

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court:

(1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a

motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by

the warden of the defendant's facility, "whichever is earlier."  18 U.S.C. § 3852(c)(1)(A).  These

changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate

release even in the face of BOP opposition or its failure to respond to the prisoner's

compassionate release request in a timely manner."  *United States v. Young*, 2020 WL 1047815,

at *5 (M.D. Tenn. Mar. 3, 2020).  The substantive criteria of § 3582(c)(1)(A)(i) remained the

same.

Congress never defined the term "extraordinary and compelling reasons," except to state

that "[r]ehabilitation . . . alone" does not suffice.  18 U.S.C. § 994(t).  Rather, Congress directed

the Sentencing Commission to define the term.  *Id.*  The Commission did so prior to the passage

---

[7] S*ee also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act
was passed against the backdrop of documented infrequency with which the BOP filed motions for a
sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5,
2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate
release . . . and expedites compassionate release applications.").

Case 2:03-cr-00271-ABKE Document 135-1 Filed 04/01/20 Page 6 of 84
Case 1:17-cp-00034-2RHABKE Document 341 Filed 04/01/20 Page 6 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 22 of 170

of the First Step Act, but has not since updated the policy statement.  *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C).  The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

Case 2:03-cr-20371-BRE Document 135 Filed 04/01/20 Page 7 of 24
Case 4:17-cr-00034-RH Document 341-7 Filed 04/20/20 Page 14 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 23 of 170

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act,[8] and the policy statement is now clearly outdated.  The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP.  And an Application Note also explicitly confines the policy statement to such motions.  *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also Brown* at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v. Ebbers*, --- F. Supp. 3d ----, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)."  *United States v. Beck*, --- F. Supp. 3d ---- , No. 13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("Application Note 1(D)'s

---

[8] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action.  *See, e.g.*, *United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121, at *1 n.3 (Feb. 18, 2020).

prefatory language, which requires a [catchall] determination by the BOP Director, is, in

substance, part and parcel of the eliminated requirement that relief must be sought by the BOP

Director in the first instance. . . . [R]estricting the Court to those reasons set forth in §1B1.13

cmt. n.1(A)-(C) would effectively preserve to a large extent the BOP's role as exclusive

gatekeeper, which the First Step Act substantially eliminated . . . ."); *United States v. Young*,

2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to

determine the existence of an extraordinary and compelling reason, like the requirement for a

motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the

amendments implemented by the First Step Act."); *Maumau*, 2020 WL at *2-*3 (D. Utah Feb.

18, 2020) (collecting cases).

   A smaller number of courts have concluded that the Sentencing Commission's policy

statement prevents district courts from considering any "extraordinary and compelling reasons"

outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g., United States v.

Lynn,* 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019); *United States v. Shields*, 2019 WL

2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2

(S.D. Ga. Dec. 10, 2019).  The government urges this Court to follow these minority decisions.

   The conclusion reached by the majority of courts is more persuasive.  It is true that

§3852(c)(1)(A) requires courts to act consistently with *applicable* policy statements under the

Sentencing Guidelines, but the Sentencing Commission simply has not issued a policy statement

that addresses prisoner-filed motions post-First Step Act:

> There is no policy statement applicable to motions for compassionate release filed
> by defendants under the First Step Act.  By its terms, the old policy statement
> applies to motions filed by the [BOP] Director and makes no mention of motions
> filed by defendants. . . . The Sentencing Commission has not amended or updated
> the old policy statement since the First Step Act was enacted, nor has it adopted a
> new policy statement applicable to motions filed by defendants.

Case 2:03-cr-00371-AB Document 135-1 Filed 04/01/20 Page 8 of 24
Case 4:17-cr-00034-JRH-BKE Document 34 Filed 04/20/20 Page 24 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 25 of 170

*Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *5 (citations omitted).  The introductory

sentence of §1B1.13, "*[u]pon motion of the Director of the [BOP . . . the court may reduce a*

*term of imprisonment*," limits the policy statement's scope to a procedural scheme exclusively

involving the BOP that does not exist anymore. And comment 4 of §1B1.13's Application Note

expressly states that "[a] reduction *under this policy statement may be granted only upon motion*

*by the Director of the [BOP]*."  Accordingly, by its own terms, the scope of the old policy

statement is clearly outdated and, at the very least, does not apply to the entire field of post-First

Step Act motions.  In other words, for prisoner-filed motions, there is a gap left open that no

"applicable" policy statement has addressed.  Therefore, the policy statement may provide

"helpful guidance" but does not limit the Court's independent assessment of whether

"extraordinary and compelling reasons" exist under § 3582(c)(1)(A)(i). *See Beck* at *6; *Fox*,

2019 WL 3046086, at *3 ("I agree with the courts that have said that the Commission's existing

policy statement provides helpful guidance . . . [but] is not ultimately conclusive given the

statutory change.").

Minority cases like *Lynn* attempt to refute this point by minimizing the impact of the First

Step Act's changes.  *See Lynn*, 2019 WL 38505349, at *4 n.5 ("While Section 1B1.13 and

application note 4 reference motions brought by BOP, this merely restates the restriction on

proper movants [that existed] prior to the [First Step] Act . . . .").  The First Step Act, however,

significantly altered the landscape of compassionate-release motions and created a procedural

gap that the Sentencing Commission's policy statement never had a chance to address.

When the Commission wrote its policy statement, a motion could reach the court only

through the BOP.  By providing the catchall provision, the Commission recognized that it may

be impossible to definitively predict what reasons may qualify as "extraordinary and

Case 1:17-cr-00037-ABE Document 135-1 Filed 04/01/20 Page 10 of 34
Case 1:17-cr-00034-RH-BKE Document 541 Filed 04/10/20 Page 13 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 26 of 170

compelling." Rather than attempt to make a definitive prediction, the Commission covered all of its bases by ensuring that *every motion* to reach the court would have an opportunity to be assessed under the flexible catchall provision. At the time the Commission wrote, the catchall provision's BOP-focused language[9] accomplished that task, because every motion to reach the court necessarily had to be filed and approved by the BOP.

Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.

It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. But under the minority view, that is exactly what would happen: prisoners in this situation would never have the chance for the BOP to assess their claim under the catchall provision and would never get the chance for this kind of flexible review in the district court, since under the minority view, the court would be constrained to the specific criteria in subsections (A)-(C) of the policy statement.[10] This would have the perverse effect of *penalizing* prisoners who take advantage of

---

[9] *See* U.S.S.G. §1B1.13 cmt. n.1(D) (providing for relief if, "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

[10] The minority bases this view on the BOP-focused language of the policy statement's catchall provision. *See* U.S.S.G. §1B1.13 cmt. n.1(D) (asking only the BOP Director to determine if other extraordinary and compelling circumstances exist).

the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.

That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications."). Under the minority view, Congress would have created a two-tiered system that poses a Sophie's Choice to prisoners with unresponsive wardens: (1) opt for quicker relief at the cost of a disadvantageous standard with no catchall; or (2) endure delay—and, possibly, complete inaction—to retain a more flexible standard. Congress sought to help, not hinder, these sorts of prisoners, and clearly did not intend to create this outcome. Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling." Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill. Nothing in

Case 1:17-cr-00034-RH-AKE Document 135-1 Filed 04/04/20 Page 12 of 24
Case 9:20-cr-00343-RH Document 541 Filed 04/10/20 Page 13 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 28 of 170

§ 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the

statute's text directly instructs *courts* to "find that" extraordinary circumstances exist.[11]

Therefore, this Court has discretion to assess whether Mr. Rodriguez presents

"extraordinary and compelling reasons" for his release outside of those listed in the non-

exclusive criteria of subsections (A)-(C) of the old policy statement.[12] Of course, this policy

statement remains informative in guiding my determination. *See, e.g.*, *Fox*, 2019 WL 3046086,

at *3 ("[T]he Commission's existing policy statement provides helpful guidance on the factors

that support compassionate release, although it is not ultimately conclusive . . . ."); *Beck*, 2019

WL 2716505, at *7 ("While the old policy statement provides helpful guidance, it does not

constrain the Court's independent assessment . . . ."); *United States v. Lisi*, 2020 WL 881994, at

*3 (S.D.N.Y. Feb. 24, 2020) ("[T]he Court may independently evaluate whether [defendant] has

---

[11] Indeed, the compassionate-release provision was first introduced in 1984—with the same "consistent with applicable policy statements" requirement—but the Sentencing Commission did not issue a policy statement until 2006. *See Young*, 2020 WL 1047815, at *3-*4 (providing history of the compassionate-release statute and the Commission's policy statement). Surely courts were not required to refrain from assessing "extraordinary and compelling circumstances" in that interim period. Until the Commission updates its policy statement in light of the First Step Act, the same point applies here.

[12] Accepting the minority view—which appears to treat the BOP's internal guidance on the catchall provision as definitive—also ignores the point that courts "do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency." *Chao v. Community Tr. Co.*, 474 F.3d 75, 85 (3d Cir. 2007) (quoting *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003)). While it is true that Congress provides that courts must act consistently with the Sentencing Commission's policy statements, Congress never delegated any authority to the BOP to define the term "extraordinary and compelling," nor did it ever instruct courts to act consistently with the BOP's internal guidance. *Accord United States v. Ebbers*, --- F. Supp. 3d ----, 2020 WL 91399, at *4 n.6 (S.D.N.Y. 2020) ("[N]o statute directs the Court to consult the BOP's rules or guidelines, and no statute delegates authority to the BOP to define the requirements for compassionate release. . . . Moreover, the First Step Act reduced the BOP's control over compassionate release and vested greater discretion with the courts. Deferring to the BOP would seem to frustrate that purpose."); *cf. U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("[W]hile federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so."); *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (same).

raised an extraordinary and compelling reason for compassionate release . . . [but §1B1.13's

policy statement] remain[s] as helpful guidance to courts . . . .").

**B. Extraordinary and compelling reasons exist here**

Mr. Rodriguez's circumstances—particularly the outbreak of COVID-19 and his

underlying medical conditions that place him at a high risk should he contract the disease—

present "extraordinary and compelling reasons" to reduce his sentence. Black's Law Dictionary

defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."

*Extraordinary*, Black's Law Dictionary (11th ed. 2019).  It defines "compelling need" as a "need

so great that irreparable harm or injustice would result if it is not met."  *Compelling Need*,

Black's Law Dictionary (11th ed. 2019).

Mr. Rodriguez has shown extraordinary and compelling reasons to reduce his sentence.

First, he suffers from underlying health conditions that render him especially vulnerable to

COVID-19.  Second, prison is a particularly dangerous place for Mr. Rodriguez at this moment.

Third, he has served almost all of his sentence and has shown commendable rehabilitation while

in prison. None of these reasons *alone* is extraordinary and compelling. Taken together,

however, they constitute reasons for reducing his sentence "[b]eyond what is usual, customary,

regular, or common," and reasons "so great that irreparable harm or injustice would result if [the

relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling

Need*, Black's Law Dictionary (11th ed. 2019).

i.   Mr. Rodriguez's Health Conditions Make Him Especially Vulnerable to COVID-19

Mr. Rodriguez's health conditions put him at high risk of grave illness or death if he gets

infected with coronavirus. Dr. Cameron Baston, Assistant Professor of Clinical Medicine at the

University of Pennsylvania Perelman School of Medicine, reviewed Mr. Rodriguez's medical

records from 2018 to 2020 and found that Mr. Rodriguez is in the "higher risk category" for

developing more serious disease. Baston Decl. ¶¶ 14-17, Def. Reply Br. Ex. B, ECF No. 134-2.

Mr. Rodriguez has Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension,

obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver

disease." *Id.* ¶ 15. Dr. Baston explained that "Mr. Rodriguez is in the higher risk category as a

result of the immunosuppression from his preexisting condition, Type 2 Diabetes." *Id.* ¶ 16.

Further, "[w]ere he to contract the virus, he would be at a higher risk of morbidity and mortality

due to his liver abnormalities, obesity, and hypertension" and "would also be at a higher risk to

require more advanced support such as ventilation and oxygenation." *Id.* ¶¶ 17-18.

Preliminary research has borne out Dr. Baston's professional opinion. An early World

Health Organization report on COVID-19 found that "[i]ndividuals at highest risk for severe

disease and death include people . . . with underlying conditions such as hypertension [and]

diabetes."[13] While the preliminary overall fatality rate in the report was 3.8%, the fatality rate for

people with diabetes was 9.2%.[14] The fatality rate for people with hypertension was 8.4%.[15] The

---

[13] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[14] *Id.* The report noted that these figures represented the "crude fatality ratio." The Joint Mission acknowledged the challenges of reporting crude fatality ratio early in an epidemic. The overall fatality rate in the report is higher than current global estimates, but these numbers nonetheless show that fatality rates for people with diabetes and hypertension are elevated.

[15] *Id.* The relationship between hypertension and elevated risk from COVID-19 is not fully understood. Some experts say that high blood pressure alone is not a risk factor, but that it may be a risk factor when combined with another underlying health condition. *See* Rob Stein, *High Blood Pressure Not Seen As Major Independent Risk For COVID-19*, National Public Radio (Mar. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/20/818986656/high-blood-pressure-not-seen-as-major-independent-risk-for-covid-19. Other experts believe that COVID-19 strains the heart, making people with hypertension more vulnerable to the disease. *See* Anna Medaris Miller et al., *10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease*, Business Insider (Mar. 23, 2020), https://www.businessinsider.com/hypertension-diabetes-conditions-that-make-coronavirus-more-deadly-2020-3 (noting that 76% of people in Italy who died from

Centers for Disease Control and Prevention also explains that "[p]eople of any age" with "certain underlying medical conditions" are at high risk of severe illness from COVID-19.[16] It names diabetes as one such condition.

The government argues that Mr. Rodriguez's "conditions are not unusual" and notes that the BOP classifies him in its lowest medical care level, for "inmates who are generally healthy with limited needs for clinician evaluation and monitoring." Resp. in Opp'n to Mot. Reduce Sentence 8-9, ECF No. 129 ("Resp. Br."). In the absence of a deadly pandemic that is deadlier to those with Mr. Rodriguez's underlying conditions, these conditions would not constitute "extraordinary and compelling reasons." It is the confluence of COVID-19 and Mr. Rodriguez's health conditions that makes this circumstance extraordinary and compelling.

    ii.   <u>Mr. Rodriguez Cannot Adequately Protect Himself Against Infection in Prison</u>

Given Mr. Rodriguez's vulnerability to COVID-19, prison is a particularly dangerous place for him. COVID-19 is now inside FCI Elkton. Many of the recommended measures to prevent infection are impossible or unfeasible in prison. The government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Rodriguez is housed. *See* Resp. Br. 10. Indeed, Congress and the Department of Justice are increasingly recognizing the danger of COVID-19 outbreaks in prison and encouraging steps to release some inmates. *See infra* at 18.

---

COVID-19 had hypertension). Mr. Rodriguez has hypertension and diabetes, so hypertension is probably a risk factor for him in either case.

[16] *People who are at higher risk for severe illness*, Centers for Disease Control & Prevention (Mar. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Case 3:97-cr-00034-RH-BKE Document 135-1 Filed 04/04/20 Page 16 of 34
Case 1:17-cr-00034-RH-BKE Document 134-1 Filed 04/10/20 Page 19 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 32 of 170

Prisons are ill-equipped to prevent the spread of COVID-19. Public health experts

recommend containing the virus through measures such as social distancing, frequently

disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.[17] Joseph J.

Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor

in the department of Community Health and Prevention at the Drexel Dornsife School of Public

Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of
> conditions of crowding, the proportion of vulnerable people detained, and often
> scant medical care. People live in close quarters and are also subject to security
> measures which prohibit successful "social distancing" that is needed to effectively
> prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without
> disinfection between use. Food preparation and food service is communal, with
> little opportunity for surface disinfection. The crowded conditions, in both sleeping
> areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate
> transmission.

Amon Decl. ¶ 20, Def. Reply Br. Ex. A, ECF No. 134-1. Some jails and prisons have already

become COVID-19 hotspots. For instance, the infection rate in New York City jails is far

outpacing the infection rate in the city as a whole.[18] FCI Oakdale, a BOP facility in Louisiana,

recently "exploded with coronavirus" cases, leading to the death of an inmate and positive test

---

[17] *See, e.g.*, *How to Protect Yourself*, Centers for Disease Control & Prevention,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton,
*Social distancing in the coronavirus pandemic — maintaining public health by staying apart*, Boston
Globe (Mar. 14, 2020), https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-
pandemic-maintaining-public-health-staying-apart/.

[18] *See* Elizabeth Weill-Greenberg, *New York City Jails Have an Alarmingly High Infection Rate,
According to an Analysis by the Legal Aid Society*, The Appeal (Mar. 26, 2020),
https://theappeal.org/new-york-city-jails-coronavirus-covid-19-legal-aid-society/.

Case 1:17-cr-00271-ABE Document 135-1 Filed 04/04/20 Page 17 of 34
Case 4:20-cv-00343-RH-BKE Document 141 Filed 04/10/20 Page 26 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 33 of 170

results for thirty other inmates and staff.[19]  As of March 31, 2020, the BOP has reported that two

inmates at FCI Elkton—Rodriguez's facility—have tested positive for COVID-19.[20]

The BOP cannot adequately protect Mr. Rodriguez from infection, especially in light of

his vulnerability and the presence of COVID-19 in FCI Elkton.

The BOP's containment measures have already proven insufficient to prevent the spread

of COVID-19. As of March 26, the BOP reported eighteen known cases of COVID-19 among

inmates and staff.[21] Just four days later, the BOP reported fifty-two cases, an inmate had died,

and COVID-19 had reached FCI Elkton.[22] The BOP's reported cases are rapidly growing and

almost certainly underestimate the true number of infections. For instance, as of March 29, the

BOP only listed eight COVID-19 cases at FCI Oakdale, while the Washington Post reported

thirty-one.[23] Testing is also scarce throughout the country.[24] Within the BOP, not all inmates

with symptoms are being tested or quarantined.[25] Further, the BOP's protocols for screening

inmates and staff depend on documented risk of exposure. Preliminary research indicates that

---

[19] Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, Washington Post (Mar. 29 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

[20] *COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 31, 2020), https://www.bop.gov/coronavirus/index.jsp.

[21] *Id.* (accessed Mar. 26, 2020).

[22] *Id.* (accessed Mar. 30, 2020); *Inmate Death at FCI Oakdale I*, Bureau of Prisons (Mar. 28, 2020), https://www.bop.gov/resources/news/pdfs/20200328_press_release_oak_death.pdf

[23] *Compare* Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, *supra* note 19, *with COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 29, 2020), https://www.bop.gov/coronavirus/index.jsp.

[24] *See, e.g.*, Robert P. Baird, *Why Widespread Coronavirus Testing Isn't Coming Anytime Soon*, New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/why-widespread-coronavirus-testing-isnt-coming-anytime-soon.

[25] *See* Michael Balsamo & Michael R. Sisak, *Federal prisons struggle to combat growing COVID-19 fears*, AP (Mar. 27, 2020), https://apnews.com/724ee94ac5ba37b4df33c417f2bf78a2.

undocumented cases of coronavirus, including those of people who have not yet begun to show symptoms, are responsible for a significant portion of the virus's transmission.[26]

The situation at FCI Elkton in particular is alarming. The first cases of COVID-19 appeared there *after* the government assured the Court that the BOP was taking aggressive action to contain the disease. Elkton is filled to capacity and appears to have few tests.[27] Mr. Rodriguez represents that inmates at Elkton do not have adequate soap or disinfectant, are still housed together in large groups, and share a thermometer without sanitization, against critical public health recommendations. Reply Br. 1. These representations are consistent with reports of conditions in federal prisons, including at Elkton.[28] At Elkton, prisoners themselves are responsible for cleaning and sanitation.[29]

Recognizing the risk of COVID-19 outbreaks in prisons, Congress, the President, and the Department of Justice have begun encouraging steps to release some prisoners to safer home environments. The coronavirus relief bill enacted on March 27 allows the Attorney General to

---

[26] *See* Ruiyun Li et al., *Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2)*, Science (Mar. 16, 2020), https://doi.org/10.1126/science.abb3221 (86% of Chinese cases before January 23 were undocumented, and undocumented cases were the infection source for 79% of documented cases); Zhanwei Du et al., *Serial Interval of COVID-19 among Publicly Reported Confirmed Cases*, 26 Emerging Infectious Diseases (Mar. 19, 2020), https://doi.org/10.3201/eid2606.200357 (as of February 8, 12.6% of reported infections in China were caused by pre-symptomatic transmission).

[27] *See* Deanne Johnson, *Two positive tests reported at Elkton prison*, Morning Journal (Mar. 31, 2020), https://www.morningjournalnews.com/news/local-news/2020/03/two-positive-tests-reported-at-elkton-prison/; Stan Boney, *Union president wants change after 2 Elkton prison inmates test positive for COVID-19*, WKBN (Mar. 30, 2020), https://www.wkbn.com/news/coronavirus/2-positive-cases-of-covid-19-confirmed-at-columbiana-county-prison/.

[28] *See* Michael Balsamo & Michael R. Sisak, *Federal prisons struggle to combat growing COVID-19 fears*, *supra* note 25; Deanne Johnson, *Two positive tests reported at Elkton prison*, *supra* note 27; Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, *supra* note 19; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, New York Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[29] *See Inmate Information Handbook*, *Federal Bureau of Prisons FCI Elkton, Ohio* at 9, Bureau of Prisons (2012), https://www.bop.gov/locations/institutions/elk/ELK_aohandbook.pdf.

expand the BOP's ability to move prisoners to home confinement. *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2) (2020). This congressional action came after Attorney General William Barr sent a memo to the Director of the BOP recognizing that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[30] Attorney General Barr accordingly requested that the BOP use its statutory authority to release certain inmates to home confinement.[31] *Id.* While he also expressed confidence in the BOP's "ability to keep inmates in our prisons as safe as possible from the pandemic sweeping across the globe," the situation has changed swiftly since he wrote the memo and the BOP's reported COVID-19 cases have since tripled.

   iii.   <u>Mr. Rodriguez is Close to His Release Date and has Demonstrated Rehabilitation</u>

Mr. Rodriguez has served the vast majority of his sentence, seventeen years. He is a year and a half away from his release date, assuming continued good behavior. He is a year away from eligibility for home confinement. Keeping him in prison for one more year makes a marginal difference to his punishment. But the difference to his health could be profound. That is why being so close to his release date in a long sentence adds to the extraordinary and compelling reasons to reduce his punishment.

---

[30] Memo. from Attorney Gen. William Barr to Director of BOP, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[31] Mr. Rodriguez will not be statutorily eligible to be released to home confinement for about a year. Therefore, he is not among those who could be released under Attorney General Barr's memo. I note, however, that Mr. Rodriguez meets many of the discretionary factors outlined in the memo for good candidates for release. He is particularly vulnerable to COVID-19; he is housed in a low-security facility; he has shown overall good conduct and no violent conduct in prison; he has a reentry plan that will maximize public safety; and I find below that he does not pose a danger to others or the community. *See id.*

He has also shown rehabilitation in prison. While serving his sentence, Mr. Rodriguez took GED classes and earned his GED. *See* U.S. Probation Office Memo (Mar. 31, 2020). In 2019, he completed an apprenticeship in computer operations. He has also taken classes about fitness and nutrition, anger management, parenting, financial education, decision-making, and hobbies. Furthermore, Mr. Rodriguez has had only two infractions in seventeen years of incarceration, one for alcohol and one for having a cell phone. Neither were violent or raise concerns about recidivism.

The government objects that rehabilitation is not an appropriate basis for granting compassionate release. It cites Congress's directive to the Sentencing Commission that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Mr. Rodriguez's rehabilitation *alone* would not constitute an extraordinary and compelling reason. But the qualifier "alone" implies that rehabilitation can contribute to extraordinary and compelling reasons. That is how the Commission has understood the statute. *See* U.S.S.G. § 1B1.13 cmt. n.3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, *by itself*, an extraordinary and compelling reason for purposes of this policy statement.") (emphasis added); *Brown*, 411 F. Supp. 3d at 449 ("[T]he Commission implies that rehabilitation may be considered with other factors."). I consider rehabilitation in conjunction with the other reasons outlined here.[32]

---

[32] I do not find the purported changes in Department of Justice (DOJ) policy to be extraordinary and compelling reasons. Whether or not this could be an appropriate basis for compassionate release, Mr. Rodriguez has not demonstrated that he would be charged differently today. He presents no evidence that any official DOJ policy would have made a difference to his designation under the Armed Career Criminal Act, the law that made his prior state drug convictions the predicate for a fifteen-year mandatory minimum sentence. He also fails to show that under current DOJ policy he would not have been charged with violating 18 U.S.C. § 924(c).

Case 1:17-cr-00371-ABE Document 135-1 Filed 04/01/20 Page 21 of 24
Case 1:17-cr-00343-RH-BKE Document 341 Filed 04/10/2019 Page 21 of 43
USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 37 of 170

Indeed, no single reason would provide a basis for reducing Mr. Rodriguez's sentence. Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.

### C.  Mr. Rodriguez is not a danger to others or the community

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

Mr. Rodriguez is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g). Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here. The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Mr. Rodriguez's criminal history involves a series of convictions for drug dealing as well as the firearm offenses in this case. While this history is serious, I find that Mr. Rodriguez does not pose a danger to others. Nothing in his record suggests that he has been violent. The firearms charges related to a gun Mr. Rodriguez disclosed to police officers when they were executing a

search warrant on his home. While he pleaded guilty to possessing a firearm in furtherance of a

drug offense, there was no evidence that he used the gun during the drug transactions or at any

other time. *See Beck*, 2019 WL 2716505, at *10 (noting in similar circumstances that "there was

no evidence or indication that [defendant] ever used or pointed a gun at anyone or that she

threatened anyone with a firearm"). His history of drug dealing is seventeen years behind him,

and nothing in his prison record raises concerns about violence or drug dealing.

I also find that Mr. Rodriguez is not a danger to the community during this pandemic

because he has a home to return to—where he can self-quarantine—and an adequate reentry

plan, as verified by the Probation Office.

### D. The sentence reduction is consistent with the Section 3553(a) factors

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to

the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The applicable sentencing factors

warrant a sentence reduction for Mr. Rodriguez. Because section 3553(a) establishes factors to

consider in initially imposing a sentence, not every factor applies here. The applicable factors

are:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and
>     to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training,
>     medical care, or other correctional treatment in the most effective manner;
> . . . [and]
> (6) the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a). The statute also mandates: "The court shall impose a sentence sufficient,

but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Id.*

The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 3553(a)(1). As described above, Mr. Rodriguez's extensive criminal history is mostly composed of low-level drug dealing. The predicate offenses to his mandatory minimum sentences were non-violent. He has shown rehabilitation and good conduct over the past seventeen years.

The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment. *Id.* § 3553(a)(2). The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes." *Id.* § 3553(a). Mr. Rodriguez has served seventeen years, most of the original sentence imposed. Seventeen years is a long time—long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Mr. Rodriguez. Rather than being long enough to provide Mr. Rodriguez with needed medical care, it may interfere with his ability to get needed medical care. To prolong his incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

The final relevant factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). Because Mr. Rodriguez has served the vast majority of his mandatory minimum sentence and is a year and a half away from release, granting his motion sufficiently minimizes sentence disparities between him and similarly situated defendants.

## II.    CONCLUSION

Mr. Rodriguez has now served the lion's share of his sentence. But his sentence did not include incurring a great and unforeseen risk of severe illness or death. For this reason, I will

grant Mr. Rodriguez's motion for a sentence reduction. I will sentence him to time served, six

years of supervised release, and a supervised release condition that he must remain in home

quarantine for at least 14 days and until further order of the Court.


  S/ANITA B. BRODY, J.
ANITA B. BRODY, J.


Copies **VIA ECF** on  04/01/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

WILSON PEREZ,

                                 Defendant.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _4/1/2020_____ |

17 Cr. 513-3 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Wilson Perez, a prisoner serving his sentence at the Metropolitan Detention Center (the

"MDC"), moves for a reduction of his term of imprisonment under the federal compassionate release

statute, codified at 18 U.S.C. § 3582(c)(1)(A). Def. Letter, ECF No. 92. For the reasons stated

below, Perez's motion is GRANTED.

**BACKGROUND**

On October 21, 2019, Perez pleaded guilty to kidnapping and conspiracy in violation of 18

U.S.C. § 1201. ECF No. 85. On January 2, 2020, the Court sentenced him to three years of

imprisonment and two years of supervised release. ECF No. 89. "Perez has a well-documented

history of medical complications which stem from injuries suffered during his incarceration." Gov't

Letter at 3, ECF No. 95. While housed at the Metropolitan Correctional Center, he was the victim of

two vicious beatings, resulting in a broken jaw and shattered bones around his eye socket; both

attacks sent him to the hospital and necessitated reconstructive surgeries of his face, with the second

surgery requiring metal implants. *See* Sentencing Tr. 9:8–18, ECF No. 74. Although Perez's

physicians directed that he receive follow-up care, such care was repeatedly delayed or difficult to

obtain. *See id.* 10:22–12:17. He continues to suffer from pain and persistent vision problems.

Because Perez has been detained since his arrest on September 27, 2017, ECF No. 17, his prison

sentence is set to terminate on April 17, 2020, Def. Letter at 1.

Perez requests release in advance of that date because he is at risk of contracting, and experiencing serious complications from, COVID-19 if he remains at the MDC. *Id.* at 1–2. He spends most of each day with a cellmate in a small cell "that is barely large enough for a single occupant," where he is "breathing recirculated air" and "unable to practice proper hygiene." *Id.* at 1. Additionally, Perez "is in pain and not receiving pain medication." *Id.* The Federal Bureau of Prisons (the "BOP") acknowledges that COVID-19 is present within the MDC. *See* COVID-19 Tested Positive Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/. The Government does not object to Perez's release on the merits, conceding that Perez has a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues," and that "he has less than a month remaining on his sentence." Gov't Letter at 3. But the Government questions the Court's authority to act on Perez's application, arguing that he has not exhausted the administrative remedies under § 3582(c)(1)(A), which requires that a defendant seeking compassionate release present his application to the BOP and then either (1) administratively appeal an adverse result if the BOP does not agree that his sentence should be modified, or (2) wait for 30 days to pass. Gov't Letter at 3–4.

On March 26, 2020, Perez submitted to the BOP his application for a sentence modification. ECF No. 96 at 4. To date, the BOP has not acted on that request. The Court holds, however, that Perez's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic. And the Court agrees with the parties that this threat also constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served. Accordingly, Perez's motion is GRANTED.

## DISCUSSION

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify

terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except
> that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or
> upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on
> the defendant's behalf or the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or
> without conditions that does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section 3553(a) to the extent
> that they are applicable, if it finds that--
>
> (i)    extraordinary and compelling reasons warrant such a reduction . . . and that
>        such a reduction is consistent with applicable policy statements issued by the
>        Sentencing Commission.

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Perez must

both meet the exhaustion requirement and demonstrate that "extraordinary and compelling

reasons" warrant a reduction of his sentence.  The Court addresses these requirements in turn.

I.    Exhaustion

Section 3582(c)(1)(A) imposes "a statutory exhaustion requirement" that "must be strictly

enforced." *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4,

2020) (citing *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (internal quotation marks

and alterations omitted)).[1]  The Court may waive that requirement only if one of the recognized

exceptions to exhaustion applies.

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not

absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503

---

[1] The Court need not decide whether § 3582(c)'s exhaustion requirement is a jurisdictional requirement or merely a
mandatory claim-processing rule. *See Monzon*, 2020 WL 550220, at *2 (describing split between courts on that
question).

U.S. 140, 146–47 (1992)).[2]  There are three circumstances where failure to exhaust may be excused. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Id.*  Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* at 119.  Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id.*

All three of these exceptions apply here.  "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.  Moreover, the relief the agency might provide could, because of undue delay, become inadequate.  Finally, and obviously, [Perez] could be unduly prejudiced by such delay." *Washington*, 925 F.3d at 120–21; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").  Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez.  The Court concludes that requiring him to exhaust administrative

---

[2] The Supreme Court has stressed that for "a statutory exhaustion provision . . . Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  Even when faced with statutory exhaustion requirements, however, the Supreme Court has allowed claims to proceed notwithstanding a party's failure to complete the administrative review process established by the agency "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate," so long as the party presented the claim to the agency.  *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976). That reasoning explains the Second Circuit's holding that even statutory exhaustion requirements are "not absolute." *Washington*, 925 F.3d at 118.  Perez has presented his claim to the BOP, *see* ECF No. 96 at 1, so the situation here is analogous.

remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

To be sure, "the policies favoring exhaustion are most strongly implicated" by challenges to the application of existing regulations to particular individuals. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). Ordinarily, requests for a sentence reduction under § 3582(c) would fall squarely into that category. But "courts should be flexible in determining whether exhaustion should be excused," *id.* at 151, and "[t]he ultimate decision of whether to waive exhaustion . . . should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239. Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Perez's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

Here, delaying release amounts to denying relief altogether. Perez has less than three weeks remaining on his sentence, and pursuing the administrative process would be a futile endeavor; he is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before his release date. Perez asks that his sentence be modified so that he can be released now, and not on April 17, 2020, because remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19. He has had two surgeries while incarcerated, and continues to suffer severe side effects such as ongoing pain and persistent vision problems. ECF No. 96 at 4. As the Government

concedes, Perez faces a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues." Gov't Letter at 3. Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling."

Accordingly, the Court holds that Perez's undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement.[3]

II.   Extraordinary and Compelling Reasons for Release

The Court also finds that Perez has set forth "extraordinary and compelling reasons" to reduce his sentence to time served. 18 U.S.C. § 3582(c)(1)(A)(i). The Government does not dispute that Perez has done so. Gov't Letter at 3. And Perez's medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-19, clears the high bar set by § 3582(c)(1)(A)(i).

The authority to define "extraordinary and compelling reasons" has been granted to the United States Sentencing Commission, which has defined that term at U.S.S.G. § 1B1.13, comment n.1. *See United States v. Ebbers*, No. 02 Cr. 11443, 2020 WL 91399, at *4–5 (S.D.N.Y. Jan. 8, 2020). Two components of the definition are relevant. First, extraordinary and compelling reasons for modification exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13

---

[3] A number of courts have denied applications for sentence modification under § 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19 on the ground that the defendants failed to exhaust administrative remedies. *See, e.g., United States v. Zywotko*, No. 2:19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Eberhart*, No. 13 Cr. 00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Hernandez*, No. 19 Cr. 834, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020). But in several of those cases, the defendant was not in a facility where COVID-19 was spreading, and in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19. In this case, unlike those, Perez has established that enforcing the exhaustion requirement carries the real risk of inflicting severe and irreparable harm to his health.

comment n.1(A)(ii).  Perez's recent surgeries, and his persistent pain and vision complications,

satisfy that requirement.  Confined to a small cell where social distancing is impossible, Perez cannot

provide self-care because he cannot protect himself from the spread of a dangerous and highly

contagious virus.  And although he may recover in the future from the surgeries and their

complications, there is no defined timeline for that recovery; certainly, he is not expected to recover

within the remainder of his sentence.

The Honorable Lorna G. Schofield recently granted an application for sentence reduction

under § 3582(c) under similar circumstances.  *See United States v. Campagna*, No. 16 Cr. 78-01,

2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020).  Judge Schofield approved the request of a

defendant confined to the Brooklyn Residential Reentry Center (the "RCC") stating that his

"compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes

an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is

suffering from a serious medical condition that substantially diminishes his ability to provide self-

care within the environment of the RCC."  *Id.* at *3 (citing U.S.S.G. § 1B1.13 comment. n.1(A)). The

same justifications apply here.

Second, U.S.S.G. § 1B1.13 comment. n.1(D) authorizes release based on "an extraordinary

and compelling reason other than, or in combination with, the [other] reasons described."  Perez

meets this requirement as well, because he has weeks left on his sentence, is in weakened health, and

faces the threat of a potentially fatal virus.  The benefits of keeping him in prison for the remainder of

his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.

Accordingly, the Court finds that Perez has demonstrated extraordinary and compelling

reasons justifying his release.

## CONCLUSION

For the reasons stated above, Perez's motion for a reduction of his term of imprisonment

pursuant to 18 U.S.C. § 3582(c)(1)(A) is GRANTED. Perez's term of imprisonment is reduced to

time served. It is ORDERED that Perez be released immediately to begin his two-year term of

supervised release.

The Clerk of Court is directed to terminate the motion at ECF No. 92.

SO ORDERED.

Dated: April 1, 2020
       New York, New York

_____
        ANALISA TORRES
    United States District Judge

8

1

2

3

4

5    UNITED STATES DISTRICT COURT

6    EASTERN DISTRICT OF WASHINGTON

7    UNITED STATES OF AMERICA,

8                              Plaintiff,        NO. 2:18-CR-0232-TOR-15

9        v.                                      ORDER GRANTING DEFENDANT'S
                                                 MOTION TO REDUCE SENTENCE
10   TERESA ANN GONZALEZ,

11                             Defendant.

12

13       BEFORE THE COURT are Defendant's Motion for Reduction of Sentence

14   and Motion to Expedite the same.  ECF Nos. 829, 830.  These matters were

15   submitted for consideration without oral argument.  The Court has reviewed the

16   record and files herein, the completed briefing, and is fully informed.  For the

17   reasons discussed below, Defendant's Motion for Sentence Reduction is granted.

18                              **BACKGROUND**

19       On December 18, 2018, an indictment was filed charging Defendant with

20   nine counts of mail fraud and conspiracy to commit mail and wire fraud, in

1   violation of 18 U.S.C. §§ 1341, 1343, 1346. ECF No. 1. On June 13, 2019,

2   Defendant pleaded guilty to Count 73, conspiracy to commit mail and wire fraud.

3   ECF Nos. 443, 444. On January 21, 2020, this Court sentenced Defendant to ten

4   months imprisonment, followed by a three-year term of supervised release. ECF

5   No. 777. On February 19, 2020, Defendant began serving her term of

6   imprisonment by reporting to the Spokane County Jail, pending Bureau of Prisons'

7   designation and transfer. ECF No. 829 at 1. Defendant's projected release date is

8   December 18, 2020.

9       On March 23, 2020, Defendant's counsel contacted the Bureau of Prisons to

10   determine which office could process her compassionate release request based on

11   her medical condition. The Bureau of Prisons communicated that because

12   Defendant was not yet in a designated facility, there was no one able to process her

13   request. The Bureau of Prisons' employee indicated that the exhaustion of

14   administrative appeals process was no applicable or possible and suggested

15   contacting the sentencing Court for relief.

16       Defendant argues that she should be granted compassionate release based on

17   her chronic medical conditions, the nature of the medical care she has received at

18   the Spokane County Jail, and the risk of exposure and death from the COVID-19

19   pandemic.

20   *//*

1    The government opposes Defendant's motion for compassionate release

2    reduction because she has not exhausted administrative remedies and she does not

3    present circumstances justifying such extraordinary relief.  ECF No. 831.

4                                    **DISCUSSION**

5    **A.  Eligibility for Compassionate Release**

6    Federal courts have the statutory authority to modify an imposed term of

7    imprisonment for two reasons: compassionate release under 18 U.S.C. § 3582(c)(1)

8    or based on a change in the sentencing guidelines under 18 U.S.C. § 3582(c)(2).

9    Until recently, motions for compassionate release could only be brought to the

10    Court by the Director of the Bureau of Prisons.  18 U.S.C. § 3582(c)(1)(A) (2002).

11    However, after the December 2018 passage of the First Step Act, defendants may

12    now bring their own motions for compassionate release after exhausting

13    administrative remedies within the Bureau of Prisons.  18 U.S.C. § 3582(c)(1)(A)

14    (2018).

15    The Court finds that Defendant has effectively exhausted her administrative

16    remedies by petitioning the BOP, giving them notice, and being told she does not

17    have any other administrative path or remedies she can pursue.  Any further

18    attempt to exhaust administrative remedies at this time would be futile.

19    Accordingly, the Defendant's motion for reduction of sentence is properly before

20    the Court.

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 3

1    A defendant may be eligible for compassionate release: (1) if the Court finds

2    "extraordinary or compelling reasons" to warrant a sentence reduction; or (2) if the

3    defendant is at least 70 years old, has served at least 30 years in prison pursuant to

4    a sentence imposed for the offense for which the defendant is currently imprisoned,

5    and the defendant is determined not to pose a risk of danger to the community. 18

6    U.S.C. § 3582(c)(1)(A). Under either eligibility prong, the Court must also find

7    that a sentence reduction is "consistent with applicable policy statements issued by

8    the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The

9    Sentencing Guidelines instruct that the Court should consider the sentencing

10    factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate

11    release, and that the Court should not grant a sentence reduction if the defendant

12    poses a risk of danger to the community, as defined in the Bail Reform Act.

13    U.S.S.G. § 1B1.13.

14    **B. Extraordinary and Compelling Reasons**

15    Defendant moves for compassionate release on the grounds that

16    "extraordinary and compelling reasons" justify a sentence reduction. ECF No. 829

17    at 13-21. The First Step Act did not define what "extraordinary and compelling

18    reasons" warrant a sentence reduction, but the compassionate release statute directs

19    the Court to consider the Sentencing Commission's policy statements when

20    deciding compassionate release motions. 18 U.S.C. § 3582(c)(1)(A).

1    The Sentencing Commission's policy statement on sentence reduction

2  mirrors the language of the compassionate release statute, but it has not yet been

3  updated to reflect the procedural changes implemented by the First Step Act.

4  U.S.S.G. § 1B1.13.  "While that particular policy statement has not yet been

5  updated to reflect that defendants (and not just the [Bureau of Prisons ("BOP")])

6  may move for compassionate release, courts have universally turned to U.S.S.G. §

7  1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that

8  may warrant a sentence reduction."  *United States v. McGraw*, No. 2:02-cr-00018-

9  LJM-CMM, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019) (gathering cases).

10  The sentence reduction policy statement outlines four categories of circumstances

11  that may constitute "extraordinary and compelling reasons" for a sentence

12  reduction: (1) the defendant suffers from a medical condition that is terminal or

13  substantially diminishes the defendant's ability to provide self-care in a

14  correctional environment; (2) the defendant is at least 65 years old, is experiencing

15  a serious deterioration in health due to the aging process, and has served at least 10

16  years or 75% of his or her term of imprisonment; (3) family circumstances

17  involving the death or incapacitation of the caregiver of the defendant's minor

18  child or the incapacitation of the defendant's spouse or registered partner; or (4)

19  other reasons, other than or in combination with the other listed circumstances, that

20  are extraordinary and compelling.  U.S.S.G. § 1B1.13, Application Note 1.

1    Here, Defendant moves for compassionate release on the grounds that her

2    multiple chronic illnesses and difficulty treating them while in custody constitute

3    "extraordinary and compelling reasons" for a sentence reduction.  ECF No. 829.

4    Because Defendant does not allege that her present conditions are terminal or

5    diminish her ability to provide self-care while in custody, her motion for

6    compassionate release is best addressed under the "other reasons" category.

7    Defendant, age 64, has chronic obstructive pulmonary disease (COPD),

8    including significant emphysema.  ECF Nos. 762 (sealed medical records), 700 at

9    19 (sealed Presentence Investigation Report).  Defendant alleges that her medical

10   conditions have worsened while incarcerated without her prescribed inhaler and

11   that she struggles to breathe daily.  ECF No. 829 at 18.  Because she is housed in a

12   local jail facility where most inmates are recently arrested and in pretrial

13   confinement, there is constant and significant turnover of new people coming in

14   and out of the facility from off the streets.  *Id*. at 19.  Because it is impossible to

15   practice social distancing or isolation in a jail setting, the pandemic will be

16   devastating when it reaches jail populations.

17   Defendant is the most susceptible to the devastating effects of COVID-19.

18   She is in the most susceptible age category (over 60 years of age) and her COPD

19   and emphysema make her particularly vulnerable.

20   //

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 6

1    **C. Sentencing Commission Policy Statements**

2        The Sentencing Guidelines instruct that the Court should consider the

3    sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for

4    compassionate release, and that the Court should not grant a sentence reduction if

5    the defendant poses a risk of danger to the community, as defined in the Bail

6    Reform Act.  U.S.S.G. § 1B1.13.

7        Defendant does not present a risk of danger to the community as articulated

8    in 18 U.S.C. § 3142(g).  On January 14, 2019, Defendant was released pending

9    trial without incurring any violations through sentencing.  The underlying criminal

10   conduct was not a crime of violence, but rather white-collar fraud.  The Court has

11   reviewed all the factors to be considered in imposing a sentence, 18 U.S.C. §

12   3553(a), and does not find any one factor or combination of factors to preclude the

13   remedy here.

14       That other Defendants received home detention does not impact the Court's

15   decision here.  Each Defendant presents with an individualized level of culpability,

16   life circumstances and personal background that warrants individualized sentences.

17       The Court was aware of Defendant's underlying medical condition and took

18   that into consideration at the time of sentencing.  In normal times, Defendant's

19   condition would be manageable.  These are not normal times, however.

20

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 7

1    The Court will exercise its discretion to reduce Defendant's sentence

2  because extraordinary and compelling reasons warrant such a reduction.

3  **ACCORDINGLY, IT IS HEREBY ORDERED:**

4     1. Defendant's Motion to Expedite, ECF No. 830, is **GRANTED**.

5     2. Defendant's Motion for Reduction of Sentence, ECF No. 829, is

6        **GRANTED.**

7     3. Simultaneously herewith, the Court will enter an AMENDED Judgment

8        imposing a sentence of "time served" and converting the remaining term

9        of incarceration into eight (8) months of home detention as an additional

10       condition of supervised release.

11    4. The United States Marshal Service and/or the United States Bureau of

12       Prisons shall promptly release Defendant from custody.

13    The District Court Executive is directed to enter this Order and furnish

14  copies to counsel, the United States Marshal Service, and the Probation Office.

15    **DATED** March 31, 2020.

16  

17                    THOMAS O. RICE
                Chief United States District Judge

18

19

20

# 341-8

# Exhibit 7 – Confidential Medical Records

# (Filed Under Seal)

# 341-9

# Exhibit 8 – Letter of Support from Indira Garcia

# EXHIBIT 8

The Honorable J. Randal Hall
Chief Judge, US District Court – Southern District Georgia
600 James Brown Blvd
Augusta, Georgia 30901


Honorable Randal Hall,

I am writing to you as a character witness to the Winner-Davis family.

I have known Billie Winner-Davis since September 1998. I have known Billie as a strong, moral, ethical, Christian woman. Throughout the years, she has been a strong advocate of children and families through her work and life endeavors. I have also known Reality and Brittany for just as long. Gary Davis, I met and have known him since 2000 and feel the same way for Gary. He too has been a strong family man with great work ethics, working with youths and families.

Reality has had a very solid upbringing by her parents with strong Christian roots attending private Christian school as a young child and integrated into the small rural school where we live and everyone knows your name and family. This small community school is unique in that it only has Pre-K to 8th grade and just about all the kids know each other from the youngest to the oldest and they look out for each other and are accountable to each other. It is those values that continue in life for Reality, her sibling and the family.

I have been a neighbor for about 15 years. During that time, I have witnessed Reality and her family to be good people. Billie and Gary are well respected members in our community and in the communities in which they work and have worked. They are model citizens doing what is right. Billie has served on Boards such as Child Advocacy, Parent Teacher Organizations, Band Boosters, liaison between Women's Shelters, Police Department, etc. (One extra example is that in amidst all of that, she was even willing to give my son a ride to and from daycare for over a month during a time that I was needing assistance around 15 years ago. ) Gary has been a member of the local volunteer fire department when he had the time. He also drafted a friend to help him coach Reality's soccer team when there were no other parent volunteers. Gary has always been willing to lend a helping hand to assist with a anything from water leak, identify burning wire smell (a skunk that got too close) in my garage, and anything else and whatever time.

Reality is a well-rounded person. When she was in school, she always did her part participating in activities representing her school and community and volunteered appropriately. She is a sweet person who loves people, life and animals. Reality is someone I have welcomed into my home without hesitation. She has a beautiful spirit and is always kind. Although, work and career opportunities have put miles between family members, they are a tight knit family.

I can recall when Reality graduated from High School; she was excited to serve our country. As she had witnessed other family members be linguist, she chose a language to study so she could serve our country. I witnessed her get physically ready just the same. I would see her exercise a prescribed regimen, from her recruiter, up and down our country road. She was preparing mentally and physically to serve our country with pride.

Reality is a good person with a strong sense of doing what is right.  She has a strong support system from her family and friends.  Her parents have been positive role models and have the proper support.  I cannot say enough positive things about Billie and Gary and their dedication and commitment to their children.  Reality is their life and they do anything to guide and support her.

Sincerely,

Indira Garcia

Indira Garcia
436 E. County Road 2190
Kingsville, Texas 78363

(361) 219-8522

**341-10**

# Exhibit 9 – Letter of Support from Shana Messerschmidt

# EXHIBIT 9

July 20, 2018


The Honorable J. Randal Hall
Chief Judge
US District Court - Southern District of Georgia
600 James Brown Blvd
Augusta, GA 30901



Dear Chief Judge Honorable J. Randal Hall,

    This letter is in reference to the character of defendant, Reality Winner.
My name is Shani Messerschmidt and I married Reality's cousin, Mathew
Messerschmidt. I have known her for 16 years and we have become great friends.
Since our first meet, I've known how unique and special Reality is. She is one of
the most driven, compassionate, and caring people I know.

    Her persistence, drive, and abilities both academically and physically
allowed her to pursue her passion of becoming not only a linguist, but a
compassionate linguistic for the Air Force. She was able to use this ability to
do what I've always known her to do best, help others. Her service record alone
shows her dedication to help fellow service members and her country, but what it
doesn't show is that this is only a small part of the dedication to help others.

    Outside of her career, Reality's selflessness continued through her
willingness to help others, which has never faltered. She has used fitness as an
outlet to touch others lives. She became a personal trainer and cycling
instructor after struggling through her own health related concerns. Remaining
physically fit and maintaining a nutritious diet became a priority for her, and
she used it as an avenue to provide guidance to others in that area. This outlet
also allowed her to pursue another passion, working with children. She
volunteered for the various organizations, including "Athletes Serving
Atheletes", through which she was able to touch the lives of children and help
them discover and pursue their own passion.

    Despite what the bias of media and other outlets may report, I know
personally the love and caring heart of Reality. Being extended family 1000+
miles from her hometown, her visits with us mattered. It didn't matter if she
would travel north to us or if we traveled to her, our time together was never
taken for granted. She always made sure she gave everyone their time, especially
the children. Whether it was drawing chalk on the sidewalks, listening to silly
stories, or simply sitting around a table or campfire, she was always sincere.
Even as her dreams and passions took across various distances of this great

country and increased their demands of her, Reality always made time for her family and closest friends. After struggling for several years to start a family, Mat and I lost our first child through miscarriage. For us, it was devastating and we struggled to understand it. Yet, during this dark time, Reality took the time to write a simple but meaningful letter that helped us move on. She also sent me a gift, a pendant of healing. One that I still wear daily. In a time when so many people remain silent because they don't know what to do or say, Reality reached out and gave us a prayer of healing. In the following years, we were blessed with our son. Even before she was able to meet him in person, Reality blessed his life through letters of compassion and gifts. After meeting, their bond has become unique and a gift for all, so much so that we wished Reality to become Godmother of him. Unfortunately due to these current circumstances, we have yet to make it official. Regardless, her blessings and well wishes to us and our son have remained unfailing and as ours are to her. Reality always has had and always will have our support.

With her unfailing service to our great country supported by her glowing service record, honorable discharge, and Commendation Medal, it's often overlooked or unknown of the struggles that Reality has faced. To me, however, I noticed her visits or even letters were often haunted by the unknown, as if she was carrying the weight of the world on her shoulders. Although she would never discuss the details of any missions or work she had done, upon her visits she would struggle to let go of the previous week's encounters. Her subtle comments indicated she felt an obligation to those assignments, and she struggled to move past them, especially when they didn't go well. Reality was never one to complain, whine, or even ask for help from us when she was hurting or needed help of her own. Often news of her personal struggles came afterward. As selfless as she was to others, she never wanted to be helpless. Although I know she knew she didn't have to go through these things on her own, I don't know that she knows how to ask for help without that feeling overwhelming her. So instead, she attempted to refocus her struggle into her fitness. By far her biggest struggle was the loss of her father. Although she didn't talk much of him to me, it was apparent that many times he disappointed her. Despite the constant disappointment, when he passed this was a part of Reality's life that was now permanently gone. She dealt with it the best way she knew how, but I know she still struggles with it today.

Reality is someone who I've never known to shy away from a challenge or not take responsibility for her actions. Despite unpleasant circumstances, she always tries to make the best of things. I hope you recognize by her recent plea that Reality is ready to take full responsibility for her actions, move forward with her life, and try to help others along the way. I also hope that despite this one action that you and the court can recognize her dedication to this country, and are willing to help repay that dedication with a plan to help support her physically, mentally, and emotionally from her various struggles she has faced.

As family, Reality will always have our support, whether that means providing her
continued emotional support through continuous contact or a place to stay upon
her release. As a veteran, we hope that she can receive necessary placements and
supports to allow her to work through her continued struggles from both personal
and career experiences.

Thank you for your time and consideration of this matter.

Sincerely,

Shani Messerschmidt

# 343

# Reality Winner's Motion for Expedited Briefing and Immediate Hearing

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S MOTION FOR EXPEDITED BRIEFING AND IMMEDIATE HEARING

Reality Leigh Winner ("Reality" or "Defendant") respectfully moves this Court to waive the time requirements otherwise set forth by Local Rule 7 and respectfully requests expedited briefing and an immediate hearing as contemplated by Local Rule 7.7 based on the "extraordinary and compelling reasons" discussed in her accompanying *Motion for Compassionate Relief Pursuant to 18 U.S.C. § 3582 and Request for Oral Argument* and brief in support thereof [ECF No. 341, 341-1] (the "Motion") and the exigent nature of her Motion, as explained therein and as acknowledged by this Honorable Court's Standing Orders (MC 120-4 and MC 120-5) issued by Chief Judge Randall Hall. As set forth in her Motion, the current global pandemic wrought by COVID-19, heightened as a result of Reality's incarceration in a densely-populated environment with an inmate population already tainted with his deadly and highly-contagious disease, requires this Court's immediate intervention. As a result of those circumstances, coupled with Reality's underlying medical conditions, she respectfully submits that the timelines for usual motion practice will not suffice under the exigent circumstances present here and, indeed, may expose her to unnecessary risk of harm that she seeks to prevent by the filing of her Motion. Counsel is and will remain available to participate in video or telephonic oral argument on this Motion after a

reasonable opportunity for the United States of America to by heard or such other procedure the

Court may deem appropriate.

Respectfully submitted,


BY:     */s/ Joe D. Whitley*
Joe D. Whitley (Bar No. 756150)
Admitted *Pro Hac Vice*
Brett A. Switzer (Bar No. 554141)
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd., NE Suite 1600
Atlanta, GA  30326
(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com


**ATTORNEYS FOR DEFENDANT
REALITY LEIGH WINNER**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

<u>/s/ Joe D. Whitley</u>
Joe D. Whitley

# 344

# Order

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

20 APR 15  PM 2: 38

CLERK
SO. DIST. OF GA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CR 117-034 |
| | * | |
| REALITY LEIGH WINNER | * | |

## O R D E R

On April 10, 2020, Defendant Reality Leigh Winner, through counsel, filed a motion for release from custody pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). At present, Defendant seeks to seal Exhibits 1 and 7 to the motion and those portions of her supporting brief that reference Exhibits 1 and 7. To that end, Defendant has filed a redacted brief on the record.

Upon consideration, **IT IS HEREBY ORDERED** that the motion to seal (doc. 342) is **GRANTED**. The Clerk is directed to docket and seal Exhibits 1 and 7 to the motion for release and to docket and seal the unredacted version of Defendant's brief in support of her motion for release.

Next, Defendant has filed a motion to expedite the briefing schedule and for an immediate hearing on her motion for release. The current global pandemic wrought by COVID-19 has affected all aspects of the judicial system in some capacity. The Court will

therefore not accelerate the briefing schedule for this matter. The Government may, but is not required to, submit its response to the motion before its fourteen-day response time elapses. Moreover, a hearing in this matter is not a certainty. Nothing in § 3582(c) requires a hearing, and Federal Rule of Criminal Procedure 43(b)(4) does not require the presence of the defendant in a proceeding to correct or reduce sentence under § 3582(c). See also United States v. Woods, 327 F. App'x 170, 172 (11th Cir. 2009) ("[D]ue process does not mandate a hearing on a § 3582(c)(2) motion.") Accordingly, Defendant's motion for expedited briefing and immediate hearing (doc. 343) is **DENIED.**

   **ORDER ENTERED** at Augusta, Georgia, this _15th_ day of April, 2020.

_____

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

# 345

# USA's Response re Motion for Compassionate Release

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 117-034 |
| | ) | |
| REALITY LEIGH WINNER | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER
18 U.S.C. § 3582(c)(1)(A) AS AMENDED BY THE FIRST STEP ACT OF 2018**

Defendant Reality Leigh Winner moves for compassionate release based upon

the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018). (Doc. 341.) Winner's

motion is primarily based on the COVID-19 pandemic and her claims of its potential

effects on her health. Winner, however, failed to exhaust her administrative remedies

first with the Bureau of Prisons (BOP). Moreover, Winner has not alleged a qualifying

medical condition, as required under U.S.S.G. § 1B1.13. Even if she were eligible, this

Court should exercise its discretion and deny her motion. Therefore, the United

States respectfully requests that this Court dismiss Winner's motion for lack of

jurisdiction, or, alternatively, deny the motion.

## Factual Background

Winner was charged by criminal complaint with willful retention and

transmission of national defense information, in violation of 18 U.S.C. § 793(e) (Doc.

5.) The Court detained Winner, both as a flight risk and as a danger to others and the

community. (Doc. 27.) In September 2017, the grand jury returned a superseding

indictment charging Winner under the same statute. (PSR ¶ 3.) She faced a statutory

maximum term of 10 years in prison. (PSR ¶ 68.) Under a binding Rule 11(c)(1)(C) plea agreement, Winner pled guilty to that charge and accepted the facts as outlined in the agreement. (PSR ¶ 4; Doc. 324.) The parties agreed to a sentence of 63 months in prison followed by 3 years of supervised release. (Doc. 324, ¶ 4.) This Court accepted the plea agreement. (Doc. 323.) The presentence investigation report (PSR) reflected a total offense level of 29, a criminal history category of I, and an advisory guideline range of 87 to 108 months' imprisonment. (PSR ¶ 69.) Consistent with the binding, negotiated plea agreement, Winner was sentenced to a below-guidelines term of 63 months' imprisonment. (Doc. 327.)

Winner now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), asserting that the COVID-19 pandemic endangers her health. She is currently incarcerated at Carswell FMC, a medical prison, located in Fort Worth, Texas, with a projected release date of November 23, 2021.[1]

## Legal Analysis

### A. Statutory Background

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or

---

[1] BOP Inmate Locator, *available at* https://www.bop.gov/inmateloc/ (last visited Apr. 13, 2020).

upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides:  "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States*, 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive Guidelines amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[2]

---

[2] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate herself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. *See United States v. Wilkes*, 464 F.3d 1240, 1245 (11th Cir. 2006) ("Commentary and Application Notes of the Sentencing Guidelines are binding on the courts unless they contradict the plain meaning of the text of the Guidelines." (internal quotation marks omitted)). The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    Medical Condition of the Defendant.—
>
>    (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis

---

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification). Thus, the United States respectfully requests that this Court deny Winner's request to hold an emergency and expedited hearing.

(ALS), end-stage organ disease, and advanced dementia.

(ii)   The defendant is—

(I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   Family Circumstances.—

(i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with note 1(D), BOP promulgated Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, amended effective January 17, 2019, to set forth its evaluation criteria.

In general, the defendant has the burden to show circumstances meeting the

5

test for compassionate release. *See United States v. Saldana*, — F. App'x —, 2020 WL 1486892, at *4 (10th Cir. 2020) ("[O]ur cases require the movant to show that § 3582(c) authorizes relief for the court to have jurisdiction."); *see also United States v. Heromin*, No. *11*-550, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (citing *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013)). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *See United States v. Willis*, No. 15-3764, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

### B. BOP's response to the COVID-19 pandemic.

For the benefit of the Court, an initial statement regarding the COVID-19 situation is warranted. Putting aside the ultimate untimeliness of Winner's motion, the Government is certainly sensitive to the issues presented by the COVID-19 pandemic, and, along with BOP, is monitoring the situation constantly. The Government does not minimize the concern or the risk. BOP has taken aggressive action to mitigate the danger and is taking careful steps to protect inmates' and BOP staff members' health. As the situation changes, BOP will continue take action to attempt to protect all inmates and staff members, including those who may be more susceptible to adverse results due to age and existing ailments. Inmates will receive equal and fair consideration based on their facility, health concerns, and other applicable factors as the situation evolves.

BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in

consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO).

On March 13, 2020, BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises several preventive and mitigation measures, including screening staff and all new BOP inmates and quarantining where appropriate; suspending volunteer access; restricting contractor access to BOP facilities except for essential services; assessing stockpiles of food, medicine and sanitation supplies; establishing quarantine areas; placing a 30-day hold on all social visits but increasing detainees' telephone allowance to 500 minutes per month; placing a 30-day hold on legal visits except on a case-by-case basis where the attorney will be first screened for infection; stopping of inmates between facilities for at least 30 days (exceptions for medical treatment and other exigencies); canceling staff travel and training; and requiring wardens at BOP facilities to modify operations to maximize social distancing, such as staggering meal and recreation times.

On March 18, 2020, the BOP implemented the Phase Three Action Plan for locations that perform administrative services, which followed Department of Justice (DOJ), Office of Management and Budget (OMB) and Office of Personnel Management (OPM). On March 26, 2020, the BOP implemented the Phase Four Action Plan, which revised preventive measures for all institutions by updating its quarantine and isolation procedures to require all newly admitted inmates to BOP,

whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. These procedures apply to all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. In addition, asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

Effective April 1, 2020, BOP implemented the Phase Five Action Plan in response to a growing number of quarantine and isolation cases, to further mitigate the risk of exposure and spread of COVID-19.  Phase Five provides that: (1) for a 14-day period, inmates in every institution were secured in their assigned cells/quarters to decrease the spread of the virus based on health concerns; and (2) BOP would coordinate with the United States Marshals Service (USMS) to significantly decrease incoming movement.[3]   On April 13, 2020, the Director of BOP ordered the implementation of Phase 6, which extended all measures from Phase 5 until May 18, 2020.

In addition, on March 26, 2020, the Attorney General directed the Director of BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last

---

[3]     Further details regarding these efforts are available at: https://www.bop.gov/resources/news/20200313_covid-19.jsp and at a regularly updated resource page: https://www.bop.gov/coronavirus/index.jsp.

six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." On April 3, 2020, the Attorney General issued a memorandum directing BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download (last visited Apr. 6, 2020). As a result, BOP implemented the Attorney General's directive. *See* Update on COVID-10 and Home Confinement: BOP continuing to aggressively screen potential inmates, *available at* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 13, 2020). BOP has increased home confinement by over 40 percent since March and has further increased its screening under the Attorney General's memo. *See id*. As part of this process, BOP is screening and reviewing all inmates automatically to determine which ones meet the criteria

established by the Attorney General, meaning prisoners do not have to apply to be considered for home confinement. *See id*. Based on the Attorney General's directive, BOP has placed an additional 1,280 inmates on home confinement so far. *See* https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 20, 2020).

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution, and reflect a careful, evidence-based approach that not only provides an overall strategy, but also allows BOP to respond to the specific challenges faced by particular facilities and inmates. BOP professionals will continue to monitor this situation and adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Accordingly, the Government does not advocate action by judges in individual cases that do not involve immediate risk to that particular inmate.

### C. Winner did not demonstrate that she first exhausted her administrative remedies.

#### 1. Winner admits that 30 days has not passed since she allegedly filed her initial request for release with BOP.

In this case, Winner's request for compassionate release should be dismissed because she has not established that she fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on her behalf, or that 30 days have lapsed from the receipt of such a request by the warden of Winner's facility. The risk that COVID-19 presents generally is well acknowledged, but BOP has an effective administrative process in place to determine how best to respond to the risk each

individual inmate faces.  Just like any other situation, the exhaustion requirement allows BOP to apply that process in a timely, professionally, orderly and fair manner, without giving preferential treatment to inmates who prematurely rush to the courts. As discussed below, courts have already emphasized the requirement for inmates to go through the BOP process first before seeking judicial remedies.

In her motion, Winner admits that she has not exhausted her administrative remedies with BOP.[4]  (Doc. 341-1 at 4.) This admission alone establishes that this Court currently is without jurisdiction and must dismiss her motion. *See United States v. Raia*, No. 20-1033, slip op. at 7 (3d Cir. Apr. 8, 2020), *available at* https://www2.ca3.uscourts.gov/opinarch/201033pa.pdf (last visited Apr. 9, 2020) ("As noted, Raia failed to comply with § 3582(c)(1)(A)'s exhaustion requirement: BOP has not had thirty days to consider Raia's request to move for compassionate release on his behalf, and there has been no adverse decision by BOP for Raia to administratively exhaust within that time period . . . ."); *see also United States v. Dowlings*, No. CR 413-171, 2019 WL 4803280, at *1 (S.D. Ga. Sept. 30, 2019) ("Defendant has not shown that he requested compassionate release from the Bureau of Prisons or exhausted his administrative remedies."); *United States v. Estrada Elias*, No. 06-96, 2019 WL 2193856, at *2 (E.D. Ky. May 21, 2019) ("The present

---

[4]  Winner claims that she submitted a written request to the Warden of FMC Carswell on April 8, 2020.  She has not submitted any documentation with her motion supporting this claim. Legal counsel for FMC Carswell has inquired with the social worker responsible for reviewing all of the institution's compassionate release requests, and as of April 20, 2020, BOP has not yet received any reduction-in-sentence (RIS) request from Winner.

motion is not brought by the Director of the Bureau of Prisons and it does not appear that Elias has exhausted his administrative remedies. . . . Accordingly, his request for compassionate release will be denied.").

In *Raia*, the defendant argued that he faced a "heightened risk of serious illness or death from the [COVID-19] virus" because he was 68-years old and suffered from Parkinson's Disease, diabetes and heart problems. *See Raia*, No. 20-1033, slip op. at 5. The Third Circuit recently explained, despite this, that it would be futile to remand the defendant's compassionate release issue back to the district court because he had not yet exhausted his administrative remedies. *See id.* at 7. As particularly relevant in this case, the Court of Appeals emphasized:

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.

*Id.* at 8.

Other courts have applied similar reasoning in enforcing the exhaustion requirement and in denying motions for compassionate release based on general COVID-19 allegations. *See United States v. Gagne*, No. 3:18-cr-242 (VLB), 2020 WL 1640152, at *4 (D. Con. Apr. 2, 2020) (denying compassionate release motion, where defendant filed supplemental briefing on risk of complications from COVID-19, because she did not exhaust administrative remedies did not present "information to show that her specific medical conditions, medications, and conditions of confinement at FCI Danbury are inclined to uniquely and adversely affect her to the degree

12

sufficient to establish 'extraordinary and compelling' reasons"); *United States v. Clark*, No. 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) ("Defendant has failed to exhaust his administrative remedies as required by the statute. Further, Defendant has failed to demonstrate extraordinary and compelling reasons for a sentence modification, and there is no evidence before the Court that the BOP's plan to address the pandemic will not adequately protect inmates."); *United States v. Garza*, No. 18-CR-1745-BAS, 2020 WL 1485782, at *2 (S.D. Cal. Mar. 27, 2020) ("[I]ssues such as Mr. Garza's medical condition, the conditions and resources at Terminal Island (including the availability of testing and treatment), and decisions as to which prisoners should be released because of the COVID-19 epidemic are better left to the Bureau of Prisons and its institutional expertise."); *United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."); *United States v. Gileno*, No. , 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) ("With regard to the COVID-19 pandemic, Mr. Gileno has also not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno.").

As in the cases cited above, Winner's motion is premature. If she filed a request with BOP (which so far has not been verified), it was filed on April 8, 2020,

at the earliest.  Thirty days have not passed since Winner allegedly made that administrative request. Accordingly, Winner has not exhausted her administrative remedies in this regard, as required under the statute, and this Court is without jurisdiction to grant compassionate release on this basis.

### 2.  *Section 3582(c) is jurisdictional with no judicial exception*.

Nonetheless, Winner argues that—despite the statutory language that the district court can reduce a sentence "upon the motion of the defendant *after* the defendant has fully exhausted all administrative rights"—this Court may still consider her motion.  As reflected in the decisions cited above, Winner is incorrect.

Prior to the First Step Act, the Eleventh Circuit held that a district court was without jurisdiction to consider a compassionate release motion under 18 U.S.C. § 3582(c)(1)(A) unless the Director of BOP first filed it on the defendant's behalf. *See Cruz-Pagan v. Warden, FCC Coleman-Lowe*, 486 F. App'x 77, 79 (11th Cir. 2012) ("The plan meaning of this section requires a motion by the Director as a condition precedent to the district court before it can reduce a term of imprisonment. The BOP has not made a motion on Cruz' behalf. Accordingly, we do not have the authority to modify his sentence under § 3582(c)(1)(A)."). The First Step Act modified § 3582(c)(1)(A) to allow prisoners to file their own motions, but it still required that BOP conduct the first level of analysis of the defendant's request through the administrative process. *See* 18 U.S.C. § 3582(c)(1)(A). Nothing in the First Step Act's amendments to the statute altered this jurisdictional requirement—it simply

14

modified the condition precedent requirement in light of allowing defendants the option of filing their own § 3582(c)(1)(A) motions.

Given the plain language and purpose of § 3582(c)(1)(A), the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by courts' historical lack of authority to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970) (explaining at common law court could not alter or set aside judgment after court's term ended, but that Fed. R. Crim. P. changed this to allow sentence reduction in certain circumstances). Section 3582(c) accordingly has been understood as conferring upon courts the jurisdictional authority that they previously lacked to modify otherwise final sentences under specific circumstances.[5] *See, e.g.,*

---

[5] As discussed above with respect to *Raia* and other recent COVID-19 related case, the time limitation in § 3582(c)(1)(A) is technically a jurisdictional requirement, given that it stands as an exception to the historic and fundamental rule that courts

*United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010) ("The law is clear that a sentencing court lacks jurisdiction to consider a § 3582(c)(2) motion, even when an amendment would lower the defendant's otherwise-applicable Guidelines sentencing range, when the defendant was sentenced on the basis of a mandatory minimum.").

Winner's claim that this Court may ignore the exhaustion requirement in light of the COVID-19 pandemic is incorrect. While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). The Supreme Court recently reaffirmed this principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), where the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA). That Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some appeal courts, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court

---

may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *See Eberhart*, 546 U.S. at 19. Indeed, even those courts that have concluded that the requirements of Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met" (emphasis in original)). The Government has properly raised the rule here, and it must be enforced.

demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856. The Supreme Court explained that, under a statutory exhaustion provision, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id.* at 1857.

That rule plainly applies to the statutory text here. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[6]

Defendants in some cases have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. There is, however, no "futility" exception to § 3582(c)(1)(A)'s requirement, and the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement. Thus, in *United States v. Perez*, — F. Supp. 3d —, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020), contrary to the above analysis, that court incorrectly excused exhaustion of a claim based on COVID-19 as "futile," relying

---

[6] Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

17

only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which addressed a judicially-created (rather than statutory) exhaustion requirement to 21 U.S.C. § 811(a) (relating to the classification of drugs under the Controlled Substances Act). And in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for compassionate release. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

The requirement of a 30-day period to afford BOP the initial review of the defendant's request, therefore, cannot be excused. Congress enacted specific measures in the First Step Act to expand the availability of compassionate release, and it expressly imposed on inmates the requirement of initial resort to BOP's administrative remedies. This is for good reason: the BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50.[7] As PS 5050.50 reflects, BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

This remains true under the present circumstances. Concerns related to COVID-19 are serious and must be evaluated by experts based on facts specific to a particular inmate. As outlined above, BOP and the Attorney General have taken

---

[7] Program Statement 5050.50 is available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, amended effective January 17, 2019 in response to the First Step Act. It is hereafter referred to as "PS 5050.50."

significant measures in an effort to protect inmates' health. The appropriate response to the pandemic is not to remove BOP from the review process. Rather, based on BOP's access to expertise and facts, BOP is best positioned to determine the proper treatment of the inmate population as a whole, to identify issues at specific facilities, and to make the first evaluation of a particular inmate's request. Given the scope of the COVID-19 pandemic, the different conditions in different BOP facilities, the particular medical situations of each inmate, and other factors, Congress' decision to prioritize administrative review, therefore, is at least as compelling now as it would be under ordinary circumstances. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, slip op. at 8. Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

### D. Winner has not alleged a qualifying medical condition.

Even if this Court were to find that Winner is not required to first exhaust her administrative remedies, she has still not alleged a medical condition that qualifies as an "extraordinary and compelling reason" for compassionate release under § 3582(c)(1)(A) and U.S.S.G. § 1B1.13. Rather, she contends that her bulimia and depression make her susceptible to COVID-19 and those conditions are exacerbated by the measures BOP has implemented to protect inmates and staff members from

infection.[8]  Notably, those arguments contradict each other—Winner argues that she

should be released both on her purported risk and on the steps BOP has taken to

protect her.   In any event, her arguments are insufficient.   The statute and the

Guidelines commentary make clear that compassionate release for extraordinary and

compelling reasons is limited to medical, elderly, or family circumstances. *See*

*Saldana*, 2020 WL 1486892, at *3-*4 (where defendant argued for compassionate

release based on his claim he was no longer a guidelines career offender based on new

caselaw, holding court did not have jurisdiction to release because that claim did not

satisfied one of the specific categories of § 3582(c)).   Winner's bulimia and depression

were the basis of this Court's recommendation, which BOP accepted, to commit her

to Carswell FMC.   They are not, though, among the physical or mental conditions so

serious that they qualify for compassionate release under the statute and associated

guidelines and policy. Because Winner fails to allege any qualifying medical reasons,

this Court should dismiss his motion.

As noted above, once all the conditions precedent have been met, the First Step

Act amended 18 U.S.C. § 3582(c)(1)(A) allows a district court to modify a term of

imprisonment if it finds "extraordinary and compelling reasons warrant such a

reduction . . . and that such a reduction is consistent with applicable policy statements

---

[8] At one point, Winner claims that she "signed up to serve her sentence under
the care, custody, and safety of the Bureau of Prisons—she did not agree (nor did this
Court require her) to be confined to an institution that was caught unprepared for
this virus . . . ."  (Doc. 341-1 at 2.)  Not only does the Government dispute this
characterization of BOP's response, Winner forgets that her situation is not the same
as walking into the Air Force recruiter's office to join the military—she signed up to
serve her sentence with BOP when she violated her oath and broke the law.

issued by the Sentencing Commission . . . ." Title 28, United States Code, Section

994(t) provides the authority for the Sentencing Commission to define the meaning

of "extraordinary and compelling reasons" under § 3582(c)(1)(A). Section 994(t)

explicitly states that "[r]ehabilitation of the defendant alone shall not be considered

an extraordinary and compelling reason." U.S.S.G. § 1B1.13, application note 1,

defines "extraordinary and compelling reasons" to encompass three categories: (1)

medical condition of the defendant, (2) age of the defendant, and (3) family

circumstances.

A fourth category, "other reasons" is left specifically to the determination of

the Director of BOP. *See* U.S.S.G. § 1B1.13, app. n. 1(D). As such, under the plain

language of § 1B1.13, the district court is without authority to determine "other

extraordinary and compelling reasons" outside of the situations in application note 1

(A) through (C). However, recognizing the discretion given to BOP under subsection

(D), the court also may look to the grounds set forth in the relevant BOP regulation

governing compassionate release. *See* PS 5050.50; *see also United States v. Lynn*, No.

89-72, 2019 WL 3805349, at *3 (S.D. Ala. Aug. 13, 2019) (disagreeing that under the

First Step Act, court may include, under U.S.S.G. § 1B1.13, app. n.1(D), additional

extraordinary and compelling reasons apart from BOP's determination). While BOP's

regulations may provide more detail regarding implementation of the grounds

contained in application note 1 (A) through (C), they still limit "extraordinary or

compelling circumstances" to specific medical circumstances, elderly inmates (either

70 years old with 30 years or more of service, or 65 years old with qualifying medical

conditions), death or incapacitation of the family-member caregiver, or incapacitation of a spouse or registered partner. *See* PS 5050.50 at 3-12.

Winner bears the burden of meeting the criteria set forth above.  She has not alleged any qualifying medical condition. She does not claim that she is suffering from a terminal illness; she is not 65 years old; she makes no claim regarding the death or the incapacitation of the caregiver of any minor children; and does not claim that she would be the only available caregiver for an incapacitated spouse or registered partner. *See* § 1B1.13, app. n.1(C)(i)-(ii). Moreover, none of her stated reasons are extraordinary or compelling under BOP's regulations. *See* PS 5050.50 at 3-19.

U.S.S.G. § 1B1.13, app. n.1(A)(ii) also does not cover Winner's situation. The application note applies to defendants who suffer from a serious physical or medical condition, or from a serious functional or cognitive impairment, but only if that condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" and the defendant "is not expected to recover" from the condition. *Id.* Winner does not allege, and does not provide evidentiary support, that her bulimia and depression are so serious that she is unable to provide self-care within the environment of a correctional facility. Not being able to exercise or eat how she would like does not qualify as "unable to provide self-care." Recognizing that her conditions were the basis of this Court's recommendation that she be incarcerated at Carswell FMC, the circumstances she describes do not rise to the level of being "unable to provide self-care." Further, she has not established that she is not expected to recover from her conditions. In the end, Winner's failure to

allege a qualifying medical condition or qualifying family reason is fatal to her claim. *See Saldana*, 2020 WL 1486892, at \*3-\*4; *see also Bryant*, No. 497-182 (S.D. Ga. Oct. 2, 2019) (order denying motion for compassionate release based on reasons stated in government's response, including that defendant failed to allege qualifying medical condition).

Winner, though, argues that after passage of the First Step Act, subsection D of application note 1 is in conflict with the statute, and that, instead, district courts now have the authority to determine other reasons that qualify as extraordinary and compelling under the statute and guideline. Indeed, and perhaps unsurprisingly, some district courts have agreed with this argument. *See United States v. Willingham*, No. CR 113-010, 2019 WL 6733028, at \*2 (S.D. Ga. Dec. 10, 2019) (outlining cases). But no court in this district has adopted this approach. To the contrary, those to consider this argument have rejected it. *See id.*; *see also United States v. Bryant*, No. CR 497-182 (S.D. Ga. Oct. 2, 2019) (denying compassionate release where defendant argued after First Step Act court had authority to determine its own extraordinary and compelling reasons). Recently, the Tenth Circuit rejected a defendant's argument that "extraordinary and compelling reasons" included a claim that he was no longer a career offender based on new caselaw. *See Saldana*, 2020 WL 1486892, at \*3-\*4. That court held the district court lacked jurisdiction to consider defendant's compassionate release motion because he was "unable to show that he satisfies 'one of the specific categories authorized by section 3582(c) . . . ." *Id.* at \*3. *See also United States v. Ebbers*, — F. Supp. 3d —, 2020 WL 91399, at \*4 (S.D.N.Y.

2020) ("The First Step Act did not revise the substantive criteria for compassionate release. . . . Congress in fact only expanded access to the courts; it did not change the standard. . . . Thus, U.S.S.G. § 1B1.13's descriptions of 'extraordinary and compelling reasons' remain current, even if references to the identity of the moving party are not.").

It is not difficult to see the problematic effects of Winner's interpretation. For example, in 28 U.S.C. § 994(t), Congress specifically delegated to the Sentencing Commission to define "extraordinary and compelling reasons" for purposes of 18 U.S.C. § 3582(c)(1)(A). *See Ebbers*, 2020 WL 91399, at *4. The Guidelines specifically allow for compassionate release of an individual who is at least 70 years old, has served 30 years in prison, and is no longer a danger to others or the community, as long as a reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(B). Under Winner's interpretation, a district court, claiming authority under a judicially-revised § 1B1.13, app. n.1(D), could ignore this and still grant compassionate release to that person, even if they failed to meet that criteria. The same can be said for anyone who would otherwise not qualify under subsections (A) through (C) of the application note 1. But that would then put that court's determination of "extraordinary and compelling" in conflict with the Sentencing Guidelines policy, an outcome which is prohibited. *See United States v. Nasirun*, No. 99-367, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020) ("[W]hile the First Step Act authorizes a court to reduce a term of imprisonment under § 3582(c)(1)(A) on motion of a defendant based on 'extraordinary and compelling' reasons, any reduction must

24

be consistent with the policy statements of the Sentencing Commission."). Therefore, because Winner fails to establish that she suffers from a qualifying medical condition, this Court should dismiss her motion.

### E. Alternatively, this Court should exercise its discretion and decline to grant Winner's motion for compassionate release.

Even if this Court were to find that it has jurisdiction to consider Winner's compassionate release, it should exercise its discretion and decline to grant it. *See* 18 U.S.C. § 3582(c)(1)(A) (explaining court "may reduce the term of imprisonment"); *see also United States v. Webster*, No. 3:91CR138 (DJN), 2020 WL 618828, at *5 (E.D. Va. Feb. 10, 2020) ("Even if a defendant meets the eligibility criteria for compassionate release, the Court retains discretion over whether to grant that relief."). In making this determination, the district court must determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . . ." U.S.S.G. § 1B1.13(2). This includes considering the person's character, physical and mental condition; their past conduct; their criminal history; and whether, at the time of the offense, the person was on probation or parole. *See* 18 U.S.C. § 3142(g)(3). Moreover, the court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id*. § 3142(g)(4). Should the district court conclude the defendant does not pose a danger to any person or the community, it must then continue to evaluate the factors under § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Willingham*, No. CR 113-010, 2019 WL 6733028, at *1 (S.D. Ga. Dec. 10, 2019).

Winner has the burden to show she qualifies for compassionate release, and she has not provided any documentation demonstrating that her specific medical conditions, medications, and conditions of confinement at Carswell FMC are inclined to uniquely and adversely affect her to the point of justifying early release.[9] Moreover, Winner has not demonstrated (as is her burden) that BOP's COVID-19 plan is inadequate or that Carswell FMC is specifically unable to adequately treat her (presumably, as a federal medical center, Carswell is particularly well situated to treat Winner, should she become exposed). As of April 19, 2020, Carswell FMC reported that two inmates and no staff members had testified positive for COVID-19.[10] Here, Winner is not being treated any differently than any other inmate, and she has not shown that BOP cannot adequately address any potential medical issues

---

[9] Her bulimia and mental health issues were known at the time of sentencing. (PSR ¶¶ 48, 53.) Although U.S.S.G. § 1B1.13 states that "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement," courts recognize that reasonable foreseeability is still a factor to consider in whether to reduce a sentence. *See, e.g., United States v. Lake*, No. 16-76, 2019 U.S. Dist. LEXIS 148003, at *9 (E.D. Ky. Aug. 30, 2019) ("The purpose of compassionate release is to reduce a term of imprisonment for extraordinary or compelling circumstances that could not have reasonably been foreseen at the time of sentencing.").

[10] BOP COVID-19 resource page *available at* https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 20, 2020). BOP has also informed the Government that the two individuals at Carswell FMC that tested positive had been purposely transferred to the facility and immediately quarantined; they were never in the general population at Carswell FMC. As of April 19, 2020, 495 inmates and 309 BOP staff members nationwide have tested positive. *See id.* One-hundred-fifty-five inmates and twenty-nine staff members have recovered. *See id.* BOP has reported COVID-19 related deaths at FCI Elkton (6), FCI Oakdale (7), Butner Medium I FCI (5), Terminal Island FCI (2), Danbury FCI (1) and Lompoc USP (1). *See id.*

she faces during this period. Because Winner has not demonstrated how COVID-19 specifically affects her, apart from pure speculation, nor shown that BOP's plan is inadequate, nor established that Carswell FMC is unable to adequately treat her, her request for compassionate release based on COVID-19 fails.

## Conclusion

For the foregoing reasons, the United States respectfully requests that Defendant's motion for compassionate release (Doc. 341) be denied.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*//s// Jennifer G. Solari*
Jennifer G. Solari
Assistant United States Attorney

*//s// Justin G. Davids*
Justin G. Davids
Assistant United States Attorney
Missouri Bar No. 57661

P.O. Box 8970
Savannah, Georgia 31412
(912) 652-4422

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This April 20, 2020.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

***/s/ Justin G. Davids***
Justin G. Davids
Assistant United States Attorney
Missouri Bar No. 57661

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422

**347**

# Reality Winner's Reply re Motion for Compassionate Release

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S REPLY IN SUPPORT OF
## MOTION FOR COMPASSIONATE RELEASE

Defendant Reality Leigh Winner ("**Defendant**" or "**Reality**"), by her undersigned attorneys and pursuant to 18 U.S.C. 3582(c), hereby files this Reply Memorandum in Support of her Motion for Compassionate Release.

## INTRODUCTION

The Republic is fragile. Ronald Reagan said that "Freedom … is never more than one generation away from extinction," in his inaugural address as Governor of the State of California in 1967. And it is. In a country where individuals enjoy more freedoms and opportunities, and society places a high value on human rights, we incarcerate more people per capita than any of our developed peers.  The First Step Act ("**FSA**"), enacted in 2018, sought to remediate this issue, in part, by providing prisoners an avenue to freedom from incarceration in times of "extraordinary and compelling" need with an option to petition the Court for compassionate release. Now, this Court must decide whether it will go against the tide of its brethren District Courts and limit freedom or, will it join the majority of the District Courts in this country and find that it may grant Reality, an at-risk inmate, in an at-risk institution, compassionate release in the face of a global pandemic?  Surely, logic, jurisprudence, compassion, and fairness compel release.

## ARGUMENT

**I.     The BOP's Response to the COVID-19 Pandemic is Insufficient.**

The reporting of the Bureau of Prisons ("**BOP**"), which BOP's Office of Public Affairs admits is understated,[1] confirms that total numbers of confirmed infections within the federal prison system have *more than doubled* since Reality's Motion was filed *less than two weeks ago*.

> *As of 04/21/2020, there are **540 federal inmates** and **323 BOP staff** who have confirmed positive test results for COVID-19 nationwide ... There have been **23** federal inmate deaths and **0** BOP staff member deaths attributed to COVID-19 disease.[2]*

Moreover, "Testing of prisoners has been limited, so the true infection rate is thought to be much higher."[3]  Indeed, the BOP has admitted in recent filings that it does not have enough tests.[4]

With each passing day, COVID-19 continues to spread like wildfire throughout the BOP system.  Facilities are taking drastic measures that illustrate the exigency of these circumstances. "Most recently, the entire population of FCI Otisville camp (111) inmates was sent to quarantine in preparation for release to home confinement."[5]  At FCI Oakdale, it has gotten so bad that

---

[1] Walter Pavlo, *AG William Barr's Memo to Bureau of Prisons: 'Time Is Of The Essence'* (April 4, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/04/ag-william-barrs-new-memo-to-bureau-of-prisons-time-is-of-the-essence/#634a22376805 (last accessed April 21, 2020) (*quoting* Sue Allison, spokeswoman for BOP) ("The goal of our reporting is to provide the public with insight as to the current status of our COVID-19 response at various facilities. As can be seen from various state websites, for example Maryland, reporting of cases while tied to positive cases, does not necessarily account for unconfirmed cases.").

[2] *See* Federal Bureau of Prisons, COVID-19 Cases, *https://www.bop.gov/coronavirus/* (last accessed on April 21, 2020) (emphasis added).

[3] Josh Gerstein, *Virus-wracked federal prisons again expand release criteria* (April 11, 2020) https://www.politico.com/news/2020/04/11/federal-prison-release-criteria-coronavirus-179835 (last accessed April 21, 2020).

[4]   Newsletter to Federal Prisoners, Internal Memo Toughens Cares Act Home Confinement Standards (April 20, 2020) https://www.lisa-legalinfo.com/newsletter-to-federal-prisoners/ (last accessed on April 21, 2020).

[5] *Id.*

"correctional officers were told to stop testing people and just assume anyone with symptoms had been infected."[6]

Yet, in pleadings across the country, like the one filed presently, *see* ECF No. 345, federal prosecutors continue to assure courts that the situation in BOP facilities is under control. These representations claim that BOP's facilities have comprehensive precautionary measures in place to prevent the transmission of COVID-19, and in any case, the facilities are well-equipped to deliver care. But, these empty claims are demonstrably inaccurate.[7] Moreover, despite the best intentions of the Department of Justice ("**DOJ**") and Attorney General William Barr's admonitions that "time is of the essence,"[8] the BOP is dragging its feet. The agency lacks the resources necessary to fix the problem. As a result, Reality – a vulnerable, non-violent, first time offender with underlying conditions, who has less than 20 months left to serve on a sentence of more than five years – is exposed.

---

[6] *Id.*

[7] *See* Letter from David Patton et al., Co-Chairs of the Federal Public & Community Defenders Legislative Committee, to Hon. William P. Barr, Atty. Gen. 3 (Apr. 1, 2020), https://www.fd.org/sites/default/files/covid19/defender_letter_ag_barr_re_covid-19_4-1-20_0.pdf (last accessed April 21, 2020), a true and correct copy of which is attached hereto as **Exhibit A**. This Court may consider Exhibit A (and the other exhibits attached hereto) on reply because good cause exists. "While the Court has a liberal briefing rule, *see Podger v. Gulfstream Aerospace Corp.,* 212 F.R.D. 609, 609 (S.D. Ga. 2003) ("parties may file as many reply briefs as they want"), it has not yet clarified whether new arguments may be raised within such briefs without good cause." *Pattee v. Georgia Ports Auth.*, 477 F. Supp. 2d 1253, 1272 n.8 (S.D. Ga. 2006) (allowing additional argument and support to be raised in reply brief). Good cause exists here because Defendant must respond to the Government's claims about the BOP's preparedness for this epidemic and because Defendant did not anticipate that the Government would take the position that she did not submit an administrative request when she unequivocally did. Defendant is permitted to attach documents to her reply brief that rebut the arguments the Government raises, for the first time, in its opposition. *Id.*

[8] Memo from Attorney Gen. William Barr to Director of BOP (April 3, 2020), *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (April 3, 2020), https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

The BOP is reporting that it has now placed an additional 1,280 inmates on home confinement. But, the BOP has some 177,000 inmates under its care, and the majority of those who have been moved into home confinement come from a handful of states including New York, New Jersey, Ohio, Colorado, and California.[9]  Indeed, the BOP's own webpage confirms that the BOP's focus is "starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for home confinement."[10]

This sounds promising and appears to align with Attorney General Barr's direction for prisoners in *certain* facilities (like FCI Otisville in New York, FCI Oakdale, FCI Danbury, and FCI Elkton); however AG Barr's guidance to prioritize problem facilities was *not* to the exclusion of others. And even in places like FCI Oakdale, where there have been at least five (5) inmate deaths, the BOP response is so inadequate and slow that the ACLU has sued the facility "for not releasing inmates fast enough."[11]  So, if inmates in priority facilities cannot get their cases reviewed fast enough, what does it mean for people like Reality?  The BOP has forgotten her.

### a.  BOP is Not Equipped to Handle a Pandemic

First, BOP is claiming, and the is Government representing, that they never received Reality's request.[12]  But, attached hereto as **Exhibit B** is a true and correct copy of the Declaration

---

[9] Elie Honig, *Releasing prisoners during Covid-19 crisis makes good sense* (April 20, 2020), https://www.cnn.com/2020/04/20/opinions/covid-19-prosecutors-prison-release-honig/index.html (last accessed April 21, 2020).

[10] *See* Federal Bureau of Prisons, Update on COVID-19 and Home Confinement (April 5, 2020), https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last accessed April 21, 2020).

[11] *See* Luke Barr, Bureau of Prisons coronavirus response under fire:  'Reactive,' not 'proactive,' inmates, staff say, https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263 (last accessed April 21, 2020); *see also* West Centrals Best, *ACLU Suing FCI Oakdale 1 For Not Releasing Inmates Fast Enough* (April 6, 2020), https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263 (last accessed April 21, 2020).

[12] *See* ECF No. 345 at p. 11, n.4.

of Alison Johnston Grinter, Esq., which establishes the great lengths Reality and her local, Texas-based counsel took to be sure that BOP received her request for release and to serve the remainder of her sentence in home confinement due to the COVID-19 pandemic. The fact that the BOP claims they have not received it is troubling. But it also epitomizes the BOP's unpreparedness and lack of resources necessary to adequately respond to the unique challenges presented by the COVID-19 pandemic. This unpreparedness and resource issue create additional risk for the facilities and prisoners that have been subrogated to higher priority facilities and prisoners – because it is well documented that all of these facilities are at tremendous risk.[13]

Second, whenever BOP *does* decide to acknowledge Reality's request, the BOP may determine that Reality is not "eligible for home confinement" under the existing statutory tools available to BOP and/or the standards Attorney General Barr's memos establish (including BOP's interpretation of and response thereto).[14] Various comprehensive memoranda have been written to explain the vast limitations on the BOP under the existing framework, including concerns that the requirement for a "minimum" score under the PATTERN assessment and the existence of various categorical, offense-based exclusions may prevent a large number of prisoners from consideration, among other criteria set forth in the Barr memos.[15]

Relief from the Court may be the only remedy left at the disposal of prisoners who the BOP determines are not eligible for priority treatment under Attorney General Barr's revised rubric.

---

[13] *See e.g.*, **Exhibits A**, **C**, and **D**, generally.

[14] *See e.g.,* Memo. from Attorney Gen. William Barr to Director of BOP, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[15] See e.g., Brennan Center for Justice at NYU School of Law Center for American Progress, *Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations* (April 16, 2020), https://www.brennancenter.org/sites/default/files/2020-04/BC%20Letter%20to%20DOJ%20final_0.pdf (last accessed April 21, 2020), attached hereto as **Exhibit C**; *see also* Legal Information Services Associates, LLC, Newsletter to Federal Prisoners, dated April 20, 2020, attached hereto as **Exhibit D**.

Notably, experts believe this criteria disqualifies the majority of inmates in the federal prison system from consideration.[16]  So, if the BOP determines Reality is ineligible for release into home confinement <u>or</u> if her request is not reviewed by the BOP (i.e., the status quo), her only remedy is via the "catchall provision" of the "compassionate release" statute (i.e., the same statute under which her Motion has been filed), which was recently modified "to expand[ ] compassionate release … and expedite [ ] compassionate release applications."[17]  The legal significance of the recent amendments is discussed in greater detail, *infra,* and in Reality's original Motion.

Third, **257 additional inmates** have been infected, **198 additional staff** have been infected, and **15 additional inmates have died** since Reality filed her Motion on April 10, 2020.[18]  Reality does not have additional time to wait for the BOP to try to locate her paperwork – which was submitted weeks ago.  There are now thirty-five (35) reported cases in nearby Fort Worth FMC as the virus spreads like wildfire through Texas,[19] including its first inmate death announced April 22, 2020.[20]  And although the BOP continues to report just two (2) cases in FMC Carswell,

---

[16] *Id.* ("[P]eople with a 'minimum' score under PATTERN likely comprise a relatively small percentage of the prison population.") (*citing* Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System, U.S. Department of Justice*, 2019, 58-62, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf) (In the general PATTERN model, 20 percent of people in a sample set used by the DOJ to evaluate the tool received a "minimum score").

[17] 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act).

[18] These and any other aggregate figures presented herein are based on the numbers publicized on BOP's website, available at, *https://www.bop.gov/coronavirus/,* as of April 21, 2020.

[19] *See* Federal Bureau of Prisons, COVID-19 Cases, *https://www.bop.gov/coronavirus/* (last accessed on April 21, 2020).

[20] *See* USDOJ BOP Press Release, *Inmate death at FMC Fort Worth* (April 22, 2020), available at https://www.bop.gov/resources/news/pdfs/20200422_press_release_ftw.pdf (last visited April 22, 2020).

these numbers and the circumstances at the facility continue to be questioned (appropriately) by public reporting outlets and inmates.[21]  They may even share staff and resources.

**b.  The Conditions at FMC Carswell Are Particularly Dangerous.**

Mendy Read-Forbes, Inmate No. 22253-031, describes an epidemiological nightmare at FMC Carswell: "We have run out of toilet paper, we have run out of pads…We've had no soap for our bathrooms.  It is crazy.  We get out one time a day for 10 minutes.  We walk to the chow hall, we get hot lunch and we come back with bologna every night."[22]  The article expounds:

> *…tensions are high after more than a week without recreation or activities.  There are about 250 women in her housing unit but only about 120 chairs…They sleep four to a cell and less than three feet apart.  Everyone's expected to wear the same disposable mask every day.  The phones are in pretty heavy use but Forbes hasn't seen anyone sanitize them…[23]*

"Basically I just wiped it off on my shirt hoping not to get it.  We are not implementing anything that should be implemented," Forbes said.[24]

> *…Even scarier, the unit across the hall was put under quarantine because of a suspected coronavirus case…But officers still move between that quarantined unit and hers…[25]*

"So whatever they've got…we're going have…," Forbes said.[26]  "The conditions are bad for us, we're all really scared, and they aren't telling us anything."[27]

> *…And earlier this month, KXAS-TV reported that a pregnant inmate in her 30s was rushed from the prison to a hospital for an emergency C-section.  She's now in critical care on a ventilator, but the baby, born premature, was doing well, according to the report…[28]*

---

[21] *See e.g.*, Christopher Connelly, *'We're All Really Scared':  Life in Federal Lockup Remains Uncertain During COVID-19 Outbreak* (April 13, 2020), https://www.keranews.org/post/were-all-really-scared-life-federal-lockup-remains-uncertain-during-covid-19-outbreak (last accessed April 21, 2020).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

The Government goes to great lengths to assure the Court that appropriate precautions are being taken, but in truth, the current conditions at FMC Carswell violate the Center for Disease Control's (CDC) well-established social-distancing guidelines – and that's putting it kindly. Reality has reported to counsel various concerns about her current situation including:

- There are four (4) inmates in her cell with her, no more than three (3) feet away from her;

- They are in their cells together approximately eleven (11) hours per day, not including the time they are asleep;

- She was unable to clean the telephone before she used it to speak to counsel, meaning any airborne droplets coughed, sneezed, or exhaled on to the telephone from any prior caller remained on the telephone when it was her turn to use it, only increasing her risk of exposure;

- Her requests for medical prescriptions (Zoloft) have been ignored, in contradiction of the assertion that she is still receiving the medical care she needs in the midst of the BOP's pandemic-induced facility restrictions;

- She has seen people taken out on stretchers, indicating that the BOP's reported number of cases are understated; and

- BOP staff are regularly getting sick, further proving the BOP's reported number of cases are understated.  The only plausible explanation for the lack of additional reported cases on the BOP webpage is that BOP is not doing enough testing in the facility or the test results have not come back yet.

Notably, reports like this are surfacing frequently, specifically as it pertains to FMC Carswell, where inmates report that conditions now are "worse than before the lockdown because it is harder to social distance."[29] "'We are breathing on each other,' said Sandra Shoulders [Inmate No. 47308-424], who has been at Carswell for two years and has four years left on a drug offense.

---

[29] *See also* Mark Dent and Kaley Johnson, *Sick, elderly and fearing coronavirus:  Life inside Fort Worth's women's federal prison* (April 20, 2020), https://www.star-telegram.com/news/special-reports/article242042671.html (last accessed April 21, 2020).

'It's four people in a room. It's very overcrowded, it's very nasty here.'"[30] "'They are trying to separate us but there is no way to (be) separated because of the overcrowding,' said inmate Kimberli Himmell [Inmate No. 64708-060] via email, who has stage five kidney failure and stage three breast cancer."[31] "Most meals are sack lunch bologna sandwiches…," "not all of the staff and inmates wear masks, and many of the inmates lack soap or don't use it."[32]

As set forth in her Motion, these conditions fly in the face of all guidance issued by the CDC and other leading authorities on preventing the spread of COVID-19 and exacerbate Reality's underlying conditions, making her even more susceptible to the deadly virus that is confirmed present in the facility. As set forth in her original Motion, Ms. Winner is immunocompromised due to her various pre-existing medical conditions now exacerbated by the facility "lockdown."

Regrettably, the Government argues that Reality should have known what she was signing up for and should have considered her underlying conditions when she entered her plea. Of course, aside from being insensitive, this argument also appears to be disingenuous. Reality was doing well – indeed no infractions or disciplinary issues of any kind – until the COVID-19 pandemic occurred, and her facility was caught off guard and unprepared. One thing Reality did not sign up for is a possible death sentence, or a punitive penalty that may leave her grievously ill. She will, however, agree to any conditions that will allow her to serve the remainder of her sentence in home confinement – in rural Texas, where her family lives, an area conducive to social distancing that has generally escaped serious devastation from COVID-19 – and spare her infection with a virus that has already taken twenty-two (22) inmate lives.

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

**II.    Reality *Did* Submit an Administrative Request, and the BOP's Mishandling of Her Request Illustrates Why This Court Must Act Now.**

On April 8, 2020, Reality submitted not one, but *two*, administrative requests to the Warden at FMC Carswell.[33] Reality made her *first* request on the BOP's standard form BP-229 for administrative requests with the oversight of Bill Pendergraft, her BOP correctional counselor.[34] This request was apparently rejected.[35] Reality made her *second* administrative request via a handwritten letter, submitted to her BOP case manager Mary Gruszka.[36] Despite these two requests, the BOP and the Government still claim they have no record of her ever making them.[37] Mr. Pendergraft and Ms. Gruszka are Reality's BOP liaisons.  Reality has done all that the law requires, and BOP has failed her. This Court cannot wait for a BOP answer or remedy – for Reality's sake, it must act now.

In his opinion issued on April 13, 2020, widely-respected Judge Rakoff of the Southern District of New York held that having to wait the full thirty days under 18 U.S.C. 3582(c) does not serve the intent and purpose the FSA was to serve in expediting requests:

> That the statute gives the defendant this choice [to exhaust administrative remedies or wait 30 days] is crucial to understanding Congress's intent. Generally, Congress imposes exhaustion requirements in order to "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy*, 503 U.S. at 145. But the hybrid requirement in this statute —- either exhaust or wait 30 days -- substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary

---

[33] *See* **Ex. B** at ¶¶ 8, 11.

[34] *See id.* at ¶¶ 6, 9.

[35] *Id.* at Ex. C ("The form … that I filled out was rejected….").

[36] *Id.*  at ¶ 8, 10.

[37] ECF No. 345 at p. 11, n.4.

course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 4 (S.D.N.Y. Apr. 3, 2020).[38]

Therefore, Judge Rakoff appropriately decided he had the discretion to waive 18 U.S.C. 3582(c)'s exhaustion requirement.  Otherwise, strict enforcement of the 30-day period would not serve the Congressional objective in light of the COVID-19 pandemic's "capacity to spread in swift and deadly fashion".[39]  The Court should do the sensible thing here and recognize the same: it may waive 18 U.S.C. 3582(c)'s exhaustion requirement and act on Reality's request.

## III.   Section 3582(c)'s Administrative Exhaustion Requirement is a Claims-Processing Rule, Not a Jurisdictional Rule.

The Government argues that administrative exhaustion under 18 U.S.C. § 3582(c) is a jurisdictional rule, mandating exhaustion before this Court may consider Reality's motion.  This argument fails. The Section 3582(c)'s administrative exhaustion requirement is a claim-processing rule, as opposed to a jurisdictional precondition, that can be waived.[40]  The U.S. Supreme Court has emphasized the necessity of observing "the important distinctions between jurisdictional prescriptions and claim-processing rules."[41] Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified

---

[38] *United States v. Haney*, No. 1:19-cr-541-JSR, ECF No. 27 (S.D.N.Y. Apr. 13, 2020).

[39] *Id.*

[40] *See United States v. Brown*, No. 18-cr-56-jdp, ECF No. 59 (W.D.Wi. Apr. 8, 2020) (citing *Bowles v. Russel*, 551 U.S. 205, 211–12 (2007) (noting "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress")); *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."); *Hamer v. Neighborhood Hous. Servs. of Chicago,* 138 S. Ct. 13, 17 (2017) ("Mandatory claim-processing rules are less stern.").

[41] *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010).

times."[42] Because claim-processing rules do not "govern[] a court's adjudicatory capacity," they

may, in certain cases, be waivable by the parties or by the courts.[43]

The U.S. Supreme Court has adopted a "bright line" test for when to classify statutory

restrictions as jurisdictional.[44] A rule qualifies as jurisdictional only if "Congress has clearly stated

that the rule is jurisdictional."[45] "[A]bsent such a clear statement," the Supreme Court has

cautioned, "courts should treat the restriction as nonjurisdictional in character," with the specific

goal of "ward[ing] off profligate use of the term 'jurisdiction.'"[46] In considering whether Congress

has spoken clearly, courts consider both the language of the statute and its "context, including . . .

[past judicial] interpretation[s] of similar provisions."[47]

While the Eleventh Circuit has not addressed the question of whether the exhaustion

requirement in Section 3582(c)(1)(A) is jurisdictional, in a related context it has found with several

federal appellate courts that the language of that subsection is non-jurisdictional, in interpreting a

different portion of 18 U.S.C. §3582(c).[48]

Accordingly, subsection (c) generally should not be understood to impose jurisdictional

requirements. While prior holdings governing compassionate release under earlier versions of the

---

[42] *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).

[43] *Id.*

[44] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

[45] *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013).

[46] *Id.*

[47] *Reed Elsevier*, 559 U.S. at 168.

[48] *United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); *see also United States v. Caraballo- Martinez*, 866 F.3d 1233, 1243 (11th Cir. 2017) (considering the Court's jurisdictional authority to consider successive motions under Section 3582(c)); *United States v. Beard*, 745 F.3d 288, 291 (7th Cir. 2014) (holding Section 3582(c) has no jurisdictional limitation); *United States v. Trujillo*, 713 F.3d 1003, 1005 (9th Cir. 2013) (holding Section 3582(c) has no jurisdictional limitation); *United States v. Weatherspoon*, 696 F.3d 416, 421 (finding no jurisdictional restriction under Section 3582(c)); *see also United States v. Green*, 886 F.3d 1300, 1306 (10th Cir. 2018) (same).

statute may create an ongoing requirement that defendants submit a request to the BOP before

filing compassionate release motions on their own, the waiting period the statute prescribes cannot

be applied as a jurisdictional requirement.

**IV.    Reality Does Not Need to Allege a Qualifying Medical Condition to be Eligible for
Compassionate Release Under 3582(c).**

The Government further argues that Reality should be denied compassionate release

because she lacks a qualifying medical condition.    This is wrong.    Reality reiterates, and

incorporates by reference, her arguments from her opening Memorandum as to why this Court is

not limited to considering only medical conditions in determining whether extraordinary and

compelling circumstances exist for granting her release.[49]

And in any event, her brief establishes that Reality is immunocompromised, one of the

enumerated categories of "People Who Are at Higher Risk for Severe Illness"[50] identified by the

CDC in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in

Correctional and Detention Facilities."[51]    In other words, she *does* have a qualifying medical

condition, as characterized by the CDC, on top of her susceptibility to pneumonia and other

presently untreated but well documented mental and physical health issues.    To state otherwise, as

the Government does, is simply wrong – and yet another example of why it is incumbent upon this

Court to act: the Department of Justice and the Bureau of Prisons simply view Reality as a

---

[49] *See* ECF No. 341-1 at p. 5-11.

[50] CDC Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness* (April 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 21, 2020).

[51] CDC Coronavirus Disease 2019 (COVID-19), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (April 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed April 21, 2020).

"defendant" or a "convict" when this situation compels a more personal review of Reality as a vulnerable human being in a precarious position.

Nonetheless, the real issue the Court faces here is whether it will join the majority of District Courts in this country that recognize the Sentencing Commission's policy statement is outdated and needs to be updated in light of the FSA.[52]  Or whether it will be on the other side of history and cling to a line of jurisprudence that goes against the current trend of American sentencing law, against the plain language of the statute, and against compassion and common sense in extraordinary circumstances.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant Reality "compassionate release" under 18 U.S.C. § 3583(c)(1)(A) and allow her to serve the remainder of her sentence at home with her family in light of the COVID-19 pandemic.  Moreover, and notwithstanding this Court's denial of Reality's request to expedite the briefing of her Motion – a request many other District Courts have appropriately granted in view of the exigency of the circumstances – Reality respectfully requests that this Court expedite its ruling, especially in light of the Government's "there's nothing to see here" position and in view of the well-documented and herein-demonstrated inaction by the BOP.

Respectfully submitted,

BY:     */s/ Joe D. Whitley*
        Joe D. Whitley (Ga. Bar No. 756150)
        Admitted *Pro Hac Vice*

        Brett A. Switzer (Ga. Bar No. 554141)
        **BAKER, DONELSON, BEARMAN,**
        **CALDWELL & BERKOWITZ, P.C.**
        3414 Peachtree Rd., NE Suite 1600
        Atlanta, GA  30326

---

[52] *Id.* at p. 7.

(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT
REALITY LEIGH WINNER**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/ Joe D. Whitley*
Joe D. Whitley

**347-1**

**Exhibit A – April 1, 2020 Letter from David Patton, et al., Co-Chairs of the Federal Public & Community Defenders Legislative Committee to Honorable William P. Barr, Attorney General**

**Federal Public & Community Defenders**
**Legislative Committee**

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

Co-Chairs

David Patton
Executive Director
Federal Defenders of New York

Jon Sands
Federal Defender
District of Arizona

April 1, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Barr:

We write on behalf of the Federal Public and Community defenders. At any given time, Defenders and others appointed under the Criminal Justice Act represent 90 percent of all federal defendants because they cannot afford counsel.

On March 19, 2020, we wrote to you to warn that our jails and prisons were in "grave and imminent danger."[1] We urged you to take "immediate and decisive action" to address the impending spread of COVID-19 among incarcerated persons.[2] That same day, the Bureau of Prisons (BOP) confirmed the first presumed-positive COVID-19 cases in the federal prison system.[3]

Despite our warnings—and those of Congress, policy groups, and public health and legal experts—the Department of Justice (DOJ) has failed to respond appropriately to this global pandemic. Instead, DOJ's response rests on its view that that "many inmates will be safer in BOP facilities."[4] DOJ has relied on this false premise to oppose release in a wide range of cases, and as the foundation of policies such as your March 26, 2020, "Memorandum for Director of Bureau Prisons." ("March 26 Policy").[5] That policy fails to take advantage of DOJ's existing tools to transfer

---

[1] Letter from David Patton, et al., Co-Chair of the Federal Public & Community Defenders Legislative Committee, to Hon. William P. Barr, Atty. Gen. 3 (Mar. 19, 2020) ("Defender Letter").

[2] *Id.*

[3] *See* Cassidy McDonald, *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/ ("*Conflicting Orders on Coronavirus Response*").

[4] Memorandum from Hon. William P. Barr, Atty. Gen. to Michael Carvajal, Director of the Bureau of Prisons 1 (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[5] *See id*; *see also id.* at 2 (directing a discretionary factor for transfer to home confinement be "verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility," and "[w]e should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.").

Federal Public & Community Defenders                    52 Duane Street, 10th Floor
Legislative Committee                                         New York, NY 1007
                                                         Tel: (212) 417-8738

vulnerable and low-risk inmates quickly to home confinement.[6] Instead, it erects a complex set of procedural and logistical hurdles to home confinement.[7] These hurdles are largely arbitrary, bear little nexus to the current public health crisis, and will disparately harm persons of color. This inadequate response to COVID-19 continues to endanger the individuals who live and work in BOP facilities.

You now have the authority, under the CARES Act, to allow BOP to transfer many more people to the relative safety of home confinement.[8] But you have not made the finding necessary to allow BOP to do so.[9] Instead, yesterday BOP announced a new plan ("Phase 5") that amounts to no more than a 14-day lockdown for all federal prisoners.[10] It is certain to fail. The real problem—as public health experts agree—is that there are simply too many people in the prisons. The only rational, humane response to this crisis is to greatly reduce the prison population. Locking people down in institutions with inadequate medical care and poor sanitation is not the answer.

This past Saturday, March 28, 2020, marked a grim milestone. Patrick Estell Jones, 49, became the first individual in BOP custody to die of COVID-19.[11] He was serving a sentence in a low-security facility for a non-violent crack cocaine offense.[12] His death will surely not be the last. The day after Mr. Jones's death, the Washington Post reported that 30 more inmates and staff at Oakdale had tested positive for COVID-19.[13] The numbers of positive-COVID-19 cases in BOP are beginning to exponentially escalate: on March 27, 2020, BOP's website reported a total of 18 COVID-19 positive

---

[6] *See* Defender Letter, at 5-6; Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary & Hon. Karen Bass, Chair, Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, to Hon. William P. Barr, Atty. Gen. 2-5 (Mar. 30, 2020); Letter from Hon. Richard J. Durbin, U.S. Senator et al., to Hon. William P. Barr, Atty. Gen. 1-2 (Mar. 23, 2020); Letter from Hon. Kamala D. Harris, U.S. Senator, to Michael Carvajal, Director, Fed. Bureau of Prisons 1 (Mar. 19, 2020). *See also* Letter from Hon. Elizabeth Warren, U.S. Senator et al., to Michael Carvajal, Director, Fed. Bureau of Prisons (Mar. 20, 2020).

[7] *See* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, NY Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html) ("*Jails Are Petri Dishes*").

[8] *See Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2) (2020) ("CARES Act") (requiring you to make this finding in order to broaden BOP's authority to release individuals to home confinement).

[9] *Id.*

[10] *See* Fed. Bureau of Prisons, *BOP – COVID-19 Action Plan: Phase 5*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 1, 2020).

[11] *See* Sarah N. Lynch, *Prisoner Serving Time For Drug Charge is First U.S. Inmate to Die from COVID-19*, Reuters (Mar. 28, 2020), https://www.reuters.com/article/us-heath-coronavirus-prison-death/federal-inmate-serving-time-for-drug-charge-is-first-inmate-to-die-from-covid-19-idUSKBN21G04T.

[12] *See id.; see also* Motion for Sentence Reduction Under Section 404 of the First Step Act, *United States v. Patrick Estell Jones*, No, 07-CR-022-ADA (W.D. Tex. Nov. 1, 2019), ECF No. 182, at 7, 16, 21.

[13] *See* Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana*, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html ("*Explosions of Coronavirus Cases*").

inmates and staff;[14] today, it reports 59 confirmed cases.[15] There are increasing reports of positive diagnoses of individuals detained in federal pretrial custody by the United States Marshals Service.[16] These diagnoses are "almost certainly an undercount."[17]

Many in the federal prison population are at grave risk of severe illness or death. There are approximately 10,000 individuals over the age of 60 presently in federal custody, and one third of all individuals in BOP custody have preexisting conditions.[18] But there are measures that DOJ can take now to avert catastrophe. We urge you to immediately reduce the number of people entering federal detention and aggressively transfer or release individuals who are already incarcerated into the community.

### A. Jails and Prisons are Unprepared and Unsafe. Experts Agree that Rapid Decarceration is Necessary to Prevent a Deadly COVID-19 Outbreak.

DOJ's claim that individuals are safer in BOP facilities than in the community is contradicted by the realities of institutional confinement, BOP's documented failure to provide adequate care, and the consensus of public health experts that decarceration is necessary to slow COVID-19's transmission.

Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases."[19] Incarcerated individuals "are at special risk of infection" and "infection control is challenging." [20] Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[21]

---

[14] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update Web Archive* (Mar. 27, 2020), https://web.archive.org/web/20200327045124/https://www.bop.gov/coronavirus/ (last visited Mar. 31, 2020).

[15] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update,* https://www.bop.gov/coronavirus/ (last visited Apr. 1, 2020).

[16] *See* Seth Freed Wessler, *The Coronavirus Has Spread to the US Marshals' Detention Empire*, Mother Jones (Apr. 1, 2020), https://www.motherjones.com/politics/2020/04/us-marshals-coronavirus-pretrial-detainees/.

[17] *See* Williams, *'Jails Are Petri Dishes'*; *see also* Walter Palvo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#3e4556d7ba32.

[18] *See U.S. Indictment of Venezuelan President Maduro Transcript: William Barr Speech*, Rev.com, 53:19 (Mar. 27, 2020), https://www.rev.com/blog/transcripts/u-s-indictment-of-venezuelan-president-maduro-transcript-william-barr-speech ("Barr Transcript").

[19] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, et al., to Hon. Larry Hogan, Governor of Maryland (Mar. 25, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine) ("Johns Hopkins Letter").

[20] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights); *see also* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.

[21] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-

Federal Public & Community Defenders                                    52 Duane Street, 10th Floor
Legislative Committee                                                        New York, NY 1007
                                                                         Tel: (212) 417-8738

Incarcerated individuals share bathrooms, sinks, and showers. They eat together, and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters.[22] "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease."[23] In short, "our jails are petri dishes."[24]

BOP is not exempt from this reality. A 2015 Bureau of Justice Statistics report found that persons incarcerated in state and federal prisons and jails were more likely than the general population to have a chronic condition or an infectious disease.[25] And BOP and its staff have acknowledged that infection control is difficult in the prison setting.[26] BOP facilities remain overcrowded. Low, medium, and high facilities are all operating at overcapacity and BOP's total inmate population exceeds the rated capacity of its prisons by an average of 12 to 19 percent.[27] Simply put, CDC recommendations such as social distancing are "impossible to achieve in our federal prisons and immigration facilities as things currently stand."[28] Locking people in their cells for the next 14 days will not change this fact.

Indeed, BOP has proven incapable of protecting the people within its walls—even on an ordinary day.[29] In 2016, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic

---

Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions) ("Public Health Experts' Letter").

[22] *See e.g.*, David Patton, Exec. Director, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html; Public Health Experts' Letter, at 1; *Williams, 'Jails Are Petri Dishes'*; Brie Williams et al., *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs Blog (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/ ("*Unique Challenges*"); *see also* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020) https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits ("*Sick Staff*") (noting access to hand sanitizer varies by facility).

[23] Kindy, *Explosions of Coronavirus Cases* (quoting Udi Ofer, director of the American Civil Liberties Union's Justice Division).

[24] Williams, *'Jails Are Petri Dishes'*.

[25] *See* Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, U.S. Dep't of Justice, Ofc. of Justice Programs, Bureau of Justice Statistics (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[26] *See* Fed. Bureau of Prisons, *Program Statement 6190.04: Infectious Disease Management* (Jun. 3, 2014), https://www.bop.gov/policy/progstat/6190_004.pdf.; Williams, *'Jails Are Petri Dishes'*; Hamilton, *Sick Staff*; *see also* Barr Transcript, at 48:57.

[27] *See* Fed. Bureau of Prisons, *Federal Bureau of Prisons Program Fact Sheet* (rev. July 31, 2019), .https://www.bop.gov/about/statistics/docs/program_fact_sheet_20191004.pdf.; *see also* U.S. Dep't of Justice, *FY2020 Performance Budget Congressional Submission Federal Prison Systems Buildings and Facilities* 3, https://www.justice.gov/jmd/page/file/1144631/download (last visited Apr. 1, 2020).

[28] Public Health Experts' Letter, at 1.

[29] *See, e.g.*, U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf ("*Medical Staffing Challenges*"); U.S. Dep't of Justice

Federal Public & Community Defenders                    52 Duane Street, 10th Floor
Legislative Committee                                            New York, NY 1007
                                                           Tel: (212) 417-8738

medical staff shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.[30] From 2010 to 2014, BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care," and 12 institutions were so medically understaffed that they were described as "crisis level."[31] Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards,[32] and has made wait times for individuals to receive even routine medical care unacceptably long.[33]

Moreover, BOP's care for its rapidly aging population—a population that is at grave risk for complications from COVID-19—has been woefully inept.[34] According to OIG, BOP lacks appropriate staffing levels and infrastructure to address the needs of aging inmates.[35] Overcrowding prevents BOP from placing aging individuals in facilities that best address their medical needs.[36]Aging persons could wait years for routine medical equipment like eyeglasses or dentures.[37] These overcrowded and understaffed facilities cannot provide routine care on a good day, let alone during a global pandemic.

A chorus of public health experts has confirmed that immediate decarceration is necessary to avoid a humanitarian crisis in our prisons and jails.[38] Correctional experts agree, warning that "America's 7,000 jails, prisons, juvenile and immigration detention centers are completely unequipped to handle

---

Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf ("*Aging Inmate Population*").

[30] *Medical Staffing Challenges*, at i, 1-2.

[31] *Id.* at 1.

[32] *See Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer, Director, Fed. Bureau of Prisons), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-SawyerK-20191017.pdf; Hamilton, *Sick Staff*.

[33] *See Aging Inmate Population*, at 17-19.

[34] *See* Centers of Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People Who Are At Higher Risk for Severe Illness*, https://bit.ly/2vgUt1P (last visited Mar. 31, 2020).

[35] *See Aging Inmate Population*, at i-ii.

[36] *See id.* at 25-26.

[37] *See id.* at 17-19. One incarcerated individual requested dentures in 2010 and had still not received them when he was interviewed by OIG years later. He said "this makes it extremely hard to eat because he cannot chew food." *Id.* at 18. Another aging person had waited two years for an eye examination and was using a magnifying glass in the interim. *Id.* at 19.

[38] *See, e.g., Public Health Experts' Letter*, at 1; *Johns Hopkins Letter*, at 2-3; *Unique Challenges*, at 5; *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention: Interim Guidance*, World Health Organization 4 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.

this pandemic,"[39] and absent swift action, we will "see devastation that is unbelievable."[40] DOJ must heed these warnings now.

Sadly, we know what will happen if DOJ declines to act. Rikers Island, a New York State correctional institution, did not heed expert advice to rapidly reduce its prison population.[41] COVID-19 has infected the institution at an exponential rate:[42] Rikers now suffers an infection rate that is seven times higher than the rest of New York City and is seventy-five times higher than the United States.[43] Rikers is no outlier. The Cook County jail in Chicago went from two positive COVID-19 cases to 101 confirmed cases in a week.[44] The progression of COVID-19 in these facilities is a bellwether of what will come if DOJ does not swiftly decarcerate.

### B.   DOJ's Claims in Court that its Jails and Prisons are Safe during the COVID-19 Pandemic are False.

In pleadings across the country, federal prosecutors have assured courts not only that the situation in BOP facilities is under control, but that detention in BOP facilities is safer than release to the community.[45] Across jurisdictions, and regardless of the facility in question, DOJ's arguments are the

---

[39] Robin McDowell & Margie Mason, *Locked up: No Masks, Sanitizer as Virus Spreads Behind Bars*, APNews / SFGate (Mar. 29, 2020), https://www.sfgate.com/news/medical/article/Fear-behind-bars-as-the-coronavirus-spreads-15163433.php.

[40] David Montgomery, *'Prisons are Bacteria Factories'; Elderly Most at Risk*, Stateline, PewTrusts (Mar. 25, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/03/25/prisons-are-bacteria-factories-elderly-most-at-risk.

[41] *See* Jean Casella & Katie Rose Quandt, *US Jails Will Become Death Traps in the Coronavirus Pandemic*, The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island ("From a public health and public safety standpoint, the solution to this crisis is quite simple: let them go.").

[42] *See, e.g.*, Katie Shepard, *'Trapped on Rikers': Jails and Prisons Face Coronavirus Catastrophe as Officials Slowly Authorize Releases*, Wash. Post (Mar. 23, 2020), https://www.washingtonpost.com/nation/2020/03/23/coronavirus-rikers-island-releases/ (noting that the chief physician for Rikers Island warned "a storm is coming . . . We have told you who is at risk. Please let as many people out as you possibly can."); Chelsea Rose Marcius, *Coronavirus Has Left Nearly 800 Inmates Quarantined in NYC Jails*, New York Daily News (Mar. 29, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-quarantine-inmates-city-jails-rikers-island-20200329-r4ozbsavc5c35bhkqk6zuwm35y-story.html; *see also* Meagan Flynn, *Top Doctor at Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before our Eyes*, Wash. Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

[43] *See* The Legal Aid Society, *COVID-19 Infection Tracking in NYC Jails*, https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited Mar. 29, 2020). The infection rate in Rikers is also exponentially higher than the rates in Wuhan, China and Lombardy, Italy.

[44] *See* Williams, *'Jails are Petri Dishes'*.

[45] *See, e.g.*, Gov't's Resp. to Def.'s Mot. for Temporary Release, *United States v. Michael Calvert*, No. 19-cr-40068 (D. Kan. Mar. 17, 2020), ECF No. 146, at 4 ("In other words, the defendant is essentially quarantined from the public. However, he contends that it is necessary and compelling to leave that environment to live in the public where the risk of contracting the virus is arguably higher."); Gov't's Resp. in Opp. to Def.'s Emergency Mot. for Pretrial Release, *United States v. Jermain French*, No. 19-cr-00946 (N.D. Ill. Mar. 25, 2020), ECF No. 33, at 14-15 ("Defendant erroneously presumes that his risk of contracting COVID-19 is greater in custody than out; but currently defendant is in a detention facility where no known instances of the virus are present, where social contact with the outside world is suspended, and apparently where entrants (staff and inmates) to the facility are screened and measures to isolate high-risk individuals are in progress, compared to the general public in Illinois, where the risk of contracting the virus is arguably higher."); Gov't's Opp. to Def.'s Mot. to Amend Conditions of Release, *United States v. Tabares-Salinas*, No. 20-cr-437 (S.D. Cal.

Federal Public & Community Defenders
Legislative Committee

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

same: it asserts that its jails and prisons have comprehensive precautionary measures in place to prevent the transmission of COVID-19, and in any case, are well-equipped to deliver care. These representations are demonstrably false. BOP's modified operations policy, even as written, is woefully inadequate.[46] And BOP staff, including correctional officers, have publicly reported dangerous and unhygienic conditions across the country.[47] Incarcerated individuals and staff have filed multiple lawsuits that set forth failures within these facilities in stark detail.[48]

BOP's modified operations are facially insufficient and—as the increasing number of positive cases demonstrate—all but ensure the rapid transmission of COVID-19 within its facilities.[49] The protocol is deficient in several ways. First, the modified operations do not sufficiently address pre-symptomatic spread of COVID-19 among staffers, contractors, and inmates. For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening." And this "enhanced screening" only requires temperature checks and self-reporting—it does not require staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these

---

Mar. 19, 2020), ECF No. 12, at 2 (arguing that the "speculation" of an outbreak at the detainee's facility "is both unsubstantiated and unwarranted: there are no known cases of COVID-19 at the facility and no evidence that the facility's staff is unprepared to address such cases if they should arise").

[46] *See* Fed. Bureau of Prisons, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on March 31, 2020).

[47] *See, e.g.*, Mitch Smith, et al., *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Mar. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Mar. 30, 2020) ("*Coronavirus in the U.S.*"); Kindy, *An Explosion of Coronavirus Cases*; Hamilton, *Sick Staff*; Darius Jaafari, *Federal Government Said it Halted Prison Transfers. They're Still Happening*, PA Post (Mar. 23, 2020), https://papost.org/2020/03/23/federal-government-said-it-halted-prison-transfers-theyre-still-happening/; McDonald, *Conflicting Orders on Coronavirus Response*.

[48] *See* Maxine Bernstein, *Federal Prison Workers File Suit Seeking Hazardous Pay After Guards Exposed to Coronavirus in Louisiana Lockup*, The Oregonian (Mar. 30, 2020), https://bit.ly/2yr3pTD (BOP correctional officers from Oregon and Louisiana are named plaintiffs in a lawsuit that "alleges federal employees have been working in close proximity to people and surfaces infected with the novel coronavirus without sufficient protective gear since Jan. 27 and continue to do so."); Williams, '*Jails are Petri Dishes*' ("[A] lawsuit filed late Friday asked the federal court in Brooklyn to order the immediate release of about 540 federal prisoners there identified as 'particularly vulnerable' to the virus because of their age or underlying health conditions."); *see also* The Public Defender Service, *PDS Publications & Legal Resources, Banks v. Booth—Challenging Life-Threatening Lack of COVID-19 Precautions at the D.C. Jail*, available at https://bit.ly/3bDbYsD (filings for a lawsuit brought by a class of incarcerated persons in the custody of a facility that also houses individuals in federal pretrial custody).

[49] *See* Fed. Bureau of Prisons, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on Mar. 31, 2020).

"enhanced screenings" are simply inadequate.[50] The screening tool used for prison contractors is similarly defective.[51]

In any case, BOP's own staff reports that the agency is failing to respond to COVID-19 in its facilities. The accounts are staggering: the New York Times "spoke[] with more than a dozen workers in the Bureau of Prisons," who reported that "federal prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies like masks, hand sanitizer, and soap."[52] A BOP employee in Atlanta explained that staff does not have enough gloves, masks, or other supplies to respond to this outbreak. Nor do they "have enough space to properly quarantine inmates."[53] Staff at FCI Tallahassee, a low-security facility, described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[54] And a union representative at FCI Oakdale recounted that BOP was slow to shut down a prison labor program in

---

[50] *See* European Centre for Disease Prevention and Control, *Rapid Risk Assessment: Coronavirus Disease 2019 (COVID-19) Pandemic: Increased Transmission in the EU/EEA and the UK – Seventh Update* (Mar. 25, 2020), https://www.ecdc.europa.eu/en/publications-data/rapid-risk-assessment-coronavirus-disease-2019-covid-19-pandemic ("[t]he proportion of pre-symptomatic transmission [has been] estimated to be around 48% to 62%"); *see also* Sam Whitehead, *CDC Director on Models For the Months to Come: 'This Virus is Going to Be With Us,'* NPR (Mar. 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us ("[W]e have pretty much confirmed [ ] that a significant number of individuals that are infected actually remain asymptomatic. That may be as many as 25%.").

[51] *See* Fed. Bureau of Prisons, *Visitor/Volunteer/Contractor COVID-19 Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last visited Apr. 1, 2020); For example, the contractor screening tool asks contractors whether they have traveled to several foreign locations including South Korea (9,887 confirmed cases), or Japan (2,178 confirmed cases) in the last 14 days. It does not bother to screen for those who have traveled to, for instance, Spain (102,136 cases), Germany (72,383 cases), or elsewhere in the United States (189,633 cases). *See COVID-19 Map – Johns Hopkins Coronavirus Resource Center*, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited Apr. 1, 2020). This tool also fails to screen for pre-symptomatic spread or whether contractors are practicing social distancing.

BOP provides conflicting information about inmate screening. It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days. *See* Fed. Bureau of Prisons, *BOP – COVID-19 Action Plan: Phase 5*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 1, 2020) (Background on Phases 1-4). But the inmate screening tool does not reflect this process: instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone *diagnosed* with COVID-19 in the last 14 days. *See* Fed. Bureau of Prisons, *Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited Apr. 1, 2020). Phase 5 of BOP's COVID-19 Action Plan, effective today, purports to significantly decrease inmate movement by requiring that incarcerated individuals at every institution be "secured in their assigned cells/quarters." *See BOP – COVID-19 Action Plan: Phase Five*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. But this plan does not appear to correct the defective screenings of staff, contractors or inmates, nor does it change the reality that individuals remain in close quarters—still sharing living space, bathrooms, showers, laundry, recreation areas, and computer and phone access.

[52] Smith, *Coronavirus in the U.S.*

[53] *Id.*

[54] Hamilton, *Sick Staff.*

8

Federal Public & Community Defenders                                52 Duane Street, 10th Floor
Legislative Committee                                                      New York, NY 1007
                                                                          Tel: (212) 417-8738

the facility; the program was not shut down until after an inmate tested positive for COVID-19. Now, "people [keep] getting sick back to back to back to back."[55]

### C.   The March 26 Policy Erects Complex Barriers that Unnecessarily Limit Transfers to the Relative Safety of Home Confinement.

The most tragic aspect of the impending medical disaster within BOP is that DOJ has ample statutory authority to return people to the community through home confinement, as opposed to incarceration. Our hopes when you announced a memorandum to BOP to "increase the use of home confinement,"[56] were dashed upon reading the March 26 Policy itself. Rather than increase the use of home confinement, the policy erects unnecessary barriers to—and sets arbitrary criteria for prioritizing access to—the relative safety of home confinement.

Congress has repeatedly directed DOJ to use home confinement expansively in response to the COVID-19 crisis.[57] Well before this pandemic, Congress issued in the First Step Act multiple statutory directives calling for BOP to make broad use of its home confinement authorities.[58] In April 2019, BOP directed staff to comply with these directives without qualification.[59] Last week, Congress unanimously passed, and President Trump signed into law, the Coronavirus Aid, Relief, and Economic Security Act, or the "CARES Act."[60] The CARES Act broadens your authority, and that of BOP, to place individuals on home confinement. On Monday, March 29, 2020, House Judiciary Committee Chairman Jerrold Nadler and Subcommittee on Crime Chairwoman Karen Bass urged you to "use every tool at your disposal to release as many prisoners as possible, to protect them from COVID-19."[61]

 Instead of exercising your authority under the CARES Act and finding that the COVID-19 pandemic is "materially affect[ing] the functioning of BOP," [62] you have rested on your assertion

---

[55] Kindy, *An Explosion of Coronavirus Cases.*

[56] Barr Transcript.

[57] *See* Press Release, U.S. Senator Dick Durbin, *Durbin, Grassley, Colleagues Press Trump Administration to Transfer Vulnerable Inmates to Home Confinement* (Mar. 23, 2020), https://bit.ly/2xGxLAN; Press Release, H. Comm. on the Judiciary, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020), https://bit.ly/2xIFQ87; Press Release, H. Comm. on the Judiciary, *Nadler & Bass Demand Answers from DOJ About Federal Bureau of Prisons & U.S. Marshals Service Response to Coronavirus* (Mar. 19, 2020), https://bit.ly/2JvvJGo; Press Release, H. Comm. on the Judiciary, *Chairman Nadler Asks DOJ About BOP & U.S. Marshals Service Response to Coronavirus & Seeks Answers Regarding Health & Safety of Those in Federal Prisons* (Mar. 12, 2020), https://bit.ly/2UuX4z0; Press Release, U.S. Senator Kamala Harris, *Harris Demands Information on Coronavirus Preparedness in Federal Prisons* (Mar. 5, 2020), https://bit.ly/33YGL0t.

[58] *See* Defender Letter at 5, n. 16.

[59] *See* Fed. Bureau of Prisons, Operations Memorandum: 001-2019 at 2, Home Confinement (Apr. 4, 2019).

[60] *See* H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2).

[61] Press Release, H. Comm. on the Judiciary, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020).

[62] CARES Act at § 12003(b)(2).

Federal Public & Community Defenders                                    52 Duane Street, 10th Floor
Legislative Committee                                                              New York, NY 1007
                                                                                    Tel: (212) 417-8738

that "many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care." This is a false narrative with catastrophic consequences. Based on this premise, your Policy imposes the upside-down requirement that BOP determine "for each individual inmate" that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." In light of the incontestable evidence, there should be a presumption that home confinement is the safest option for all. Moreover, this upside-down requirement is impractical. It defies reason to believe that BOP's already understaffed medical departments—likely increasingly overtaxed by the COVID-19 crisis—will be able to swiftly conduct this calculus on an individualized basis.[63]

The March 26 Policy also imposes an arbitrary hierarchy for access to safety that lacks a nexus to public health. For example, you direct BOP staff to give "priority treatment" to inmates who score as "minimum" risk under BOP's risk-assessment tool, PATTERN. Chairman Nadler and Subcommittee Chair Bass immediately objected to your use of PATTERN in this manner, warning that it was "created for an entirely different purpose," and "is still an incomplete tool."[64] We agree with them on these points, as well as their concerns about "possible racial/ethnic and gender bias" associated with the tool. Indeed, the only publicly reported data on the demographic impact of PATTERN confirms that its use here will have a racially disparate impact on black males. DOJ's data shows that black males are far less likely than white males to have a PATTERN score that puts them in the "minimum" category: only 7% of black men score as minimum risk, compared with 30%—almost one third—of white men.[65]

Also arbitrary and divorced from any valid public health or public safety consideration is the March 26 Policy's direction to deprioritize "inmates . . . who have incurred a BOP violation within the last year." But an individual can receive a BOP violation for innocuous conduct, such as smoking where prohibited or using abusive or obscene language.[66] Moreover, the arbitrariness of receiving a BOP violation is exacerbated by the minimal due process in BOP disciplinary actions and the likely varied enforcement practices from one BOP facility to another.

We also are concerned that the March 26 Policy deems individuals "ineligible" for home confinement based on "some offenses."[67] You do not disclose what is included on this list of "ineligible" offenses. This is a new and significant limitation on home confinement that is neither statutorily mandated, nor articulated in existing BOP policy. Neither the First Step Act's directive that BOP "place prisoners with lower risk levels and lower needs on home confinement for the

---

[63] *See* Memo from Emily Galvin-Almanza, Senior Legal Counsel, The Justice Collaborative, *Re: Barr BOP Memo*, (Mar. 26, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJC-Reponse-Home-Confinement-Memo-Mar-2020.pdf.

[64] Press Release, H. Comm. on the Judiciary, *Nadler & Bass Renew Call for DOJ to Take Action*, at 4.

[65] *See* U.S. Dep't of Just., *The First Step Act of 2018: Risk and Needs Assessment System* 62, tbl. 8 (2019) ("DOJ Report") (reporting 29.7% of white males in the developmental sample fall in the minimum risk category while only 7% of black males fall in that same category).

[66] *See* Dep't of Justice, Bureau of Prisons, Inmate Discipline Program, Program Statement 5270.09, tbl. 1, (July 8, 2011).

[67] March 26 Policy at 2.

maximum amount of time permitted," nor the CARES Act expansion of the amount of time permitted, exclude any inmate from consideration for home confinement. There is no constitutional or statutory authority for DOJ to "play[] roulette with people's lives" because of their offense of conviction.[68] "Imprisonment is meant to punish by restricting liberty, not by exposure to illness."[69]

Finally, the March 26 Policy directs BOP to place any individual into a "14-day quarantine period" before that individual is discharged from BOP. The very reason that prisons are so unsafe during a pandemic is because of the inability to safely quarantine patients. The Washington Post has reported that at FCI Oakdale, "all . . . prison staff have now been exposed to the virus."[70] We agree that measures should be taken to ensure medical care and safe housing for at-risk individuals upon exit from BOP. But under no circumstances should their time in BOP custody be extended for an illusory "quarantine" that will have dangerous consequences for individuals, the facility where they are detained, and the surrounding community.

The COVID-19 pandemic must and can be addressed immediately. We welcome any opportunity to provide you with additional information and support for these critical and time-sensitive next steps.

                              Sincerely,

                              s/
                              David Patton
                              Executive Director, Federal Defenders of New York
                              Co-Chair, Federal Defender Legislative Committee

                              s/
                              Jon Sands
                              Federal Public Defender for the
                              District of Arizona
                              Co-Chair, Federal Defender Legislative Committee

                              s/
                              Lisa Freeland
                              Federal Public Defender for the
                              Western District of Pennsylvania
                              Chair, Defender Services Advisory Group


cc:     Mr. Michael Carvajal, Director, Federal Bureau of Prisons

---

[68] Williams, '*Jails are Petri Dishes*.'

[69] Rachel Barkow, *Our Leaders Have the Power to Release People in Prison. Now they Must Use It* (Mar. 27, 2020), https://bit.ly/3dP5Ak7.

[70] Kindy, *An Explosion of Coronavirus Cases.*

# 347-2

# Exhibit B – Declaration of Alison Johnston Grinter, Esq.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| v. | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF ALISON JOHNSTON GRINTER, ESQ.

I, Alison Johnston Grinter, Esq., pursuant to 28 U.S.C. § 1746 hereby declare, under penalty of perjury:

1.  I am an attorney in private practice working almost exclusively in the criminal courts. I also keep a docket of pro-bono civil rights cases through Legal Access Texas, as well as several other community civil rights groups. My office address is currently (as we are all sheltering in place) 6738 Old Settlers Way, Dallas, Texas 75236

2.  I am an attorney-at-law admitted in and in good standing to practice before the courts of the State of Texas and the US District Courts for the Northern District of Texas. I was licensed to practice on November 4, 2005, and my bar number with the State of Texas is 24043476.

3.  I submit this declaration in connection with my position as local counsel to Defendant Reality Leigh Winner ("Ms. Winner") in relation to the above-captioned case.

4.  The facts set forth below are based upon my personal experience and knowledge. I will supplement this declaration if additional information becomes available during the pendency of the case.

5. On April 3, 2020, I mailed a copy of the Bureau of Prisons ("BOP") Form BP-229 ("Request for Administrative Remedy"), a true and correct copy of which is attached hereto as **Exhibit A**, to Ms. Winner, who is currently an inmate (Registered Number 22056-021) at FMC Carswell located at 3000 I St, Fort Worth, TX 76127, for her execution and submission to the BOP via the Warden of FMC Carswell requesting that she be permitted to serve the remainder of her sentence in home confinement due to underlying medical conditions that make her particularly susceptible to the COVID-19 virus that is infiltrating the federal prison system and, in particular, FMC Carswell.

6. On the same day, April 3, 2020 at 10:11 AM CDT, I also personally emailed Ms. Winner's Correctional Counselor, Bill L. Pendergraft, an attachment of the form and notifying him that I needed Ms. Winner to have access to the form. He responded on April 6 at 7:23 AM CDT that he would present Ms. Winner with a copy of the form. A true and correct copy of my email correspondence with Mr. Pendergraft is attached hereto as **Exhibit B**.

7. It is my understanding that Ms. Winner's counsel of record from the law firm Baker, Donelson, Bearman, Caldwell and Berkowitz, PC, Matthew S. Chester, Esq., also discussed the form with Ms. Winner by telephone, on or around April 3, 2020, and in the days prior and subsequent thereto, to explain the form to her and how it would need to be submitted.

8. I was informed by Ms. Winner on April 9, 2020, that she had submitted the completed form as well as a second hand-written letter addressed to the Warden of FMC Carswell, which was hand-delivered to Ms. Winner's assigned case manager, Ms. Mary Gruszka, who accepted the letter and assured Ms. Winner that she would deliver it to the appropriate prison officials at approximately 3:10 PM, Central Time, on April 8, 2020.

A true and correct copy of the correspondence received from Ms. Winner confirming these details is attached hereto as **Exhibit C.**[1]

9.  Notably, although BOP apparently rejected the first form submission, it is my understanding based on communications with Mr. Pendergraft (her BOP assigned Correctional Counselor) that he provided Ms. Winner with the form that she ultimately used, understanding her intentions to file a request for release into home confinement as contemplated by 18 U.S.C. § 3582(c)(1)(A)(i).

10. Nonetheless, Ms. Winner has confirmed via both written and verbal communications (most recently to Mr. Matt Chester) that BOP's staff-member and agent, Ms. Mary Gruszka, acknowledged and accepted the same substantive request made via letter addressed to the Warden of FMC Carswell and assured its safe passage.

11. I disagree with the assertion in the Government Opposition Brief [*see* Rec. Doc. No. 345, n.4] suggesting that Ms. Winner has not actually submitted a request to the Warden of FMC Carswell.  In fact, I respectfully submit that she has submitted two.  Further, she has made multiple BOP staff aware of her request.  One such staff member provided the form that she used, and the other promised to deliver her request to the Warden.

---

[1] In an extreme abundance of caution, and without waiving the attorney-client privilege, I am providing the limited communication received directly from Ms. Winner upon which these statements are based, as it is my understanding that the communication was provided solely to establish proof of submission and the chain of custody in relation to her request, which has now been called into question by the *Government's Response In Opposition to Defendant's Motion for Compassionate Release Under 18 U.S.C. §(c)(1)(A) as Amended by the First Step Act of 2018* [Rec. Doc. No. 351] ("**Government Opposition Brief**").  Ms. Winner's notes and recollection made contemporaneous with her submission is the best evidence of these facts available at present, especially in light of the present inability for counsel to visit Ms. Winner at her facility due to COVID-19 related restrictions.  This evidence directly contradicts the Government's statements.

12.   I declare under penalty of perjury that the foregoing statements are true and correct to

the best of my knowledge, information and belief.

Dated:  April 21, 2020

_____

Alison Johnston Grinter, Esq.

# Exhibit A

U.S. DEPARTMENT OF JUSTICE    Case 1:17-cr-00034-JRH-BKE   Document 247-2   Filed 04/32/20   Page 6 of 12    **REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons    USCA11 Case: 20-11692    Document: 23-2    Date Filed: 06/22/2020    Page: 137 of 170

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

_____      _____
DATE                                               SIGNATURE OF REQUESTER

**Part B– RESPONSE**

_____      _____
DATE                                            WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE             CASE NUMBER: _____

                                                  CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

_____      _____
DATE                                              RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982

USP LVN        PRINTED ON RECYCLED PAPER

# Exhibit B



Alison Grinter <alisongrinter@gmail.com>

---

## Ms. Winner - legal issue

3 messages

---

**Alison Grinter** <alisongrinter@gmail.com>       Fri, Apr 3, 2020 at 10:11 AM
To: Bill Pendergraft <bpendergraft@bop.gov>

Hi Mr. Pendergraft,
we're going to be filing a motion in the district court for Reality Winner to be have compassionate release. As I
understand it, she first has to apply internally with the grievance form and be denied (I mean, we'd also be thrilled if the
warden just released her, but I understand). My question to you is, can you provide her with the form or should I mail one
to her? I thought I'd check before just in case y'all have these around.


**Thanks,**

**Alison Grinter,**
**Attorney and Counselor**
**(214) 704-6400 (cell)**

**Board Certified Criminal Law Specialist**


Confidentiality Notice: This electronic transmission and any accompanying documents contain information from The Law
Office of Alison Grinter. The information may be privileged and/or confidential, and is intended only for the use of the
intended recipient. If you have received this email in error, please contact Alison Grinter by telephone or email to alert the
office of the unintended disclosure and delete the message immediately. Any other use, retention, dissemination,
forwarding, printing, or copying of this message or any attachments is strictly prohibited.

---

📄 **US_Bureau_of_Prisons_Blank_Grievance_Forms_BP-9_BP-10_BP-11 (1).pdf**
59K

---

**Bill Pendergraft** <BPendergraft@bop.gov>      Mon, Apr 6, 2020 at 7:23 AM
To: Alison Grinter <alisongrinter@gmail.com>

yes, I'll provide her with administrative remedy forms

Bill L. Pendergraft
Correctional Counselor
P.O. BOX 27066
"J" Street Bldg. 3000
Fort Worth, Texas 76127
(817) 782-4241 (office)
(817) 782-4250 (Fax)
B.Pendergraft@bop.gov


>>> Alison Grinter <alisongrinter@gmail.com> 4/3/2020 10:11 AM >>>
[Quoted text hidden]

---

**Alison Grinter** <alisongrinter@gmail.com>      Thu, Apr 16, 2020 at 4:49 PM
To: Bill Pendergraft <BPendergraft@bop.gov>

Hi Mr. Pendergraft,
I hope you're well. I need to set up a legal call with Ms. Winner. When do you think we can schedule it?

**Thanks,**

**Alison Grinter,**
**Attorney and Counselor**
**(214) 704-6400 (cell)**

**Board Certified Criminal Law Specialist**


Confidentiality Notice: This electronic transmission and any accompanying documents contain information from The Law Office of Alison Grinter. The information may be privileged and/or confidential, and is intended only for the use of the intended recipient. If you have received this email in error, please contact Alison Grinter by telephone or email to alert the office of the unintended disclosure and delete the message immediately. Any other use, retention, dissemination, forwarding, printing, or copying of this message or any attachments is strictly prohibited.

[Quoted text hidden]

# Exhibit C

## Alison Grinter

**From:**        WINNER REALITY LEIGH (22056021)

**Sent Date:**   Tuesday, April 7, 2020 7:05 PM

**To:**          Alisongrinter@gmail.com

**Subject:**     HEY

HAY

I have the form. If you need another field trip with the kids, I might need an extra in case I mess this one up.
Thank you so much I can't believe it got here so fast! :)

<3RE

## Alison Grinter

**From:**    WINNER REALITY LEIGH (22056021)

**Sent Date:**    Wednesday, April 8, 2020 3:49 PM

**To:**    Alisongrinter@gmail.com

**Subject:**    RE: RE: HEY

The form you sent in that I filled out was rejected and being the wrong form for this purpose. Therefore, I had a hand-written letter with the same statement ready just in case :)
I asked if it could be delivered to the warden. Ms. M. Gruszka, my assigned Case Manager, accepted the letter and assured me she would get it to him. This happened at 3:10 pm, central time, on 8 April 2020.

I will let Matt Chester know next time he calls, or if you could, let him know that I've sent the request. I don't have him on Corrlincs anymore because I can only have 30 friends on this version of Facebook at a time. :)

<3RE



REALITY LEIGH WINNER on 4/7/2020 7:05:55 PM wrote
HAY
I have the form. If you need another field trip with the kids, I might need an extra in case I mess this one up. Thank you so much I can't believe it got here so fast! :)

<3RE

**347-3**

**Exhibit C – *Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce Their Prison Populations* (April 16, 2020)**

# BRENNAN
# CENTER
## FOR JUSTICE

April 16, 2020

Hon. William P. Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

**Re:    Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations**

Dear Attorney General Barr:

We write to ask that the Department of Justice ("DOJ") take a leadership role in helping the nation's criminal justice systems adapt to the challenges presented by the novel coronavirus.

America's prisons and jails present unique health dangers,[1] and are especially vulnerable to the spread of infectious disease[2] — problems that the outbreak of the novel coronavirus throw into sharp relief.[3] Absent additional interventions, COVID-19 will continue spreading through incarcerated populations, and our nation's correctional officers and staff, at an alarming rate.[4]

We thank you for the steps you have taken to respond to this crisis, including expanding the use of home confinement by the Bureau of Prisons ("BOP"). As you acknowledge, the BOP has a "profound obligation to protect the health and safety of all inmates" requires nothing less.[5] Yet more must be done to stop the spread of the novel coronavirus behind bars. Even if the BOP's recent lockdown slows transmission among people who remain imprisoned in its facilities, it will also stretch tensions behind bars even further. And, correctional administrators nationwide face similar pressures.[6]

---

[1] Michael Massoglia & Brianna Remster, "Linkages Between Incarceration and Health," *Public Health Reports* 134, no. 1 (2019): 8S-14S, https://journals.sagepub.com/doi/epub/10.1177/0033354919826563 ("incarceration is associated with worse health for all formerly incarcerated persons compared with never incarcerated persons").
[2] See, e.g., David Cloud, *On Life Support: Public Health in the Age of Mass Incarceration*, Vera Institute of Justice, 2014, 12 https://www.vera.org/publications/on-life-support (noting an example of the rapid spread of drug-resistant tuberculosis behind bars).
[3] See Daniel A. Gross, "'It Spreads Like Wildfire': The Coronavirus Comes to New York's Prisons," *The New Yorker*, March 24, 2020, https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons.
[4] Lauren-Brooke Eisen, "How Coronavirus Could Affect U.S. Jails and Prisons," *Brennan Center for Justice*, March 13, 2020, https://www.brennancenter.org/our-work/analysis-opinion/how-coronavirus-could-affect-us-jails-and-prisons.
[5] Memorandum from Attorney General William P. Barr to Director of the Federal Bureau of Prisons Michael Carvajal, April 3, 2020, Office of the Attorney General, 1, https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.
[6] The BOP ordered a 14-day lockdown on March 31, 2020. Federal Bureau of Prisons, "Bureau of Prisons COVID-19 Action Plan: Phase Five," March 31, 2020, https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf. As similar measures are

We therefore urge you to take two important steps. First, we ask that you expand the use of home confinement even further, as detailed below.

Second, the DOJ can encourage states to respond more proactively to this crisis. We therefore ask that you circulate a "Dear Colleague" letter among state criminal justice stakeholders — including governors, prosecutors, judges, correctional administrators, and public defenders — urging them to work together to adopt policies to limit the virus's impact. Those policies should include (1) releasing people from prison who do not pose a public safety threat, thus decreasing population density and viral transmission risk; and (2) improving health behind bars by making hygiene products and medical services broadly available. This guidance would underscore the federal government's commitment to zealously confronting a threat to the wellbeing of imprisoned people and those who work in correctional institutions nationwide.

We explain both proposals below. Thank you for your attention to this important matter.

## I.    The DOJ Should Continue Expanding the Use of Home Confinement.

First, we urge you to use your authority under the CARES Act to its maximum effect. Under ordinary circumstances, the BOP can transfer people to home confinement for "10 percent of the term of imprisonment," or six months — whichever is shorter.[7] The CARES Act provides for a significant expansion of this authority if the Attorney General concludes that "emergency conditions will materially affect the functioning of" the prison system.[8]

Your April 3rd memorandum makes that finding and broadens home confinement eligibility to include "all at-risk inmates," starting with those in facilities hit hardest by the virus.[9] But the memorandum recommends that transfer decisions continue to be "guided by" the factors listed in your March 26th memorandum.[10] Several criteria from that earlier memorandum could unnecessarily limit the reach of the newly expanded home confinement authority.[11] We therefore urge you to revisit and revise March 26th guidance as follows:[12]

---

implemented nationwide, at least one nonviolent protest has broken out in a state correctional facility, and "signs of stress" are emerging elsewhere. Keri Blakinger, "Coronavirus Restrictions Stoke Tensions in Lock-Ups Across U.S.," *The Marshall Project*, April 2, 2020, https://www.themarshallproject.org/2020/04/02/coronavirus-restrictions-stoke-tensions-in-lock-ups-across-u-s.

[7] 18 U.S.C. § 3624(c)(2).

[8] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(a)(2), (b)(2), 134 Stat. 281, 515-16 (2020).

[9] Barr April 3 memorandum, 2.

[10] Barr April 3 memorandum, 2. For the criteria themselves, see Memorandum from Attorney General William P. Barr to Director of the Federal Bureau of Prisons Michael Carvajal, March 26, 2020, Office of the Attorney General, 1-2, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda67142000.

[11] Defense attorneys have described at length other recommended changes to these criteria. Letter from David Patton et al. to Attorney General William P. Barr, April 1, 2020, https://www.fd.org/sites/default/files/covid19/other_resources/defender_letter_ag_barr_re_covid-19_4-1-20.pdf; Letter from David Patton et al. to Attorney General William P. Barr, March 19, 2020, https://sentencing.typepad.com/files/20200319--letter-to-ag-barr-et-al.-re-covid-19.pdf.

[12] Some have already noted, correctly, that leaving the March 26th guidance in place sends "mixed messages" to BOP administrators. Lisa Freeland et al., "We'll See Many More Covid-19 Deaths in Prison if Barr and Congress Don't Act Now," *Washington Post*, April 6, 2020, https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing-at-risk-offenders.

- First, your March 26th memorandum asks the BOP to prioritize transfers of imprisoned people who have a "minimum" risk of recidivating according to PATTERN, the risk and needs assessment tool created by the First Step Act.[13] However, people with a "minimum" score under PATTERN likely comprise a relatively small percentage of the prison population.[14] And as we have previously written, PATTERN is an imperfect system, one that relies on a broad definition of recidivism that may overstate the actual risk of reoffending, and may also perpetuate racial disparities.[15] Even if the BOP makes decisions "guided by" a person's PATTERN score, at-risk people should not be denied transfer based substantially on a "score" assigned to them by an unproven and arguably flawed tool that was not designed for this purpose.

- Relatedly, categorical, offense-based exclusions prevent administrators from making the individualized determinations called for when evaluating people for transfer to home confinement.

We also ask that you move quickly to address serious implementation issues in the newly expanded home confinement program. Reports from family members describe people having their transfers revoked at the last moment, and healthy people being quarantined in the same unit as those suspected of having COVID-19.[16]

Lastly, it is well established that recidivism drops sharply with age — and the BOP should bear this fact in mind when making release decisions about the more than 10,000 people in federal prison who are over the age of 61.[17] The BOP could consider establishing a presumption of transfer for people of advanced age who, for whatever reason, do not qualify for other programs (such as compassionate release).

---

[13] Barr March 26 memorandum, 2, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[14] In the general PATTERN model, 20 percent of people in a sample set used by the DOJ to evaluate the tool received a "minimum" score. Just 7 percent of Black men received a "minimum" score. Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Department of Justice, 2019, 58-62, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf.

[15] See Letter from Ames C. Grawert to David B. Muhlhausen, Ph.D., September 3, 2019, 2-5, https://www.brennancenter.org/our-work/research-reports/brennan-centers-public-comment-first-step-acts-risk-and-needs-assessment. The DOJ considered revising PATTERN to narrow its definition of recidivism, but ultimately declined to do so, citing a lack of "access to accurate and complete data for case dispositions." The DOJ also claims to have revised PATTERN to reduce racial disparities, but has yet to offer data to fully support that claim. Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System — Update*, U.S. Department of Justice, 2020, 8-11, 13-14, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

[16] Josh Gerstein, "U.S. Prisons' Virus-Related Release Policies Prompt Confusion," *Politico*, Apr. 10, 2020, https://www.politico.com/news/2020/04/10/us-prisons-virus-related-release-policies-prompt-confusion-178691.

[17] The U.S. Sentencing Commission found that "offenders over sixty years old at the time of release had a recidivism rate of 16.0 percent," sharply lower than the general population. *Recidivism Among Federal Offenders: A Comprehensive Overview*, U.S. Sentencing Commission, 2016, 5, 23 & n.56, https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview. For the number of vulnerable people behind bars, see Nathan James & Michael A. Foster, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release*, Congressional Research Service, Report. No. R46297, 2020, 4, https://crsreports.congress.gov/product/pdf/R/R46297.

## II.    The DOJ Should Encourage Criminal Justice Stakeholders to Safely Reduce their Prison Populations and Improve Hygiene Behind Bars.

Next, we ask that you circulate a "Dear Colleague" letter to key state policymakers, offering guidance and best practices on how to safely reduce state prison populations and improve prison hygiene. Recipients should include, but need not be limited to, governors, probation and parole officials, state chief judges, attorneys general, prosecuting attorneys, correctional administrators, and public defenders. Consistent with DOJ policy, this letter would be limited to offering "non-binding advice on technical issues" and express the DOJ's commitment to safeguarding the safety and civil rights of imprisoned people and those who work in correctional facilities.[18]

The health challenges faced by the BOP are not unique to federal prisons. Fortunately, several states have already risen to the occasion, taking steps that range from a temporary halt on prison commitments to early releases.[19] Drawing on these examples, your letter could encourage state decisionmakers to take the following steps:

**Expand compassionate release programs.**

Like the federal system, many states provide opportunities for people who are sick or older to be released from incarceration early.[20] The authority to grant such "compassionate release" varies widely by state. While some are lenient, others require people to meet a relatively narrow set of criteria.[21] We ask that you encourage state decisionmakers to, wherever possible, work together to cut through the "red tape" limiting compassionate release in their jurisdictions, and ensure that this relief is offered as broadly as possible under state law. Administrators should focus on releasing people who are especially vulnerable to COVID-19 due to their age or preexisting health conditions.

**Release people nearing the end of their sentence.**

Research indicates that many prison sentences are longer than necessary to achieve public safety goals.[22] Even under the best conditions, the final months or even years of imprisonment may not serve any legitimate deterrent or punitive purpose. With the outbreak of COVID-19,

---

[18] DOJ policy forbids issuing guidance documents that impose affirmative legal obligations or serve "as a substitute for rulemaking," but expressly permits the issuance of technical guidance such as the letter envisioned here. See Memorandum from Attorney General Jeff Sessions to All Components, November 16, 2017, Office of the Attorney General https://www.justice.gov/opa/press-release/file/1012271/download. Statutes reflecting the DOJ's mandate to safeguard the safety and civil rights of imprisoned people include, but are not limited to, the Civil Rights of Institutionalized Persons Act of 1980. See 42 U.S.C. § 1997a.

[19] See "Reducing Jail and Prison Populations During the Covid-19 Pandemic," Brennan Center for Justice, March 27, 2020, last modified April 1, 2020, https://www.brennancenter.org/our-work/research-reports/reducing-jail-and-prison-populations-during-covid-19-pandemic.

[20] For more on federal early release programs, see James & Foster, *Federal Prisoners and COVID-19*, 10-13.

[21] See Mary Price, *Compassionate Release in the States*, FAMM Foundation, 2018, 13, 17, https://famm.org/our-work/compassionate-release/everywhere-and-nowhere.

[22] See Lauren-Brooke Eisen et al, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Center for Justice, 2016, 8, 35-41, https://www.brennancenter.org/our-work/research-reports/how-many-americans-are-unnecessarily-incarcerated.

the diminishing marginal benefits of those final months of imprisonment must be contrasted with the increasing *risks* associated with prolonged incarceration. Every day behind bars means another day of elevated exposure to a potentially deadly disease.

Acknowledging that new calculus, we ask that you advise state policymakers to use every available policy tool to cut short prison sentences that are already nearing their end. Depending on state and local law, authorities may be able to accomplish this goal by expanding merit-time credits or accelerating parole hearings. Your letter should specifically encourage authorities to think creatively about their legislative and regulatory options. Cooperation across agencies may enable people to more aggressively confront this crisis.

**Work with prosecutors to delay prison commitments.**

We note that the DOJ recently changed its pretrial detention policy, encouraging federal prosecutors to "consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic," and "consider not seeking [pretrial] detention to the same degree we would under normal circumstances." This step will help people avoid the elevated infection risk associated with incarceration.[23] We urge you to recommend that states adopt similar guidelines.

Many people who have been convicted of crimes but not yet sentenced remain in the community or detained in a local jail. Depending on state law, correctional administrators may be able to suspend new prison commitments on their own authority, keeping these people out of the prison system for the duration of the pandemic.[24] But even if they lack the authority to take this step on their own, state prison administrators could work with judges, defense attorneys, and prosecutors to delay sentencing proceedings, effectively postponing rather than forfeiting the right to seek a prison sentence. State prosecutors could also be encouraged to agree to motions seeking release from jail pending sentencing, and work with judges to set appropriate release conditions for people receiving such relief.[25]

---

[23] Memorandum from Attorney General William P. Barr to All Heads of Departments and All United States Attorneys, April 6, 2020, Office of the Attorney General, 2 https://www.justice.gov/file/1266901/download.

[24] See Emmanuel Camarillo, "Illinois Prisons Halt Admissions from County Jails to Slow Spread of Coronavirus," *Chicago Sun-Times*, March 26, 2020, https://chicago.suntimes.com/2020/3/26/21196581/illinois-prisons-coronavirus-halt-admissions.

[25] See, e.g., N.Y. CRIM. PROC. L. § 530.45(1) (permitting judges to, upon application of the defendant, set less restrictive release conditions "before sentencing" in certain cases and for certain offenses); ME. STAT. tit. 15, § 1051(1) (permitting someone convicted of a crime to apply for bail "pending imposition of sentence").

**In cooperation with private vendors, waive commissary charges for hygiene products, waive fees for phone calls and other forms of communication, and suspend copays for medical services for the duration of the crisis.**

For many people behind bars, soap and hand sanitizers are unavailable, or are luxuries that they simply cannot afford, placing the entire prison system at greater risk of infection.[26] To address this problem, we recommend that you urge state correctional administrators to suspend all commissary charges related to soap and personal hygiene products for the duration of the pandemic. This policy change can reduce disease transmission at very little cost to states. Arizona, Minnesota, and Pennsylvania have already taken similar steps.[27] Your guidance should recommend that other states follow their example.

With in-person visitation canceled across the country, imprisoned people and their families face incredible stress, aggravated by uncertainty about safety and health behind bars and the difficulty of staying in touch with each other. We therefore ask that you also encourage states to, in cooperation with private vendors, completely suspend charges for mail, phone calls, and video communication for the duration of this crisis. Some vendors, such as JPay, have already begun offering specific services at reduced prices.[28] These are important first steps, but (in many cases) still leave cost barriers between families and their increasingly isolated loved ones behind bars. Thankfully, the BOP recently made video visitation and phone calls free to all people in its custody.[29] We ask that you encourage states to do the same.

Lastly, state prisons must provide free healthcare to imprisoned people throughout this crisis. Free medical care will encourage quick diagnosis and treatment and help halt the further spread of infection. Thankfully, according to one source, at least forty-seven states now provide free medical care to imprisoned people with COVID-19 symptoms.[30] We ask that you urge the remaining three states — Delaware, Hawaii, and Nevada — to follow their example.

Some of these recommendations should also be implemented in the federal system. We have heard that the BOP waived its prohibition on alcohol-based hand sanitizers, but others have reported commissary spending caps that interfere with purchasing hygiene products, limited

---

[26] Conor Friedersdorf, "Can't We at Least Give Prisoners Soap?," *The Atlantic*, April 1, 2020, https://www.theatlantic.com/ideas/archive/2020/04/make-soap-free-prisons/609202/; Eisen, "How Coronavirus Could Affect U.S. Jails and Prisons"; Keri Blakinger & Beth Schwartzapfel, "When Purell is Contraband, How Do You Contain Coronavirus?," *The Marshall Project*, March 6, 2020, https://www.themarshallproject.org/2020/03/06/when-purell-is-contraband-how-do-you-contain-coronavirus.
[27] See "Reducing Jail and Prison Populations During the Covid-19 Pandemic," Brennan Center for Justice, March 27, 2020, last modified April 13, 2020, https://www.brennancenter.org/our-work/research-reports/reducing-jail-and-prison-populations-during-covid-19-pandemic.
[28] See "CDCR, GTL, JPay Expand Communication Access," *California Department of Corrections and Rehabilitation*, last modified March 30, 2020, https://www.cdcr.ca.gov/covid19/cdcr-gtl-jpay-expand-communication-access; "PRESS RELEASE: Department of Corrections Negotiates Free Calls and Reduced Digital Costs for Incarcerated Population," *Washington Department of Corrections*, last modified March 20, 2020, https://www.doc.wa.gov/news/2020/03202020p.htm.
[29] Josh Hendel, "Federal Prisons Make Inmate Calling, Video Visits Free During Pandemic," *Politico*, April 14, 2020, https://www.politico.com/news/2020/04/14/federal-prisons-make-inmate-calling-free-186383.
[30] "Responses to the COVID-19 Pandemic," Prison Policy Initiative, last modified April 14, 2020, https://www.prisonpolicy.org/virus/virusresponse.html.

opportunities for cleaning living spaces during the lockdown, and poor access to cleaning and protective supplies for correctional officers and imprisoned people alike.[31] Such poor conditions will surely contribute to the spread of COVID-19.

\*     \*     \*     \*     \*

Over the past month, the Department of Justice has taken important steps to limit the impact of the novel coronavirus on the health and safety of those held in and working in our correctional system. We ask that you continue to adapt to these challenging circumstances and lead the nation's law enforcement agencies in developing their response.

Respectfully,

Brennan Center for Justice at NYU School of Law

Center for American Progress

#cut50

FAMM

FreedomWorks

Justice Action Network

National Association of Criminal Defense Lawyers

R Street Institute

---

[31] See Sadie Gurman et al., "Coronavirus Puts a Prison Under Siege," *Wall Street Journal*, April 6, 2020, https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030?mod=searchresults&page=1&pos=1.

**347-4**

**Exhibit D – Legal Information Services Associates, LLC, Newsletter to Federal Prisoners (April 20, 2020)**

# NEWSLETTER TO FEDERAL PRISONERS

This is a copy of the newsletter sent on April 20th to our 8,000 subscribers in the federal prison system.



**BOP Director Says, "We're Doing Pretty Good" Fighting COVID-19, But Reports Call Results "Tragic" – LISA Newsletter for April 20, 2020**

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, M.A., J.D.

Vol. 6, No. 16



**BOP COVID-19 Curve Not Flattening**

**Internal Memo Toughens CARES Act Home Confinement**

**Standards**

**Former Judges Urge 3rd Circuit to Back Off *Raia* Decision**



**BOP COVID-19 CURVE NOT FLATTENING**

The Federal Bureau of Prisons is now in "Phase 8" of its plan to curb the spread of COVID-19 among its 172,000 inmates housed in 122 institutions and among its 30,000 staff members. As Forbes magazine put it last Wednesday, "BOP's efforts thus far have included halting social and legal visits since the middle of March, screening of inmates, staff and contractors by taking their temperature to measure infection, mobilizing administrative staff to step into front line positions, increase rate of hiring new corrections officers and halting staff training. The results have been tragic."

As of Apr 19, there are 495 inmates (up 41% from last week) and 305 staff (up 61% from last week) ill with COVID-19 in 45 institutions (more than one-third of all BOP facilities). At least 22 inmates have died, the latest at FCI Terminal Island yesterday. Reportedly, a BOP case manager from USP Atlanta died last week in her home of COVID-19.

The federal government's COVID-19 strategy has been to "flatten the curve," to spread out the spike in coronavirus cases so as not to overwhelm hospital capacity and resources. But, as Forbes notes, no epidemiologists "ever envisioned the systemic failure that would expose 177,000 inmates housed in multiple institutional clusters, some numbering over 5,000 inmates, to a COVID-19 outbreak. These failures are resulting from a lack of a widespread testing protocol at institutions, the continued transfer of inmates between institutions, the introduction of new inmates who are either arrested or self-surrender and the thousands of staff and contractors that go in and out of these institutions."

The problem that has led to the continuing skyrocketing BOP COVID-19 cases is simple: the BOP has been unable or unwilling to test any inmates "except those who have died or are willing to risk fellow inmate retribution by revealing themselves to be symptomatic. Forbes reports that "more inmates are sick than the BOP is reporting and more inmates are not reporting that they are sick out of fear of being identified as sick."

This is probably so. As of Sunday night, FCI Elkton reports 50 inmates sick with COVID-19. But last Friday, the BOP admitted in federal court that it had 207 suspected inmate COVID-19 cases, but only had ever received 80 test kits. It has used 37, leaving only 43 on hand. It expects to receive an additional 25 kits a week for the next several weeks.

The Northwest Arkansas Democrat Gazette released emails last Monday in which Arkansas health officials discussed whether the BOP fully understood the "seriousness" of the coronavirus outbreak at the FCI Forrest City, and whether they were fully cooperating with the mitigation effort. The released emails show that shortly after the first positive COVID-19 case at the FCI was disclosed on Friday, April 3, the Arkansas Department of Health director for infectious diseases questioned the prison's efforts and expressed a desire for CDC backup.

The BOP has almost no ability to test. "We have very, very limited amounts of the testing kits," Brandy Moore, secretary treasurer of the national union that represents correctional officers in federal prisons,

was quoted as saying by Mother Jones magazine:

At FCC Terre Haute, "we have between 2,500 and 3,000 inmates, and we were given four tests," Steve Markle, another leader of the national union who works at the prison, told Mother Jones in late March. At FCI Oakdale, correctional officers were told to stop testing people and just assume that anyone with symptoms had been infected, according to Ronald Morris, president of the local union there.

All of this, Mother Jones reported, "is to say that statistics reported by the Federal Bureau of Prisons are likely massive undercounts. "Our numbers are not going to be adequate because we're not truly testing them," Moore said.

Meanwhile, in a filing in the EDNY last Monday, the BOP admitted that "'because of the shortage of tests, testing is currently reserved for those meeting' certain criteria, including the kind of symptoms the inmate is facing, his potential exposure, whether he is high risk and whether he works in a high-contact role such as food service." Through Thursday, April 16, the number of inmates tested at MCC New York and MDC Brooklyn has risen from 11 to 19. That is out of a combined population of over 2,300 inmates.

The ACLU has brought lawsuits against FCI Oakdale, FMC Devens, and FCI Elkton, seeking to compel release of more inmates because of the virus. "Devens — one of only seven federal prison medical centers — is a powder keg of potential infection and death from COVID-19, to an even greater degree than nursing homes, cruise ships, and other prisons, sites of some of the most intense clusters of mortality in Massachusetts, the United States, and elsewhere in the world," the plaintiffs' lawyers wrote in the Devens complaint.

Perhaps the most sobering report last week came from the Santa Barbara Independent, which reported that Efrem Stutson was released on April 1st and put on a bus to San Bernardino by USP Lompoc officials while he had a hacking cough and was so ill "he could hardly hold his head up." Efrem refused to go to the hospital that night, but the next morning his family insisted. Doctors diagnosed him with COVID-19 and put him in quarantine. No visitors were allowed. Four days later, Efrem died.

His sisters are furious, the Independent reported. "Why did they release him so sick?" one asked. "They sent him home on his deathbed."

A USP Lompoc spokesman said, "All inmates, prior to releasing from the BOP, will be screened by medical staff for COVID-19 symptoms. If symptomatic for COVID-19, the institution will notify the local health authorities in the location where the inmate is releasing, and transportation that will minimize exposure will be used, and inmates will be supplied a mask to wear."

"We're dealing with [COVID] just as well as anybody else," BOP Director Michael Carvajal told CNN a week ago, "and I'd be proud to say we're doing pretty good."

Forbes, *Federal Bureau of Prisons Institutions Not Showing Any Signs of "Flattening Curve"* (Apr 15)

Business Insider, *The Federal Bureau of Prisons has confirmed the first staff death linked to the coronavirus, report says* (Apr 18)

*Wilson v Williams*, Case No. 4:20cv794 (ND Ohio), Supplement to Respondents' Answer, Dkt 19, filed Apr. 18, 2020

New York Law Journal, *Brooklyn Federal Lockup Officials Describe 'Shortage of Tests' in Newly Filed Documents* (Apr 15)

CNN, *Exclusive: 'I don't think anybody was ready for this Covid,' says head of federal prisons* (Apr 10)

Northwest Arkansas Democrat-Gazette, *Emails detail talks on illnesses at federal prison* (Apr 15)

Mother Jones, *Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas* (Apr 15)

**Santa Barbara Independent, *Sisters Say Brother Sick with COVID-19 was Released from Lompoc Prison to Die* (Apr 15)**



**INTERNAL MEMO TOUGHENS CARES ACT HOME CONFINEMENT STANDARDS**

A recently-released prisoner complained to a TV station that FCI Butner was "slow-rolling" COVID-19 releases. A 76-year old federal prisoner told the Wall Street Journal that so far has been unable to convince officials to release him despite his age and history of respiratory problems. "It's like pushing a wet noodle up the hill with your nose," he said. An attorney representing the FCI Oakdale plaintiffs complained last Monday that only three prisoners have been given CARES Act releases. The Houston Chronicle said last Thursday that "as the coronavirus crisis raises concerns about mass infections at prisons and jails, few federal prisoners from southeast Texas have cleared the gauntlet for compassionate early release."

The BOP, on the other hand, says it has already sent more than 1,119 to home confinement as of last Wednesday. Most recently, the entire population of FCI Otisville camp (111 inmates) was sent to quarantine in preparation for release to home confinement.

But last Wednesday, the BOP issued internal guidance that restricts those who can go to home confinement well beyond what Attorney General Barr directed. In an affidavit filed in WD Louisiana, an FCI Oakdale Associate Warden reported that "on April 15, 2020 we received a memorandum from BOP's Correctional Programs Division, confirming the factors to be used when reviewing and referring inmates for home confinement… 1) Primary or prior offense is not violent; 2) Primary or prior offense is not a sex offense; 3) Primary or prior offense is not terrorism; 4) No detainer; 5) Mental Health Care Level is less than IV; 6) PATTERN… score is Minimum; 7) No Incident Reports in the past 12 months; 8) US Citizen; and 9) have a viable release plan."

The BOP criteria are more restrictive than what Barr specified in his Mar 26 and Apr 3 memos. Barr made violence, sex or terrorism disqualifying only if it was the offense of conviction, the crime for which the inmate is now serving time. Plus, Barr did not outright disqualify for an incident report in the past year, or a PATTERN score above minimum. Rather, his memo merely said that such factors "would not [be] receiving priority treatment," implying that they would be weighed against other factors.

The changes make home confinement for anyone other than a camper problematical. At FCI Elkton, only six inmates have been approved for home confinement, while 32 have been denied. At Oakdale, of 68 elderly inmates, 75% are ineligible. Only six of the remaining inmates have gone to home confinement.

WRAL-TV, Raleigh, NC, *Former inmate says Butner officials 'slow-rolling' prisoner releases during pandemic* (Apr 14)

WCTI-TV, New Bern, NC, *Ex-Trump lawyer Michael Cohen to serve out prison sentence at home* (Apr 17)

Houston Chronicle, *'Crammed in' and terminally ill: Prison officials drag their feet as vulnerable inmates seek release* (Apr 17)

*Livas v Myers*, Case No. 20cv422 (WDLa), Declaration of Juan Segovia, filed Apr 16, 2020, Dkt 14-1



**FORMER JUDGES URGE 3RD CIRCUIT TO BACK OFF *RAIA* DECISION**

Two weeks ago, the 3rd Circuit denied a compassionate release motion it clearly lacked the power to grant, but then went on to decide an issue that no one had raised, holding that the defendant had to exhaust remedies with the BOP first.

The defendant has petitioned for rehearing, and five former federal judges from 3rd Circuit courts have filed in support. In their brief, the judges argued that a court of appeals should not "issue a precedential opinion on a far-reaching and debatable issue of first impression, affecting numerous non-party

Case 1:17-cr-00034-JRH-BKE    Document 34-4    Filed 04/22/20    Page 6 of 6

USCA11 Case: 20-11692     Document: 23-2     Date Filed: 06/22/2020     Page: 158 of 170

individuals in a wide range of circumstances – some of which are literally matters of life-or-death -that had not been addressed by the district court and was not briefed in the court of appeals by the parties." They contend that the Raia panel "effectively decided a question that has divided courts across the country without acknowledging those authorities holding that the exhaustion requirement is subject to exceptions in the very circumstances presented here and without affording the parties the opportunity to argue why exhaustion should not be required under the FSA."

They ask the Court to withdraw the exhaustion holding in the opinion, a holding already bedeviling compassionate relief filers across the country.

*US v Raia*, 3rd Cir Case No. 20-1033, Brief of Amici Curiae Former Members of the Judiciary in Support of... Rehearing (filed Apr 14, 2020)



LISA is not a female. In fact, she is not even a person. LISA is Legal Information Services Associates, LLC. If you want a brochure describing LISA's other services, send us an email request. We'll mail you one right away. If you want copies of any of the cases or documents we cover, send us or have your family send us $24.00. We take MasterCard, VISA, Discover, Amex, checks or Paypal. We'll mail the document the same day.

For privacy, we normally omit inmates' real names from our reports if they are still locked up.

Your family may read our newsletter online at www.lisa-legalinfo.com. If you want to receive the newsletter, send a Corrlinks invitation to newsletter@lisa-legalinfo.com.

If you have a question, please send us a fresh email to newsletter@lisa-legalinfo.com. PLEASE DO NOT HIT "REPLY" TO THIS NEWSLETTER. BECAUSE WE HAVE NO ROOM IN THE EMAIL TO RESPOND, WE CANNOT ANSWER THOSE.



**349**

**Order**

U.S. DISTRICT COURT
AUGUSTA DIV.

20 APR 24 AM 11: 57

CLERK
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

UNITED STATES OF AMERICA       *
                               *
        v.                     *       CR 117-034
                               *
REALITY WINNER                 *

---

**O R D E R**

---

Defendant Reality Winner seeks relief under the "compassionate release" provision of 18 U.S.C. § 3582(c)(1)(A). The government opposes the motion. Upon due consideration, the Court denies Winner's request for relief.

Winner pled guilty to a violation of 18 U.S.C. § 793(c), willful retention and transmission of national defense information, on June 26, 2018. While Winner faced a statutory maximum of ten years, and an advisory sentencing guideline range of 87 to 108 months, the Court accepted the parties' Rule 11(c)(1)(C) plea agreement, in which the parties agreed to a sentence of 63 months. Winner is currently incarcerated at FMC Carswell, a federal medical prison for women in Fort Worth, Texas. Her expected release date is November 23, 2021.

The compassionate release provision of § 3582(c)(1)(A) provides a narrow path for a defendant in "extraordinary and compelling circumstances" to leave prison early. Prior to the passage of the First Step Act, only the Director of the Bureau of Prisons ("BOP") could file a motion for compassionate release in the district court. The First Step Act modified 18 U.S.C. § 3582(c)(1)(A) to allow *a defendant* to move a federal district court for compassionate release, but only "after [she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." In this case, Winner states that she submitted a written request to the Warden of FMC Carswell on April 8, 2020, but she filed the instant motion only two days later. Because she has not given the Warden and the BOP an opportunity to review her petition for release, the present motion before the Court is simply premature.

Despite Winner's contentions to the contrary, neither the statute nor case law creates any special exception to the mandatory language that the BOP essentially must be given at least thirty days to consider any request for compassionate release. See Ross v. Blake, --- U.S. ---, 136 S. Ct. 1850, 1856 (2016) (finding that courts cannot ignore the mandatory language of the Prison Litigation Reform Act's exhaustion statute even to accommodate

2

special circumstances). This waiting period is appropriate because the BOP is better positioned to assess an individual inmate's present circumstances. In the context of the COVID-19 pandemic, where the BOP has implemented policies and proactive measures to protect the health and safety of its prisons' populations,[1] and where the Attorney General has directed the BOP to "immediately maximize appropriate transfers to home confinement . . . where COVID-19 is materially affecting operations,"[2] the expertise and informed assessment of the BOP should not be heedlessly omitted from the process. Accord United States v. Raia, Case No. 20-1033 (3d Cir. Jan. 3, 2020), Am. Opinion of Apr. 8, 2020, Doc. 25, at 8 (stating that "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added – and critical - importance" in connection with the COVID-19 pandemic).

---

[1]   (See generally Gov't Response in Opp'n to Def.'s Mot. for Compassionate Release, Doc. 345, at 6-10 and sources cited therein.)

[2]   Memorandum from the Attorney General to the Director of Bureau of Prisons, dated Apr. 3, 2020, *available at* https://www.justice.gov/file/126661/download (last visited Apr. 23, 2020). See also Memorandum from the Attorney General to the Director of Bureau of Prisons, dated Mar. 26, 2020, *available at* https://www.justice.gov/file/1262731/download (last visited Apr. 23, 2020) ("I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.).

Upon due consideration of the foregoing, Defendant's motion for compassionate release is premature and must be denied.

That said, the Court will comment on the merits of Winner's bid for compassionate release. A district court may reduce a term of imprisonment, upon consideration of the factors set forth in 18 U.S.C. § 3553(a), if it finds that "extraordinary and compelling reasons warrant such a reduction" and that such reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress did not define what constitutes "extraordinary and compelling circumstances" other than to express that "[r]ehabilitation of the defendant alone" is insufficient. See 28 U.S.C. § 994(t). Rather, Congress instructed the Sentencing Commission to promulgate the "criteria to be applied and a list of specific examples" of extraordinary and compelling reasons. Id.

The existing policy statement of the Sentencing Commission, adopted before passage of the First Step Act, provides that in addition to the existence of extraordinary and compelling reasons, the defendant must not present a danger to the safety of any other person or the community. U.S.S.G. § 1B1.13. The application notes to this policy statement list three specific examples of extraordinary and compelling reasons to consider reduction of a defendant's sentence under § 3582(c)(1)(A): (1) medical condition; (2) advanced age; and (3) family circumstances. Id. n.1(A)-(C).

4

Winner essentially concedes that she does meet the criteria for any of these categories since she resorts to the catch-all category of application note 1(D).  This fourth category provides: "**As determined by the Director of the Bureau of Prisons**, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the aforementioned three categories.  Id. n.1(D) (emphasis added).  Despite the emphasized language, Winner insists that after the passage of the First Step Act, the Court may now determine whether an extraordinary or compelling reason for reduction in sentence exists independent of the BOP's assessment.  The Court disagrees.

Winner's contention in this regard is not without support. Some courts have determined that the First Step Act signaled an intent from Congress that district courts may now consider whether extraordinary and compelling reasons for compassionate release exist other than those delineated in U.S.S.G. § 1B1.13 n.1.  See United States v. Brown, --- F. Supp. 3d ---, 2019 WL 4942051, *4 (S.D. Iowa Oct. 8, 2019) (holding that the district court now assumes the same discretion as the BOP Director when it considers a compassionate release motion); United States v. Fox, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); United States v. Beck, 2019 WL 2716505 (M.D.N.C. June 28, 2019); United States v. Cantu, 2019 WL

2498923 (S.D. Tex. June 17, 2019).  These courts have held that the policy statement of U.S.S.G. § 1B1.13 is simply outdated because it assumes that compassionate release may only be granted upon motion by the Director of the BOP.  See, e.g., Beck, 2019 WL 2716505, at *5 ("There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act.").

These cases, however, rest upon a faulty premise that the First Step Act somehow rendered the Sentencing Commission's policy statement an inappropriate expression of policy.  This interpretation, and it appears to be an interpretation gleaned primarily from the salutary purpose expressed in the title of Section 603(b) of the First Step Act,[3] contravenes express Congressional intent that the Sentencing Commission, not the judiciary, must determine what constitutes an appropriate use of the "compassionate release" provision.  See 28 U.S.C. § 944(t). Indeed, § 3582(c)(1)(A) as amended by the First Step Act *still* requires courts to abide by "applicable policy statements issued by the Sentencing Commission."  See 18 U.S.C. § 3582(c)(1)(A). Accordingly, this Court will follow the policy statement in U.S.S.G. § 1B1.13 and deny Winner's motion because she does not meet the specific examples of extraordinary and compelling reasons

---

[3]  Section 603(b) of the First Step Act is titled "Increasing the Use and Transparency of Compassionate Release."

and the Director of the BOP has not determined that circumstances outside of these examples exist to grant her relief. Accord, e.g., United States v. Lynn, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 12, 2019) ("If the policy statement needs tweaking in light of Section 603(b) [of the First Step Act], that tweaking must be accomplished by the [Sentencing] Commission, not by the courts."); United States v. Johns, 2019 WL 2646663 (D. Ariz. June 28, 2019); United States v. Gross, 2019 WL 2437463 (E.D. Wash. June 11, 2019); United States v. Heromin, 2019 WL 2411311 (M.D. Fla. June 7, 2019); United States v. Willis, 2019 WL 2403192 (D.N.M. June 7, 2019); United States v. Shields, 2019 WL 2359231 (N.D. Calif. June 4, 2019) (stating that there is no "authority for the proposition that the Court may disregard guidance provided by the Sentencing Commission where it appears that such guidance has not kept pace with statutory amendments").

Finally, even if the Court were to conclude that the First Step Act gave it discretion to consider what constitutes extraordinary and compelling circumstances outside of the Sentencing Commission's policy statement, Winner would not be afforded the relief she seeks. Winner has not carried the burden of demonstrating that her specific medical conditions under the particular conditions of confinement at FMC Carswell place her at

a risk substantial enough to justify early release.[4]  In fact, the Court is constrained to observe that Winner is in a medical prison, which is presumably better equipped than most to deal with any onset of COVID-19 in its inmates.  See United States v. Clark, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (noting that compassionate release movant failed to provide evidence that "the BOP's plan to address the [COVID-19] pandemic will not adequately protect inmates"); United States v. Gileno, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (noting that compassionate release movant failed to show that "the plan proposed by the [BOP] is inadequate to manage the pandemic within [movant's] correctional facility, or that the facility is specifically unable to adequately treat [movant]").  In short, even if the Court had discretion in this matter, Winner has not demonstrated an extraordinary and compelling reason to reduce her sentence.

Upon the foregoing, Defendant Reality Winner's motion for compassionate release (doc. 341) is **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 24th day of April, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[4]  The Court would be remiss not to point out Winner's incongruous complaint that she is at greater risk because of the preventative measures undertaken by the prison in response to COVID-19.

# 350

# Notice of Appeal

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | | |

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that Defendant Reality Leigh Winner in the above-named case, pursuant to 28 U.S.C. § 1291, hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the Order of April 24, 2020 (ECF No. 349) denying Defendant's Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A).

Respectfully submitted,

BY:   <u>*/s/ Joe D. Whitley*</u>
Joe D. Whitley (Ga. Bar No. 756150)
Admitted *Pro Hac Vice*
Brett A. Switzer (Ga. Bar No. 554141)
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd., NE Suite 1600
Atlanta, GA  30326
(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com


**ATTORNEYS FOR DEFENDANT**
**REALITY LEIGH WINNER**


**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/ Joe D. Whitley*
Joe D. Whitley


2